Kathryn E. Cahoy (Bar No. 298777)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
(650) 632-4735
kcahoy@cov.com

Matthew Q. Verdin (Bar No. 306713)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-7065
mverdin@cov.com

[Additional counsel listed on signature page]

*Attorneys for Defendant Capital One Financial
Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GARY INGRAHAM, and DEIA WILLIAMS, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CAPITAL ONE FINANCIAL CORPORATION, d/b/a CAPITAL ONE, d/b/a CAPITAL ONE, NATIONAL ASSOCIATION, d/b/a CAPITAL ONE, N.A., d/b/a CAPITAL ONE SHOPPING,<br><br>Defendant. | Case No. 3:24-cv-05985-TLT<br><br>**CAPITAL ONE'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) AND 12(h)(3)**<br><br>Judge: Hon. Trina L. Thompson<br>Date: June 30, 2026<br>Time: 2:00 p.m.<br>Ctrm: 9, 19th Floor<br><br>**PUBLIC REDACTED** |

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION TO DISMISS ................................................. 1

MEMORANDUM IN SUPPORT ................................................. 1

I.     INTRODUCTION ................................................. 1

II.    BACKGROUND ................................................. 3

    A.    Capital One's Website-Based Card Application and Plaintiffs' Lawsuit Based on Purported Transmissions by a Wide Swath of Technologies on the Website. .. 3

    B.    Discovery Reveals Narrow Scope of Transmissions for Limited Purposes. .......... 4

    C.    Capital One's Disclosures to Plaintiffs Regarding Website Technologies............. 9

    D.    Plaintiffs' Options to Opt-Out of Targeted Advertising. .................................... 11

III.   LEGAL STANDARD ................................................. 12

IV.    ARGUMENT ................................................. 13

    A.    Plaintiffs Lack Article III Standing to Challenge Technologies That Did Not Transmit Any Information About Them. ................................................. 14

    B.    Transmissions for ██████████████████ Do Not Give Rise to Standing... 15

        1.    ██████████████████████ Cannot Establish a Concrete Privacy Injury................................................. 16

        2.    Google Ads Data Hub Server-to-Server Transmissions Fall Outside the Scope of the Complaint and Cannot Establish a Concrete Privacy Injury. ................................................. 19

    C.    The ██████████████ for ████████ ████ Does Not Give Rise to Standing. ................................................. 21

    D.    Plaintiffs Did Not Act Consistently with an Expectation of Privacy in the Transmissions at Issue. ................................................. 22

    E.    Plaintiffs Lack Article III Standing to Seek Injunctive and Declaratory Relief... 25

V.     CONCLUSION ................................................. 25

CAPITAL ONE'S MOTION TO DISMISS PURSUANT TO FED R. CIV. P. 12(b)(1) AND FED R. CIV. P. 12(h)(3)
Case No. 3:24-cv-05985-TLT

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abdulaziz v. Twitter, Inc.*,
2020 WL 6947929 (N.D. Cal. Aug. 12, 2020) ..........................................................................18

*Bargetto v. Walgreen Co.*,
2024 WL 3493260 (N.D. Cal. June 14, 2024) ..........................................................................12

*Benson v. JPMorgan Chase Bank, N.A.*,
673 F.3d 1207 (9th Cir. 2012) .................................................................................................13

*Byars v. Sterling Jewelers, Inc.*,
2023 WL 2996686 (C.D. Cal. Apr. 5, 2023) ............................................................................14

*Cahen v. Toyota Motor Corp.*,
717 F. App'x 720 (9th Cir. 2017) .............................................................................................16

*City of L.A. v. Lyons*,
461 U.S. 95 (1983).....................................................................................................................25

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000)...................................................................................................................15

*In re Google Inc. Gmail Litig.*,
2014 WL 1102660 (N.D. Cal. Mar. 18, 2014)..........................................................................23

*Griffith v. TikTok, Inc.*,
2024 WL 4308813 (C.D. Cal. Sept. 9, 2024) ...........................................................................16

*Hammerling v. Google, LLC*,
2024 WL 937247 (9th Cir. Mar. 5, 2024)...........................................................................13, 24

*Hart v. TWC Prod. & Tech. LLC*,
2023 WL 3568078 (N.D. Cal. Mar. 30, 2023)....................................................................22, 25

*Hill v. Nat'l Collegiate Athletic Assn.*,
7 Cal. 4th 1 (1994) ....................................................................................................................22

*Hubbard v. Google LLC*,
2024 WL 3302066 (N.D. Cal. July 1, 2024).......................................................................17, 22

*In re iPhone Application Litig.*,
2011 WL 4403963 (N.D. Cal. Sept. 20, 2011) .........................................................................18

*Ji v. Naver Corp.*,
2022 WL 4624898 (N.D. Cal. Sept. 30, 2022) ...................................................................18, 20

*Khamooshi v. Politico LLC*,
786 F. Supp. 3d 1174 (N.D. Cal. 2025) ...................................................................................18

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
624 F.3d 1083 (9th Cir. 2010) ...............................................................................................19

*Lakes v. Ubisoft, Inc.*,
777 F. Supp. 3d 1047 (N.D. Cal. 2025) .................................................................................23

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014) ...............................................................................................13

*Lewis v. Casey*,
518 U.S. 343 (1996).................................................................................................................15

*Lloyd v. Facebook, Inc.*,
2024 WL 3325389 (9th Cir. July 8, 2024).........................................................................13, 24

*Martinez v. Newsom*,
46 F.4th 965 (9th Cir. 2022) ..................................................................................................15

*Mikulsky v. Bloomingdale's, LLC*,
713 F. Supp. 3d 833 (S.D. Cal. 2024)................................................................................15, 25

*Mikulsky v. Noom, Inc.*,
2024 WL 251171 (S.D. Cal. Jan. 22, 2024).............................................................................16

*NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*,
926 F.3d 528 (9th Cir. 2019) ..................................................................................................15

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016)....................................................................................................17

*Phillips v. U.S. Customs & Border Prot.*,
74 F.4th 986 (9th Cir. 2023) ..............................................................................................19, 20

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) ......................................................................................... *passim*

*Raines v. Byrd*,
521 U.S. 811 (1997)................................................................................................................19

*Rodriguez v. Autotrader.com, Inc.*,
2025 WL 1122387 (C.D. Cal. Mar. 14, 2025)...................................................................21, 25

*San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*,
65 F.4th 1012 (9th Cir. 2023) .................................................................................................12

*Sanchez v. Los Angeles Dep't of Transp.*,
39 F.4th 548 (9th Cir. 2022) ..................................................................................................22

iii

*Skaff v. Meridien N. Am. Beverly Hills, LLC,*
  506 F.3d 832 (9th Cir. 2007) ..................................................................................15

*Slayman v. FedEx Ground Package Sys., Inc.,*
  765 F.3d 1033 (9th Cir. 2014) ................................................................................12

*Smidga v. Spirit Airlines, Inc.,*
  2024 WL 1485853 (W.D. Pa. Apr. 5, 2024)............................................................14

*Smith v. Maryland,*
  442 U.S. 735 (1979)................................................................................................20

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016)..............................................................................12, 13, 14, 18

*Staley v. Gilead Scis., Inc.,*
  2020 WL 5507555 (N.D. Cal. July 29, 2020)..........................................................13

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021)....................................................................................13, 14, 25

*Williams v. DDR Media, LLC,*
  2023 WL 5352896 (N.D. Cal. Aug. 18, 2023) ...................................................18, 19

*Winsor v. Sequoia Benefits & Ins. Servs.,*
  LLC, 62 F.4th 517 (9th Cir. 2023)...........................................................................14

*Wood v. City of San Diego,*
  678 F.3d 1075 (9th Cir. 2012) ................................................................................12

*Wooten v. BioLife Plasma Servs. L.P.,*
  807 F. Supp. 3d 1139 (E.D. Cal. Oct. 22, 2025)......................................................18

*Wright v. Serv. Emps. Int'l Union Loc. 503,*
  48 F.4th 1112 (9th Cir. 2022) .................................................................................25

*Yamada v. Snipes,*
  786 F.3d 1182 (9th Cir. 2015) ................................................................................15

**Statutes**

Cal. Civ. Code § 1798.120................................................................................................12

Cal. Civ. Code § 1798.140...........................................................................................12, 17

**Other Authorities**

Fed. R. Civ. P. 12(b)(1)................................................................................................1, 12

Fed. R. Civ. P. 12(h)(3)................................................................................................1, 12

CAPITAL ONE'S MOTION TO DISMISS PURSUANT TO FED R. CIV. P. 12(b)(1) AND FED R. CIV. P. 12(h)(3)
Case No. 3:24-cv-05985-TLT

Ads Data Hub for Marketers,
    https://bit.ly/4qD9pg6 .................................................................................................7

Cal. Dep't of Justice, Office of the Attorney General, Press Release,
    https://bit.ly/4b3FSI0 ...............................................................................................12

Capital One Financial Corp., *2024 Annual Report* (2025),
    https://bit.ly/4aafR9y .................................................................................................3

Clickstream, PlainSignal,
    https://bit.ly/4aE2gXa .................................................................................................6

DAA*, Consumer Assistance: WebChoices, AppChoices and YourAdChoices —
    Frequently Asked Questions*, https://youradchoices.com/choices-faq#jr03 ...........................11

DAA, *Participating Companies*,
    https://digitaladvertisingalliance.org/participating ....................................................11

Get Started with the Meta Pixel, Meta for Developers,
    https://developers.facebook.com/docs/meta-pixel/get-started....................................................7

**NOTICE OF MOTION AND MOTION TO DISMISS**

PLEASE TAKE NOTICE that on June 30, 2026,[1] at 2:00 p.m., in the courtroom of the Honorable Trina L. Thompson, located at 450 Golden Gate Avenue, Courtroom 9, 19th Floor, San Francisco, California 94102, Defendant Capital One Financial Corporation ("Capital One") will and hereby does move to dismiss Plaintiffs' Complaint (ECF 1) pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3).

**STATEMENT OF RELIEF SOUGHT**

Capital One seeks an order dismissing Plaintiffs' Complaint for lack of Article III standing.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Like most companies, Capital One works with business partners to improve the services it offers through its website, including online preapproval and credit card applications. Those partners help Capital One with routine functions such as website analytics (*i.e.*, to debug and optimize Capital One's website), marketing analytics (*i.e.*, to measure the effectiveness of Capital One's advertisements), and advertising. Capital One discloses these practices to customers, including through its Privacy Policy and California-specific disclosures.

Plaintiffs Gary Ingraham and Deia Williams are two such California customers who applied for Capital One credit cards. Although both testified that they read Capital One's Privacy Policy and California-specific disclosures multiple times, they nonetheless filed this action based on the theory that Capital One, without their consent, shared information about their applications with third parties using nearly a dozen website technologies—Google, Microsoft, DoubleClick, New Relic, Adobe, Everest, Skai/Kenshoo, Snowplow, BioCatch, Tealium, and Facebook/Meta Pixel. According to the Complaint, the "only purpose" for these transmissions was "to be used for [] Third Party and fourth parties' marketing and sales purposes," which allegedly caused Plaintiffs to experience an "injury-in-fact." Compl. ¶¶ 47, 220.

---

[1] Capital One believes judicial efficiency would be served if this motion was heard on the same day as Plaintiffs' motion for class certification. That motion for class certification is currently noticed for April 28, 2026, but that hearing date was closed when Capital One filed this motion.

1

After more than a year of litigation and full discovery, including from third parties Meta and Google, the evidence tells a very different story. Plaintiffs submitted ███ applications for credit cards before filing the Complaint. With one exception, Plaintiffs have no evidence that any of the technologies mentioned in the Complaint transmitted any data tied to their applications. The lone exception is data collected via ███████, but that data is ███████████████████ ████████████████ "marketing and sales purposes."

Plaintiffs then pivoted to a new theory based on "server-to-server" technologies. That theory was not alleged in the complaint, *see* ECF 213 at 1-2, but in any event, that new focus did not uncover any transmissions for advertising before this suit was filed. Instead, discovery uncovered only ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████. And the ████████████████████████████████████████ ███████████████ No corresponding transmission occurred for Mr. Ingraham.

The fundamental mismatch between Plaintiffs' advertising-driven theory of injury and the ███ ████████████████████████████████████████████████ ██████████████—is fatal to Article III standing. Under Ninth Circuit precedent, Plaintiffs cannot satisfy Article III's injury-in-fact requirement simply based on data transmitted to a third party. *See Popa v. Microsoft Corp.*, 153 F.4th 784, 790-91 (9th Cir. 2025). In *Popa* the Ninth Circuit held that the use of website analytics technology to collect "over 30 different categories" of data about a plaintiff's "entire visit to the website" did not establish a concrete privacy injury. *Id.* at 786-787. As the Ninth Circuit reasoned, none of the data transmissions were "remotely similar to the 'highly offensive' interferences or disclosures that were actionable at common law," as required to establish a concrete injury-in-fact. *Id.* at 791. After over a year of litigation, Plaintiffs have produced no evidence satisfying this standard. As this Court has already held in this case, the transmissions of the kind Plaintiffs alleged in the Complaint are not "highly offensive as a matter of public policy." ECF 59 at 11. The far more limited transmissions that actually occurred do not meet this standard either.

For several reasons, this Court should dismiss the Complaint for lack of Article III standing.

*First,* for nearly all of the technologies alleged in the Complaint, Plaintiffs have no evidence that *their* data were transmitted. Black letter law requires Plaintiffs to establish an injury-in-fact that actually exists at the time of the Complaint; they do not have standing to press claims based on technologies that did not impact them at all, or that transmitted their data only after they filed this lawsuit.

*Second,* for the limited transmissions that did occur, Plaintiffs cannot show an injury remotely similar to a highly offensive disclosure, as required to establish a concrete privacy injury. Some (but not all) of their applications ██████████████████████████████████████ ████████████████████, not Plaintiffs' names or contact information. And they were used only for ████████████████████████. Similarly, information on ████████████████████████ ████████████████████. Courts have repeatedly held that this routine commercial behavior is not highly offensive conduct and therefore cannot establish a concrete privacy injury.

*Third,* Plaintiffs independently lack standing because they acted inconsistently with any actual expectation of privacy in the data that were transmitted. Plaintiffs testified that they read Capital One's Privacy Policy and California-specific disclosures multiple times, all of which provided notice of the challenged data practices before they proceeded to submit applications.

*Finally,* Plaintiffs lack standing to seek declaratory or injunctive relief because they cannot show that the alleged wrong is likely to recur now that they are on notice of the challenged data practices. For all of these reasons, Plaintiffs lack Article III standing.

## BACKGROUND

**A.      Capital One's Website-Based Card Application and Plaintiffs' Lawsuit Based on Purported Transmissions by a Wide Swath of Technologies on the Website.**

Capital One seeks to "bring[] better deals to consumers and democratiz[e] access to credit cards" through "data, analytics, scientific testing and statistical modeling to bring the right product at the right price to the right customer at the right time." Capital One Financial Corp., *2024 Annual Report* (2025), at 3, https://bit.ly/4aafR9y (last visited Mar. 6, 2026). To help accomplish that mission, Capital One uses website technologies to support its preapproval and credit card application processes on the Capital One website (the "Webpages"). These technologies fall into three categories—website analytics, marketing

analytics, and advertising—and their use is subject to contractual and technical restrictions on how data may be collected, used, and disclosed.

Plaintiffs filed this lawsuit challenging just one of these practices—the sharing of information for advertising purposes. They claimed they applied for credit cards on the Capital One website and experienced an "injury-in-fact" based on alleged data transmissions whose "only purpose" was "to be used for the Third Party and fourth parties' marketing and sales purposes." Compl. ¶¶ 47, 220. The Court rejected many of the claims at the pleading stage but allowed five claims to proceed, crediting Plaintiffs' allegations that data transmissions were used "for third and fourth parties' marketing and sales." ECF 59 at 2. The five claims included negligence, violation of the Electronic Communications Privacy Act ("ECPA"), violation of the California Invasion of Privacy Act ("CIPA"), violation of the California Consumer Privacy Act ("CCPA"), and unjust enrichment. *See id.* at 25. Plaintiffs seek damages, statutory damages, and declaratory and injunctive relief. *See, e.g.*, Compl. ¶¶ 297-98, 329–36.

The Complaint based Plaintiffs' claims on purported "online tracking technologies" installed on Capital One's website, ECF 59 at 1, provided by "Google, Microsoft, DoubleClick, New Relic, Adobe, Everest, Skai/Kenshoo, Snowplow, Biocatch, Tealium, and Facebook/Meta Pixel." *Id.* at 2. In their class certification motion, without seeking to amend the Complaint, Plaintiffs broadened their theory to include server-to-server technologies not installed on the website, including Meta Conversions API, Skai SFTP, and Google Ads Data Hub and its User Provided Data Match feature. ECF 187-1 at 1.

**B.    Discovery Reveals Narrow Scope of Transmissions for Limited Purposes.**

Discovery now has closed, and the record differs markedly from Plaintiffs' allegations. Plaintiffs collectively submitted ▮ Capital One credit card applications. *See* ECF 215-2 ("Soukup Decl.") Exs. 16-24; ECF 215-44 ("Trowbridge Decl.") ¶ 15. ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ (*see* Trowbridge Decl. ¶ 15 & Fig. 2) so cannot support Article III standing (*infra* at 15). The remaining applications are as follows:

- **Ms. Williams** ▮▮▮▮▮▮





- ███████████
- ██ Mr. Ingraham ███████████
██ ████████████
██ ████████████
██ ████████████
█ ████████████

Discovery revealed only a ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Moreover, the purposes and scope of those transmissions are much narrower than Plaintiffs alleged.

*Microsoft, New Relic, Everest, Snowplow, BioCatch, Tealium, Skai/Kenshoo (Skai SFTP), Meta Conversions API, Google Analytics, Google Marketing Tags*. These technologies differ in whether they were present on Capital One's website before Plaintiffs filed their Complaint, what data they may have collected, and for what purposes. *See* ECF 215-31 ("Ager Decl.") ¶¶ 46-67 (Skai SFTP); ECF 215-38 ("Morawetz Decl.") ¶¶ 4-28 (Meta Conversions API); Trowbridge Decl. ¶¶ 28-37 (Google Analytics, Google Marketing tags). But they all have one thing in common: to the extent Plaintiffs are still pursuing a claim based on these technologies,[2] Plaintiffs have no evidence *their* data were transmitted through any of these technologies before they filed this lawsuit.

*Adobe Analytics (Website Analytics Only).* Capital One uses Adobe Analytics for "purely internal uses" to understand how customers interact with the Capital One website; it does "not use Adobe Analytics for marketing." *See* Trowbridge Decl. ¶ 7; ECF 215-8 ("Trowbridge Ind. Tr.") 161:19-20; *id.* 238:4-6. Adobe Analytics is a browser-based tool that ████████████████████████████████████████████████████████████████████████████. Trowbridge Ind. Tr. 141:15-142:4; 150:16-20; 167:22-168:5; ECF 215-9 ("Trowbridge 30(b)(6) Tr.") 71:11-23; ECF 215-11 ("Willingham Tr.") 18:15-24. The data do *not* include user-entered form-field information, such as name, date of birth, social

---

[2] Plaintiffs appear to have abandoned any claim based on the collection or transmission of information via technologies from Microsoft, New Relic, Everest, Snowplow, BioCatch, and Tealium, as they did not include these in any of their proposed class definitions. *See* ECF 187-1 at 1.

CAPITAL ONE'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) AND FED. R. CIV. P. 12(h)(3)
Case No. 3:24-cv-05985-TLT

security number, or address. Trowbridge Decl. ¶ 10 & Fig. 1 (listing data fields that may be collected). And the data are associated not with any individual's name ██████████████████████ ████████████████████████████████ *Id.*

Adobe Analytics provides dashboards and reports that Capital One can use to analyze this data at an aggregate level to "optimize user experiences, refine content strategies, and support advanced use cases like personalization and predictive modeling." Clickstream, PlainSignal, https://bit.ly/4aE2gXa (last visited Mar. 6, 2026); *see also* Willingham Tr. 18:15-24; Trowbridge 30(b)(6) Tr. 71:11-23. The data collected █████████████████████████████████ ████████████████████████████████████ ██████████████████ ECF 215-49 ("Wing Decl.") Ex. N at 11-12.

Adobe Analytics transmissions occurred relating to the ██ applications Ms. Williams submitted and ██ Mr. Ingraham's (█████████████). Trowbridge Decl. ¶¶ 15-16 & Figs. 2-3; *id.* Ex. 2. The transmissions were tied not to the name of each Plaintiff, ████████████████████ █████████████████████████████████████ █████████████████████████████████████ *Id.* ¶¶ 12, 15-16. These ███████████████ █████████████████████████████████████ *Id.* ¶¶ 11, 15-16 & Ex. 2. Capital One was able to ████████████████ █████████████████████████████████ internal Capital One data repositories not available to third parties, including Adobe. *Id.* ¶ 12. In other words, only with the benefit of ████ █████████████████████████████████████ ████████████████ for purposes of this lawsuit.

**Google Ads Data Hub (Marketing Analytics).** Capital One uses Google Ads Data Hub, both the Standard and User Provided Data Matching features, to understand how its advertisements perform on Google platforms, including on Google's Search Engine, Gmail, or YouTube. Ager Decl. ¶ 6. Capital One ██████████████████████████████████ ███████████ and then receives aggregated analytics reports ██████████ █████████████████████████████████████

CAPITAL ONE'S MOTION TO DISMISS PURSUANT TO FED R. CIV. P. 12(b)(1) AND FED R. CIV. P. 12(h)(3)
Case No. 3:24-cv-05985-TLT

███████. *See* Ager Decl. ¶¶ 14, 19; Intro. to Ads Data Hub for Marketers, https://bit.ly/4qD9pg6 (last visited Mar. 6, 2026). Capital One ████████████████████████████████████████████ ████████████████████████████████████████████ ████████ Wing Decl. Ex. R at 2. Google Ads Data Hub, unlike the website technologies identified in the Complaint, is a server-to-server technology; it is not installed on the website and instead involves ████████████████████████████████████████████. Ager Decl. ¶¶ 7-8.

The only Google Ads Data Hub server-to-server transmissions identified for either Plaintiff in this case relates to ████████████████████████ One transmission for this application was sent through the User Provided Data Matching feature and included ████████ ████████████████████████████████████████████ ████████████████████ *See id.* ¶ 22. Another was separately sent via the Standard share and is reflected in the table below (*see id.* ¶ 18):

████████████████████████████████████████████

As this table reflects, the ████████████████████████████████████████████████████ For example, Capital One may ████████████████████████████████████ but this meaning is not shared with Google. *Id.* ¶¶ 26, 31, 36. Instead, Google receives only the ████████ ████████ reflected above. *See id.* ¶¶ 13, 18, 22.

***Meta Pixel (Marketing Analytics & Advertising).*** The Meta Pixel is a browser-based tool Capital One uses to better reach customers who may be interested in Capital One's product offerings, including through online advertisements. Trowbridge Decl. ¶ 39; Trowbridge Ind. Tr. 93:10-25. The Meta Pixel does not collect user-entered information. Depending on user settings and location, it may collect ████ ████████████████████████████████████ Trowbridge Decl. ¶¶ 40-41, 44 & Fig. 7. These data can be used to "measure ad effectiveness" and "define custom audiences" more likely to visit the Webpages for targeted advertising. *See* Get Started with the Meta Pixel, Meta for

CAPITAL ONE'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) AND FED. R. CIV. P. 12(h)(3)
Case No. 3:24-cv-05985-TLT

Developers, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Mar. 6, 2026). Users can opt out of transmissions through the Meta Pixel, including by enabling GPC. Trowbridge Decl. ¶ 40.

Meta contractually agrees that it will "implement processes and procedures to protect the confidentiality and security" of the data transmitted and that it "will not share Business Tool Data that you provide to us with third parties (including advertisers) unless you advise us that we are permitted to do so or we are required to do so by law." Wing Decl. Ex. O at 26; *id.* ¶ 26.



▓▓▓▓▓ Trowbridge Decl. ¶ 41. Enabling ▓▓▓▓▓ means that Meta will "not (a) Sell or Share such Personal Information nor (b) retain, use or disclose such Personal Information outside the direct business relationship with you or for any purpose other than the Business Purposes described in the Applicable Product Terms, unless otherwise permitted by the California [Consumer Privacy] Act." Wing Decl. Ex. O at 201.

Meta did not ▓▓▓▓▓ ▓▓▓ As to ▓▓▓▓ Meta did produce ▓▓▓▓▓ ▓▓▓▓▓. Those transmissions, however, are out of scope for this case as they do not relate to any ▓▓▓▓ ▓▓▓▓▓ ▓▓▓▓▓ *See* ECF 187-49 (Rows 2, 4); *supra* at 4-5. Indeed, the transmissions include only ▓▓▓▓▓ ▓▓▓▓▓ ▓▓▓▓▓ *See* ECF 187-49 (Rows 2, 4).[3]

In sum, the evidence confirms that Plaintiffs' theory of injury—that their data transmissions were "used for the Third Party and fourth parties' marketing and sales purposes," Compl. ¶ 47—has no support.

---

[3] This webpage is the generic landing page for potential customers to explore whether they may be preapproved. As the top banner states: "See if you're pre-approved for card offers—with no harm to your credit score." As such, the URL for this page neither indicates nor suggests that a user navigating to this page has been preapproved.

Plaintiffs have not identified a single piece of evidence showing that any data related to *their* applications was "used for [any] Third Party['s] . . . marketing and sales purposes." Nor is there any evidence that any "fourth parties" ever received or possessed any of Plaintiffs' data at all. The absence of evidence is not surprising. As explained above, Capital One's ███████████████████████████ ███—the only technologies for which any relevant transmissions were identified—██████████ █████████████████████████████████ and ████████████████████ ████ to Capital One. Nothing uncovered in discovery suggests that either third party deviated from those restrictions.

### C.    Capital One's Disclosures to Plaintiffs Regarding Website Technologies.

Capital One discloses to customers, including Plaintiffs, that it collects data and shares those data with third parties who support Capital One's analytics and advertising. When applicants click "Submit Application" on the Webpages, they acknowledge that they "have read and agree to" the "Privacy and Opt Out Notice" ("Privacy Policy"). Wing Decl. ¶¶ 4, 5, 15 & Exs. A, M. The Privacy Policy is hyperlinked, and Plaintiffs Williams and Ingraham both testified they read it multiple times. ECF 215-10 ("Williams Tr.") 182:23-183:23; ECF 215-5 ("Ingraham Tr.") 247:17-248:6. Capital One's consumer behavior expert has offered unrebutted opinions that the Privacy Policy "includes disclosures related to how information is collected, tracked, and shared with third parties" and is drafted in clear language that balances completeness with minimizing cognitive overload from providing an excessive amount of technical details. *See* ECF 215-14 ("Kirk Fair Rep.") ¶¶ 66, 73–74.

***Privacy Policy Disclosures.*** The Privacy Policy informed Plaintiffs that Capital One and "third-party providers acting on [its] behalf use a variety of online tools and technologies to collect information when you visit or use the Online Services" for each of the purposes at issue here. Wing Decl. Ex. C, 2020 Privacy Policy, at 4; *id.* Ex. D, 2022 Privacy Policy, at 6.[4] Specifically, the Privacy Policy explains:

---

[4] The September 15, 2020 and December 28, 2022 versions of Capital One's Privacy Policy are the versions applicable to Plaintiffs' pre-complaint credit applications that fall within the longest applicable statute of limitations period in this case (three years). *See* ECF 111 (finding the "Relevant Time Period" for purposes of Rule 30(b)(6) depositions to be "August 26, 2021 to August 26, 2024") (Kim, J.). Except for the addition of information regarding the Global Privacy Control setting in 2022 (*see infra* at 11), the Capital One Privacy Policy remained substantially the same in the 2022 version. *See* Wing Decl. ¶ 4.

CAPITAL ONE'S MOTION TO DISMISS PURSUANT TO FED R. CIV. P. 12(b)(1) AND FED R. CIV. P. 12(h)(3)
Case No. 3:24-cv-05985-TLT

- **Website Analytics:**  Capital One and "[its] third-party providers use online tracking technologies to engage in data analytics, auditing, measurement, research, reporting, and debugging on our Online Services."  2020 Privacy Policy at 4; 2022 Privacy Policy at 7.

- **Marketing Analytics:**  Capital One and "[its] third-party providers use online tracking technologies . . . to measure the effectiveness of our advertising."  2020 Privacy Policy at 4; 2022 Privacy Policy at 7.

- **Advertising:**  Capital One and "[its] third-party providers may collect information about your activities on our Online Services and across different websites, mobile apps, and devices over time for targeted advertising purposes."  2020 Privacy Policy at 4; 2022 Privacy Policy at 7.[5]

The Privacy Policy also identifies specific categories of information Capital One may collect and share with third parties and for what purposes.  Under a heading "**What Information does Capital One collect?**," the Privacy Policy explains that Capital One collects, among other things, "information related to your Capital One . . . applications, or prequalification inquiries," as well as "[c]ontact or identity data," "[d]evice data," "credit report information," "education," "income," and "employment status."  2020 Privacy Policy at 2; 2022 Privacy Policy at 2-3.  Under the heading, "**How does Capital One use this information**," the Privacy Policy confirms that "this information" may be used for "Advertising and marketing," and "Conducting analytics and research."  2020 Privacy Policy at 3; 2022 Privacy Policy at 4.  Finally, under the next heading "**How does Capital One share this information**," the Privacy Policy explains that "this information" may be shared with "marketing partners" and "Service providers" to help Capital One with "analyzing and improving our Online Services, and targeting our advertising."  2020 Privacy Policy at 3; 2022 Privacy Policy at 5.

*CCPA Disclosures.* "In addition" to the Privacy Policy, Capital One's "California Consumer Privacy Act Disclosure applies to certain information we collect about California residents."  2020 Privacy Policy at 1; 2022 Privacy Policy at 1 (same).  Plaintiffs testified that they read this CCPA Disclosure as well.  Williams Tr. 262:16-263:7; Ingraham Tr. 277:19-20.  The CCPA Disclosure, like the Privacy Policy,

---

[5] In other portions of the Privacy Policy, Capital One provided more detail regarding the role of third parties in targeted advertising: "These providers may then show you ads, including across the internet and mobile apps, and other devices, based in part on the information they have collected.  For example, when you visit the Capital One website and explore our products, our advertising providers may use that information to determine which ads to show you when you go to other, non-Capital One websites.  Similarly, when you view a Capital One ad on your computer, our advertising providers may use that information when deciding whether to show you a subsequent ad on your laptop or mobile device."  2020 Privacy Policy at 4-5; 2022 Privacy Policy at 7 (similar).

CAPITAL ONE'S MOTION TO DISMISS PURSUANT TO FED R. CIV. P. 12(b)(1) AND FED R. CIV. P. 12(h)(3)
Case No. 3:24-cv-05985-TLT

informed Plaintiffs about the specific categories of information Capital One collects and shares with third parties and for what purposes. For example, the CCPA Disclosure explains that Capital One collects, among other things, "[n]ame," "email address," "employment-related information," and "[c]ontact and financial information." *See* Wing Decl. Ex. I, 2022 CCPA Disclosure, at 1-2; *id.* Ex. H, 2021 CCPA Disclosure, at 1-2 (same). And it further explains that Capital One has, in the past 12 months, "disclosed each of the above-listed categories of personal information concerning California residents for our business purposes to" third parties, such as "data analytics providers" and "marketing partners" that "provide marketing services to us, including to target advertising to you." 2022 CCPA Disclosure at 3-6; 2021 CCPA Disclosure at 4-5 (similar).

### D. Plaintiffs' Options to Opt-Out of Targeted Advertising.

As this Court previously observed, the Privacy Policy "also provides information for how individuals may opt out of the targeted advertising, including that customers may visit three opt out pages." ECF 59 at 3-4; *see also* 2020 Privacy Policy at 5 (providing instructions on how to "opt out of certain targeted advertising"); 2022 Privacy Policy at 8 (same). These include the Digital Advertising Alliance ("DAA") WebChoices Tool (opt out for DAA participating companies), the NAI Opt Out Page (opt out for NAI member companies), and the TrustArc Preference Manager. 2020 Privacy Policy at 5; 2022 Privacy Policy at 8. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Soukup Decl. Ex. 39; Williams Tr. 233:10-25. When this feature is enabled on a browser, participating companies, like Meta, Google, and Adobe, commit to not use or transfer the user's personal data for targeted advertising.[6]

Capital One updated its Privacy Policy in 2022 to add the Global Privacy Control ("GPC") as an additional opt-out method, in anticipation of 2023 amendments to the CCPA. As that update explained, "Capital One supports Global Privacy Control (GPC), which is a setting [on a user's browser] that allows you to communicate your privacy preferences to websites and online services that you visit." 2022 Privacy Policy at 8. "When [Capital One] detect[s] a GPC signal from a browser," Capital One's "Online Services are designed to treat the browser as opted out and to stop sharing personal information for certain targeted

---

[6] DAA, *Consumer Assistance: WebChoices, AppChoices and YourAdChoices — Frequently Asked Questions*, YourAdChoices (FAQ jr03), https://youradchoices.com/choices-faq#jr03 (last visited Mar. 4, 2026); DAA, *Participating Companies*, https://digitaladvertisingalliance.org/participating (last visited Mar. 4, 2026) (listing Adobe, Facebook, and Google as participants).

CAPITAL ONE'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) AND FED. R. CIV. P. 12(h)(3)
Case No. 3:24-cv-05985-TLT

advertising purposes." *Id.* This GPC signal is a mechanism for California residents like Plaintiffs to "exercise [their] right" under the CCPA "to opt out" of "sharing personal information for cross-context behavioral advertising purposes." 2022 CCPA Disclosure at 7 (providing California residents resources "to learn more about the setting and how to enable it on your browser"). Although Plaintiffs read Capital One's GPC-related disclosures (*supra* at 10) and Ms. Williams studied the GPC in law school, (Williams Tr. 184:22-185:20), neither availed themselves of what the California Attorney General has recognized as "an easy-to-use 'stop selling or sharing my data switch.'" Cal. Dep't of Justice, Office of the Attorney General, Press Release, https://bit.ly/4b3FSI0 (Feb. 11, 2026).[7]

**PROCEDURAL STANDARD**

Federal Rule of Civil Procedure 12(b)(1) authorizes a party to move to dismiss for "lack of subject-matter jurisdiction," including "for lack of Article III standing," "at any stage in the litigation." *Wood v. City of San Diego*, 678 F.3d 1075, 1082 (9th Cir. 2012). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); *see, e.g.*, *Bargetto v. Walgreen Co.*, 2024 WL 3493260, at *5–6 (N.D. Cal. June 14, 2024) (Thompson, J.) (granting post-discovery motion to dismiss for lack of Article III standing pursuant to Rules 12(b)(1) and 12(h)(3) and denying class certification motion as moot).

"The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing" three elements to satisfy the "irreducible constitutional minimum" of Article III standing: injury-in-fact, traceability, and redressability. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). When assessing standing, courts "must look at the facts as they exist at the time the complaint was filed." *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1047 (9th Cir. 2014). Faced with a factual attack on jurisdiction, as here, the Court "may consider the evidence presented with respect to the jurisdictional issue," and "[n]o presumptive truthfulness attaches to plaintiff's allegations." *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1028 (9th Cir. 2023). Instead, "the plaintiff

---

[7] The GPC allows consumers to opt out of having personal information "sold or shared," Cal. Civ. Code § 1798.120, where "shared" means the disclosure of personal information for "cross-context behavioral advertising," *Id.* § 1798.140(ah)(1); *see also id.* § 1798.140(k) (defining "cross-context behavioral advertising" as "the targeting of advertising to a consumer").

must support her jurisdictional allegations with competent proof under the same evidentiary standard that governs in the summary judgment context." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).[8]

## ARGUMENT

More than a year after filing this lawsuit, Plaintiffs have no evidence they suffered an injury-in-fact. Article III standing requires Plaintiffs to demonstrate a "concrete" injury-in-fact that "actually exist[s]," meaning "it must be real, and not abstract." *Spokeo*, 578 U.S. at 352. To clear this bar, Plaintiffs must show "the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts.'" *Popa*, 153 F.4th at 789 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)).

Plaintiffs cannot satisfy Article III's injury-in-fact requirement simply based on data transmitted to a third party. *See id.* at 792. Indeed, the *Popa* plaintiff alleged "30 different categories" of data about her "entire visit to the website" were transmitted, but the Ninth Circuit affirmed dismissal for lack of standing. *Id.* at 786. It did so because the purported injury for claims involving data transmission, like those at issue here, are most analogous to "common-law privacy torts." *Id.* at 791. And the plaintiff had not shown she experienced a "kind of harm" from the data transmission recognized under "common-law privacy torts." *Id.* Those privacy torts require a "highly offensive" intrusion or disclosure of information over which a plaintiff has "a reasonable expectation of privacy." *See id.*; *Lloyd v. Facebook, Inc.*, 2024 WL 3325389, at *2 (9th Cir. July 8, 2024); *Hammerling v. Google, LLC*, 2024 WL 937247, at *3 (9th Cir. Mar. 5, 2024).

Here, Plaintiffs do not satisfy this standard for four overarching reasons. *First*, Plaintiffs lack evidence *their* data were transmitted through most of the challenged technologies. *Second*, the limited transmissions that did occur bear no resemblance to a "highly offensive" intrusion that can support standing. *Third*, Plaintiffs cannot establish a reasonable expectation of privacy over information they disclosed after reading Capital One's Privacy Policy—and, in ███████ case, after filing this

---

[8] If this Court finds Plaintiffs lack standing to pursue claims based upon Capital One's use of specific technologies, the Court may properly eliminate those "portions of [Plaintiffs'] claim[s] that are barred," even if not dismissing all claims in full. *See Benson v. JPMorgan Chase Bank, N.A.*, 673 F.3d 1207, 1216 (9th Cir. 2012); *see also Staley v. Gilead Scis., Inc.*, 2020 WL 5507555, at *11 (N.D. Cal. July 29, 2020) ("Often, a plaintiff asserts a single cause of action that is predicated on more than one liability theory, and a court eliminates one theory through a motion to dismiss.").

CAPITAL ONE'S MOTION TO DISMISS PURSUANT TO FED R. CIV. P. 12(b)(1) AND FED R. CIV. P. 12(h)(3)
Case No. 3:24-cv-05985-TLT

lawsuit. *Fourth*, Plaintiffs lack Article III standing to seek injunctive or declaratory relief because they are now aware that third-party technologies are used on Capital One's website and so cannot show they will suffer a similar injury in the future.

## I.    Plaintiffs Lack Article III Standing to Challenge Technologies That Did Not Transmit Any Information About Them.

Plaintiffs "must demonstrate standing for each claim that they press." *TransUnion*, 594 U.S. at 431. They cannot do so for the following technologies because they lack evidence *their* data was affected:

- **Skai:** No evidence of data about either Plaintiff transmitted through Skai SFTP.

- **Meta:** No evidence of data about either Plaintiff transmitted through the Meta Conversions API before this lawsuit was filed. No evidence of data about Ms. Williams ever transmitted through the Meta Pixel.

- **Google:** No evidence of data about either Plaintiff transmitted through Google Analytics or Google Tags. No evidence of data about Mr. Ingraham transmitted through Google Ads Data Hub, whether through its Standard share or its User Provided Data Matching feature.

- **Microsoft, New Relic, Everest, Snowplow, BioCatch, and Tealium:** No evidence of data about either named Plaintiff transmitted to any of these third parties. These third parties are not mentioned in Plaintiffs' class certification motion, and it is unclear they are even maintaining these claims.

Because Plaintiffs cannot show *their* data was transmitted through each of these technologies, they cannot "show that they personally have been injured" by Capital One's use of these technologies. *Winsor v. Sequoia Benefits & Ins. Servs.*, LLC, 62 F.4th 517, 523 (9th Cir. 2023) (quoting *Spokeo*, 578 U.S. at 338 n.6). Without evidence of any data transmission, Plaintiffs cannot show an injury that "actually exist[s]" or affects them in a "personal and individual way." *Spokeo*, 578 U.S. at 339-340; *see supra* at 13. Courts routinely dismiss plaintiffs' data-transmission claims for lack of Article III standing where, as here, plaintiffs "produce[] neither a declaration nor any other evidence" of the challenged data transmission. *Byars v. Sterling Jewelers, Inc.*, 2023 WL 2996686, at *2 (C.D. Cal. Apr. 5, 2023) (dismissing CIPA claim for lack of Article III standing because plaintiff produced "no evidence" of the challenged data transmission); *see also, e.g.*, *Smidga v. Spirit Airlines, Inc.*, 2024 WL 1485853, at *5 (W.D. Pa. Apr. 5, 2024) (dismissing CIPA claim for lack of Article III standing because plaintiffs "have offered nothing" to demonstrate that "personalized data was recorded").

Plaintiffs likewise cannot establish Article III standing based on any data transmissions that occurred *after* the Complaint was filed. "[Courts] have an obligation to assure [them]selves that [plaintiffs] had Article III standing at the outset of the litigation." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). This rule "admits of no . . . exception": "if a plaintiff lacks standing at the time the action commences," then that plaintiff is "not entitle[d] . . . to a federal judicial forum." *Id.* at 170. Thus, "[t]he existence of standing turns on the facts as they existed at the time the plaintiff filed the complaint," *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007), and Plaintiffs "cannot rely on events that unfolded after the filing of the complaint" "to establish [their] standing." *Yamada v. Snipes*, 786 F.3d 1182, 1204 (9th Cir. 2015); *see also Mikulsky v. Bloomingdale's, LLC*, 713 F. Supp. 3d 833, 846 (S.D. Cal. 2024) (dismissing data-transmission claims for lack of Article III standing to the extent based on post-complaint website visits).

The fact that Plaintiffs seek to represent a class does not affect the analysis. A plaintiff who seeks to represent a class "must allege and show that they personally have been injured, not that the injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *see also Martinez v. Newsom*, 46 F.4th 965, 970 (9th Cir. 2022) ("named plaintiffs generally lack standing to sue defendants that have not injured them personally, even if they allege that those defendants injured absent class members"). Indeed, "[i]f the individual plaintiff lacks standing, the court need never reach the class action issue." *NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 532 (9th Cir. 2019). Since Plaintiffs lack standing to assert any of their individual claims, they cannot establish standing to sue through the claims of putative class members.

**II.     Transmissions for** ███████████████ **Do Not Give Rise to Standing.**

That leaves only two technologies for which Ms. Williams can identify █████████ ███████████ Adobe Analytics and Google Ads Data Hub. None of these transmissions are "remotely similar to the 'highly offensive' interferences or disclosures that were actionable at common law." *Popa*, 153 F.4th at 791. They thus cannot support standing for Ms. Williams.

**A.** ██████████████████████████ **Cannot Establish a Concrete Privacy Injury.**

Ms. Williams does not have standing to pursue claims based on Adobe Analytics transmissions because this type of ████████████████████ does not give rise to a privacy injury. Moreover, Capital One ████████████████, not targeted advertising, so it could not have caused Plaintiffs' claimed injuries.

***Adobe Analytics Uses an*** ████████████████████████ ***Ms. Williams.*** The law requires Ms. Williams to demonstrate that the data transmissions to Adobe are "individually identifiable" to her, *Cahen v. Toyota Motor Corp.*, 717 F. App'x 720, 724 (9th Cir. 2017), because "[t]he disclosure of non-individually identifiable data is insufficient to give rise to an injury-in-fact to support Article III standing." *Mikulsky v. Noom, Inc.*, 2024 WL 251171, at *4 (S.D. Cal. Jan. 22, 2024) (collecting cases).

Ms. Williams cannot make that showing here. The Adobe Analytics transmissions do not include information she entered into form fields on the Webpages, such as name, date of birth, social security number, address, or any other potentially identifiable information. *See* Trowbridge Decl. ¶ 16 & Fig. 3. Instead, Adobe received



*Id.* ¶¶ 16, 19-22 & Fig. 3. ████████████████████ "*who* the person is." *Griffith v. TikTok, Inc.*, 2024 WL 4308813, at *2-3 (C.D. Cal. Sept. 9, 2024) (rejecting a contrary use of "identifiers" as "misleading"), *appeal filed*, Case No. 25-553 (9th Cir. 2025). In fact, Capital One could locate and produce the ████████████████████ with internal Capital One data repositories that are not available to third parties, including Adobe. Trowbridge Decl. ¶ 12, 16.

Because the Adobe transmissions are not ████████████████, they are "insufficient to give rise to an injury-in-fact to support Article III standing." *Mikulsky*, 2024 WL 251171, at *4 (dismissing data-transmission claims for lack of standing because no "personally identifiable information" would "allow [the third party] to link the 'sensitive health information'" to plaintiff).

***Capital One Uses Adobe Analytics for*** █████████████  The anonymity of the Adobe Analytics data is a direct function of how the technology is used:  Capital One employs Adobe Analytics solely for ████████████.  Trowbridge Decl. ¶ 7; Trowbridge Ind. Tr. 161:19-20, 238:4-6 (Adobe Analytics is used "███████████████").  That matters for Article III standing in two independent ways:  (1) it forecloses any claim that the disclosures resemble any highly offensive conduct, and (2) it severs any causal link to Ms. Williams' asserted injury from targeted advertising.

First, Capital One's use of Adobe Analytics cannot be highly offensive: it is no different in kind than the routine analytics technology approved by the Ninth Circuit in *Popa* that "helps a business to determine which parts of its website are effective with customers and which are not."  153 F.4th at 786. Data are ████████████████████████████████ ████████████.  Trowbridge Ind. Tr. 141:15-20.  Capital One then uses the ██████████████ ████████████████████████████████████ ████████████████████████████████  *Id.* 167:22-168:19, 229:22-230:3.  Courts in this District repeatedly have held that "data collection and disclosure to third parties that is routine commercial behavior," as here, "is not a highly offensive intrusion of privacy."  *Hubbard v. Google LLC*, 2024 WL 3302066, at *7 (N.D. Cal. July 1, 2024) (collecting cases); *see In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 294 (3d Cir. 2016) ("[C]ourts have long understood that tracking cookies can serve legitimate commercial purposes.").

Indeed, California law does not treat the data collected through Adobe Analytics as shared with a third party at all.  The CCPA carves out from the definition of a "third party" any "service provider" (Adobe) "to the business" (Capital One), Cal. Civ. Code § 1798.140(ai)(2), contractually restricted by the business from "[r]etaining, using, or disclosing the information," *id.* § 1798.140(ag)(1). ███████████ ████████████████████████████████████████ ████████████████████████████████████████ Wing Decl. Ex. N at 22 (emphasis added).  Adobe █████████████████████ ████████████████████████  *Id.* (emphasis added).  Adobe thus ██████████ ████████████████████████████████████████ ████████████████████████████████████████

CAPITAL ONE'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) AND FED. R. CIV. P. 12(h)(3)
Case No. 3:24-cv-05985-TLT

██████ *Id.* at 11-12.  These ████████████ "no use by ████████████ ████████████ to refer back to," which is both "routine commercial behavior" and also "benign."  *Williams v. DDR Media, LLC*, 2023 WL 5352896, at *7 (N.D. Cal. Aug. 18, 2023) (use of analytics website technology "not highly offensive").

Second, the use for ████████████ shows Ms. Williams' purported injury is not "fairly traceable to the challenged conduct" related to Adobe Analytics.  *Spokeo*, 578 U.S. at 338.  Plaintiffs base their Complaint on alleged sharing of their data with "Third Parties" for "Third Party and fourth parties' marketing and sales purposes."  *See, e.g.*, Compl. ¶¶ 7, 47; *see also* ECF 59 at 2 ("The named Plaintiffs allege that that they used Defendant's website and then received targeted marketing ads from third-party websites.").  That injury cannot be traced to Adobe Analytics, which is used solely for ████████ ████████████████ (*see supra* at 5-6), not for "Third Party and fourth parties' marketing and sales purposes," (Compl. ¶¶ 7, 47).  Plaintiffs therefore cannot "trace the alleged injury-in-fact" (sharing for targeted advertising) to the "specific actions" that they challenge for Adobe (█████ ████████████).  *See, e.g., id.*; *Ji v. Naver Corp.*, 2022 WL 4624898, at *10 (N.D. Cal. Sept. 30, 2022) (no standing where no "conduct on the part of [defendants] that is fairly traceable to any injuries Plaintiffs may have suffered under CIPA and ECPA"); *Abdulaziz v. Twitter, Inc.*, 2020 WL 6947929, at *6 (N.D. Cal. Aug. 12, 2020) (no standing where "facts do not plausibly establish that [defendant's] alleged misconduct caused the harms"); *In re iPhone Application Litig.*, 2011 WL 4403963, at *6 (N.D. Cal. Sept. 20, 2011) (similar).

***The Adobe Analytics Data Is Not Embarrassing or Invasive.***  Finally, the Adobe Analytics ████ ████████████████ are not "sensitive" under Ninth Circuit law, independently foreclosing standing.  Those data largely consist of ████████████ ████████████████ (*supra* at 5-6), which is information the Ninth Circuit and other courts have held is not "embarrassing, invasive, or otherwise private information" sufficient to establish Article III standing.  *Popa*, 153 F.4th at 787, 791 ("browser," "device," and "URLs of webpages visited"); *see Khamooshi v. Politico LLC*, 786 F. Supp. 3d 1174, 1178 (N.D. Cal. 2025) (same as to IP address); *Wooten v. BioLife Plasma Servs. L.P.*, 807 F. Supp. 3d 1139, 1142, 1144 (E.D. Cal. Oct. 22, 2025) (same as to data revealing zip code).

The remaining data ███████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████ Trowbridge Decl. ¶ 16 & Fig. 3. In determining whether Plaintiffs had stated a claim under California law, this Court already held that sharing "employment information, bank account information, and [Plaintiffs'] eligibility for preapproval or approval for a credit card" is not "highly offensive." ECF 59 at 11. In any event, the Ninth Circuit has held that information such as "place of employment" cannot give rise to an Article III injury because it is "not generally considered private" in the first place. *Phillips v. U.S. Customs & Border Prot.*, 74 F.4th 986, 996 (9th Cir. 2023). Indeed, ███████████ ███████████████, among other information (*see* Soukup Decl. Exs. 32-38), so cannot base standing on this information. *Phillips*, 74 F.4th at 996 (no standing based on information posted on "social media").

**B.      Google Ads Data Hub Server-to-Server Transmissions Fall Outside the Scope of the Complaint and Cannot Establish a Concrete Privacy Injury.**

The only other transmissions ███████████████████████████████ ███████████████████████████ through Google Ads Data Hub.

*First*, Ms. Williams lacks standing to pursue claims based on Google Ads Data Hub because it is a "server-to-server technology" (*see* ECF 187-1 at 1) outside the scope of the Complaint. Standing must be "based on the[] complaint," *Raines v. Byrd*, 521 U.S. 811, 818 (1997), and a plaintiff "may not effectively amend [the] Complaint by raising a new theory of standing" in response to a dispositive motion. *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088–89 (9th Cir. 2010) (rejecting a plaintiff's "new theory of standing" found "[n]owhere in the complaint" that was raised for the first time "in its response to a motion for summary judgment"). As Judge Kim correctly observed, "from the inception," this case "did not include server-to-server transmission." ECF 213 at 1-2. Because the Complaint nowhere alleges server-to-server transmissions, Ms. Williams cannot base standing on that theory.

*Second*, Google Ads Data Hub server-to-server transmissions cannot give rise to an Article III injury for the independent reason that Capital One uses this technology ████████████████ ██████████. Ager Decl. ¶¶ 6, 9. As a result, Capital One's use of this server-to-server technology

is nothing more than "routine commercial behavior" that falls short of the kind of "highly offensive" conduct giving rise to Article III standing. *See Williams*, 2023 WL 5352896, at *7 (use of analytics website technology "not highly offensive"); *supra* at 17-18. And Capital One's use of a ███████████ ███████████ like Google Ads Data Hub is not fairly traceable to Plaintiffs' claimed injuries relating to targeted advertising. *See Ji*, 2022 WL 4624898, at *10; *supra* at 18.

*Third*, the Google Ads Data Hub transmissions related to ████████████████████████ did not include any sensitive data capable of establishing a concrete privacy injury. The transmission included ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████. Ager Decl. ¶¶ 23-44. As explained above, ███████████████████ is not sensitive, nor is a ███████████████ that could be seen by anyone to whom ████████████████████████ at a store or a restaurant ("████████████████," *id.* ¶ 18). *Popa*, 153 F.4th at 787. The second category also does not suffice to show injury: "[C]ontact information" is "not generally considered private" or "sensitive" even when transmitted in plain text. *See Phillips*, 74 F.4th at 996. Moreover, Ms. Williams already ████████████████████████████████████ ████████████████████████████████ and has no reasonable expectation of privacy ███ ████████████████████████████. Williams Tr. 265:18-22; *see also Smith v. Maryland*, 442 U.S. 735, 743–44 (1979) ("[A] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."); *see Phillips*, 74 F.4th at 996 (no injury for data collection available on plaintiff's "social media pages").

That leaves only ██████████████████, which is not sensitive. For example, Google ████████ ████████████████████████ Ager Decl. ¶¶ 14, 18. There is nothing sensitive revealed about Ms. Williams through the ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Indeed, Plaintiffs' own expert acknowledged that there is ████████████████████████████████████████████████████ ████████████████ ECF 215-4 ("Egelman Tr.") 253:24-254:2, 271:23-272:6. "[P]otential harms that *might* be associated with [website] technology" are not enough to support Article III standing. *Popa*, 153 F.4th at 791 n.5.

**III.    The** ███████████████████████████ **for** ██████████████████████████ **Does Not Give Rise to Standing.**

Out of the more than a dozen technologies Plaintiffs have attempted to pursue since filing this lawsuit over a year ago, discovery uncovered only a ████████████████ through a single technology (Adobe Analytics) ████████████████████████████████████████ ████████    *See* Trowbridge Decl. ¶ 15 & Fig. 2.  That ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████    *See id.* ¶¶ 11, 15-16 & Fig. 2.  For all the same reasons Ms. Williams cannot base standing on Adobe Analytics transmissions, this ████████████ likewise cannot support Article III standing for Mr. Ingraham.  *Supra* at 15-19.

No evidence demonstrates any pre-Complaint transmissions for Mr. Ingraham's applications through any other technology.  Although ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████.  Trowbridge Decl. ¶¶ 13-14; *supra* at 15.  In any event, these transmissions consisted of ██████████████████████████████████████ which the Ninth Circuit held is insufficient to confer Article III standing.  *Popa*, 153 F.4th at 787, 791.  The ██████████ ████████████████████████████████████████████████████████ ████████████████████████████████ ECF 187-49 (Rows 2, 4).  Observing that fact is no different from observing someone walk into a Capital One branch—conduct analogous to "a store clerk's observing shoppers" that does not create Article III standing.  *Popa*, 153 F.4th at 786, 791.

Mr. Ingraham's own conduct confirms the absence of any cognizable injury.  His ability to show a concrete privacy injury "squarely depends on [his] expectations, as an invasion of privacy requires a reasonable expectation of privacy to have been violated."  *Rodriguez v. Autotrader.com, Inc.*, 2025 WL 1122387, at *3 (C.D. Cal. Mar. 14, 2025).  Yet even after he filed this lawsuit alleging far more expansive data sharing than he has proven actually occurred, and claiming he was "injured" from Capital One's data collection practices on the Webpages (Compl. ¶ 345), Mr. Ingraham ████████████████████████████

21

███████████. *See supra* at 4. That conduct is incompatible with an actual expectation of privacy in the transmissions Mr. Ingraham claimed to know were occurring when he filed this action. *See Sanchez v. Los Angeles Dep't of Transp.*, 39 F.4th 548, 559 (9th Cir. 2022) (no expectation of privacy where plaintiff "affirmatively chose to disclose location data . . . each time he rented a device" after agreeing to policy disclosing data will be "shared with governmental authorities").

**IV.    Plaintiffs Did Not Act Consistently with an Expectation of Privacy in the Transmissions at Issue.**

"Contemporary internet browsing involves the collection of users' data, including by tracking users across the internet, and a reasonable user should expect as much." *Hubbard*, 2024 WL 3302066, at *7. Against this backdrop, "the plaintiff must have conducted himself or herself in a manner consistent with an actual expectation of privacy." *Hart v. TWC Prod. & Tech. LLC*, 2023 WL 3568078, at *9 (N.D. Cal. Mar. 30, 2023) (quoting *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 26 (1994)). In other words, "[f]actors personal to an individual may affect whether that individual maintained a reasonable expectation of privacy," including whether the individual received "advance notice" of the challenged action. *Id.*

Taken together, the evidence shows that Plaintiffs did not hold an actual expectation of privacy in the limited data transmissions through Adobe Analytics (Williams & Ingraham) and Google Ads Data Hub (only Williams), providing a separate basis to dismiss for lack of standing.

*First*, Plaintiffs proceeded to use the Webpages after receiving multiple, clear disclosures that information related to their applications could be shared with third parties for purposes of website analytics and marketing analytics.[9]

Plaintiffs each testified they read and agreed to Capital One's Privacy Policy multiple times before submitting their applications, including the CCPA Disclosure. Williams Tr. 262:16-263:7; Ingraham Tr. 277:19-20; Wing Decl. Ex. A; *see supra* at 9-11. The Privacy Policy explained that Capital One and "[its]

---

[9] Because Plaintiffs filed this lawsuit based on alleged data transmissions whose "only purpose" was "to be used for the Third Party and fourth parties' marketing and sales purposes" (Compl. ¶ 220; *id.* ¶ 47), the Court's prior order addressed whether these "allegations directly conflict with Defendant's Online Privacy Policy because Defendant discloses that it releases customer information for third party marketing" (ECF 59 at 5). The Court's prior order did not address disclosures related to website analytics and marketing analytics, nor did it address the additional CCPA Disclosure both Plaintiffs received and read.

CAPITAL ONE'S MOTION TO DISMISS PURSUANT TO FED R. CIV. P. 12(b)(1) AND FED R. CIV. P. 12(h)(3)
Case No. 3:24-cv-05985-TLT

third-party providers use online tracking technologies to engage in data analytics . . . on our Online Services and to measure the effectiveness of our advertising." 2020 Privacy Policy at 4; 2022 Privacy Policy at 7. The CCPA Disclosure likewise explained that Capital One shares information with "service providers," including "data analytics providers." 2022 CCPA Disclosure at 5; 2021 CCPA Disclosure at 5; *see also* 2022 Privacy Policy at 5 (similar); 2020 Privacy Policy at 3-4 (similar). Plaintiffs were therefore on notice that Capital One may share data with third parties like ███████████ for website analytics and marketing analytics at issue here. *Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1057 (N.D. Cal. 2025) (Thompson, J.) (explaining that the law "does not require" a "more granular disclosure" specifying the alleged third party, Meta, by name).

These disclosures also identified the categories of information that may be shared for these purposes, including "information related to your Capital One . . . applications, or prequalification inquiries." 2020 Privacy Policy at 2; 2022 Privacy Policy at 2-3; *supra* at 9-11. Indeed, Capital One disclosed that it may share the ███████████████████████████████ ███████████████████████████████ ("device type," "web browser type," "internet protocol address," "general location," "URL"), ██████████ ("how you use and interact with our Online Services"), ██████████ ("information related to your Capital One . . . applications"), and ██████████ ("cookie IDs, device IDs"). 2020 Privacy Policy at 2; 2022 Privacy Policy at 3. The same is true for the ████████████████████████████████████████ ████████████████, including ████████████ (see above) and ██████████ ("name," "email address," "phone number"). 2020 Privacy Policy at 2; 2022 Privacy Policy at 2. Capital One discloses that "this information" is among the categories of information that Capital One "may share" with "service providers" like Adobe and "marketing partners" like Google. 2020 Privacy Policy at 3-4; 2022 Privacy Policy at 4-6.

Ms. Williams—the only Plaintiff with any transmissions to Google—was independently on notice through Google's own disclosures. *See In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *18–19 (N.D. Cal. Mar. 18, 2014) (concluding that "disclosures that third parties . . . made" are relevant to whether a plaintiff "had notice of [an] interception"). Ms. Williams is a Google user and testified that she read Google's privacy policies. Williams Tr. 265:18-266:3. Those policies explain that businesses like Capital

One "may share information about your activity with Google," and that Google "receive[s] [this] information" to "provide advertising and research services on [the business's] behalf." Soukup Decl. Ex. 28 at 5, 37; *see id.* Ex. 31 at 4, 31; *id.* Ex. 29 at 5, 33 (similar); *see also id.* Ex. 31 at 31-32 (noting that "this data may be associated with your personal information").

Having used the Webpages to submit applications after reading these disclosures, Plaintiffs cannot claim a concrete privacy injury. The Ninth Circuit repeatedly has held that plaintiffs "d[o] not have a reasonable expectation of privacy in th[eir] information" when, as here, they are put on "clear notice" that the defendant "may share data with [a third party]," including in cases where plaintiffs agreed to Meta's and Google's privacy policies. *See, e.g., Lloyd*, 2024 WL 3325389, at *2 (affirming dismissal of claim that Meta "impermissibly track[ed] [plaintiff's] online activity" because Meta's "data policy" established no reasonable expectation of privacy); *Hammerling*, 2024 WL 937247, at *3 (similar as to Google's "Privacy Policy" disclosing that it collects data about users' "activity on third-party sites and apps").

*Second*, Plaintiffs had the choice to turn off data sharing for targeted advertising purposes. The Capital One disclosures Plaintiffs said they read informed them of how they can opt out of data transmissions for targeted advertising purposes. *See supra* at 11-12. Capital One supports "Global Privacy Control (GPC)," meaning that when Capital One detects the Global Privacy Control signal from a user's browser, it "stop[s] sharing personal information for certain targeted advertising purposes" (2022 CCPA Disclosure at 7; *see also* 2022 Privacy Policy at 8), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ *See, e.g.,* Trowbridge Decl. ¶¶ 35, 40; Morawetz Decl. ¶ 29; *see also* ECF 215-7 ("Morawetz Tr.") 37:8-11. Capital One also informs consumers that they "may opt out of certain targeted advertising by visiting the Digital Advertising Alliance Opt Out Page, Network Advertising Initiative Opt Out Page, and TrustArc Preference Manager," or by "adjusting the privacy settings on your mobile device." 2022 CCPA Disclosure at 7; *see also* 2022 Privacy Policy at 8 (same). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See supra* at 11. She thus did not suffer any actual injury of the nature she alleged in her Complaint. *Supra* at 18.

And Mr. Ingraham specifically recalled reading the sections of the Privacy Policy explaining how to opt out of targeted advertising, including by implementing the GPC, yet did not exercise these options.

Ingraham Tr. 272:9-25.  His choice not to do so—despite his admitted awareness of this option—is not consistent with an "actual expectation of privacy."  *Hart*, 2023 WL 3568078, at \*9; *see, e.g.*, *Rodriguez*, 2025 WL 1122387, at \*3 (dismissing CIPA claim for lack of Article III standing where the plaintiff "visited the Website fully expecting" data collection and sharing).

**V.    Plaintiffs Lack Article III Standing to Seek Injunctive and Declaratory Relief.**

Plaintiffs "must demonstrate standing . . . for each form of relief that they seek."  *TransUnion*, 594 U.S. at 431.  They lack standing to pursue injunctive and declaratory relief because they cannot show "a sufficient likelihood that [they] will again be wronged in a similar way."  *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983) (injunctive relief); *see Wright v. Serv. Emps. Int'l Union Loc. 503*, 48 F.4th 1112, 1118 (9th Cir. 2022) (same for declaratory relief).  Here, the alleged wrong is the purported "disclos[ure of] customers' Personal and Financial Information to third parties without consent."  Compl. ¶ 143.  But Plaintiffs filed this lawsuit, confirming they now know third-party technologies are being used on the Capital One website; they thus cannot show that they will "again be wronged in a similar way."  *Lyons*, 461 U.S. at 111; *e.g.*, *Mikulsky v. Bloomingdale's*, *LLC*, 713 F. Supp. 3d 833, 846 (S.D. Cal. 2024) (dismissing injunctive relief claim for lack of standing because "continued use of [the] website, now that Plaintiff ha[d] notice of [defendant's] use of [third-party tools], would constitute consent to any recording").

## CONCLUSION

This Court should dismiss this case for lack of subject matter jurisdiction.

Respectfully Submitted,

Dated: March 6, 2026

By: /s/ Andrew Soukup

Andrew Soukup (*pro hac vice*)
Nicholas Evoy (*pro hac vice*)
Marianne Spencer (*pro hac vice*)
Jeffrey Huberman (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
asoukup@cov.com
nevoy@cov.com
mspencer@cov.com
jhuberman@cov.com

Kathryn E. Cahoy (Bar No. 298777)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
(650) 632-4735
kcahoy@cov.com

Matthew Q. Verdin (Bar No. 306713)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-7065
mverdin@cov.com

*Attorneys for Defendant Capital One Financial Corporation*

26