Kathryn E. Cahoy (Bar No. 298777)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
(650) 632-4735
kcahoy@cov.com

Matthew Q. Verdin (Bar No. 306713)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-7065
mverdin@cov.com

*Attorneys for Defendant Capital One Financial Corporation*

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GARY INGRAHAM, and DEIA WILLIAMS, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs<br><br>v.<br><br>CAPITAL ONE FINANCIAL CORPORATION, d/b/a CAPITAL ONE, d/b/a CAPITAL ONE, NATIONAL ASSOCIATION, d/b/a CAPITAL ONE, N.A., d/b/a CAPITAL ONE SHOPPING,<br><br>Defendant. | Case No. 3:24-cv-05985-TLT<br><br>**CAPITAL ONE'S MOTION TO EXCLUDE PLAINTIFFS' DAMAGES EXPERT ERIC KRAUSE**<br><br>Judge: Hon. Trina L. Thompson<br>Hearing: June 30, 2026<br>Time: 2:00 p.m.<br>Ctrm: 9, 19th Floor<br><br>**PUBLIC REDACTED** |

## TABLE OF CONTENTS


INTRODUCTION ....................1

BACKGROUND ....................2

A. Mr. Krause's Qualifications ....................2

B. Mr. Krause's Damages Opinions ....................3

1. Mr. Krause's Opening Report ....................3

2. Mr. Krause's Supplemental Report ....................6

PROCEDURAL STANDARD ....................7

ARGUMENT ....................8

I. The Court Should Exclude Mr. Krause Because He Is Unqualified ....................8

II. Mr. Krause Does Not Understand the Data at Issue, Making His Opinions Unreliable ....................10

III. Mr. Krause's Opinions Should Be Excluded for Additional Reasons ....................13

A. Mr. Krause's Fair Market Value Methodology Is Unreliable and Rests on Flawed Assumptions ....................13

B. Mr. Krause's Unjust Enrichment Opinion Is Unreliable and Rests on Flawed Assumptions ....................17

C. Mr. Krause's Restitution Methodology Is Irrelevant and Unreliable. ....................20

CONCLUSION ....................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abu-Lughod v. Calis*,
2015 WL 12731921 (C.D. Cal. July 1, 2015) ........ 14

*In re Accellion, Inc. Data Breach Litig.*,
2025 WL 2799102 (N.D. Cal. Sept. 30, 2025) ........ 7, 9, 10

*Am. Home Assurance Co. v. Makita Corp. of Am.*,
752 F. Supp. 3d 1028 (N.D. Ind. 2024) ........ 14

*Bargetto v. Walgreen Co.*,
2024 WL 3493260 (N.D. Cal. June 14, 2024) ........ 18

*Bennett v. United States*,
2018 WL 6265092 (C.D. Cal. Mar. 22, 2018) ........ 9

*Blockchain Innovation, LLC v. Franklin Resources, Inc.*,
2024 WL 5483606 (N.D. Cal. Oct. 22, 2024) ........ 8, 10

*Cabrera v. Cordis Corp.*,
134 F.3d 1418 (9th Cir. 1998) ........ 9

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ........ 9, 14

*Digital Reg of Texas, LLC v. Adobe Systems, Inc.*,
2014 WL 4090550 (N.D. Cal. Aug. 19, 2014) ........ 19, 20

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ........ 7

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025) ........ 7

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ........ 14

*Good Tech. Corp. v. Mobileiron, Inc.*,
2015 WL 4090431 (N.D. Cal. July 5, 2015) ........ 11

*Holley v. Gilead Scis., Inc.*,
2024 WL 538535 (N.D. Cal. Jan. 29, 2024) ........ 15

*Kim v. Benihana, Inc.*,
2024 WL 3550390 (C.D. Cal. May 20, 2024) ........ 20

*Kingsbury v. U.S. Greenfiber, LLC*,
2013 WL 7018657 (C.D. Cal. Nov. 5, 2013) .......... 21

*Lassalle v. McNeilus Truck & Mfg., Inc.*,
2017 WL 3115141 (N.D. Cal. July 21, 2017) .......... 12

*Lucas v. MGM Resorts Int'l*,
724 F. Supp. 3d 1142 (D. Nev. 2024) .......... 15

*Mercer Global Advisors, Inc. v. Hewitt*,
2024 WL 5423015 (C.D. Cal. Oct. 31, 2024) .......... 21

*Metabyte, Inc. v. Canal+Technologies, S.A.*,
2005 WL 6032845 (N.D. Cal. June 17, 2005) .......... 14

*Miller v. Travel Grd. Grp., Inc.*,
2023 WL 7106479 (N.D. Cal. Sept. 15, 2023) .......... 20

*Murray v. S. Route Maritime SA*,
870 F. 3d 915 (9th Cir. 2017) .......... 14

*Netfuel, Inc. v. Cisco Sys., Inc.*,
2020 WL 1274985 (N.D. Cal. 2020) .......... 14, 15

*Otto v. LeMahieu*,
2021 WL 1615311 (N.D. Cal. Apr. 26, 2021) .......... 9

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994) .......... 14

*Pavo Solutions LLC v. Kingston Tech. Co., Inc.*,
2019 WL 8138163 (C.D. Cal. Nov. 20, 2019) .......... 11

*Pulse Elec., Inc. v. U.D. Elec. Corp.*,
2021 WL 981123 (S.D. Cal. Mar. 16, 2021) .......... 20

*Rearden, LLC v. Walt Disney Pictures*,
152 F.4th 1058 (9th Cir. 2025) .......... 9

*Reyes v. Apple, Inc.*,
2025 WL 1223550 (N.D. Cal. Apr. 28, 2025) .......... 9

*Rojas v. Marko Zaninovich, Inc.*,
2011 WL 6671737 (E.D. Cal. Dec. 21, 2011) .......... 13

*Sensoren Gmbh v. NVIDIA Corp.*,
2025 WL 3500726 (N.D. Cal. Sept. 26, 2025) .......... 20

*Sines v. Darling Ingredients Inc.*,
2023 WL 3841741 (D.N.J. June 6, 2023) .......... 13

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*,
978 F. Supp. 2d 1053 (C.D. Cal. 2013) ....... 12

*United States v. Chang*,
207 F.3d 1169 (9th Cir. 2000) ....... 8

*In re Vioxx Class Cases*,
180 Cal. App. 4th 116 (2009) ....... 20

*White v. Ford Motor Co.*,
312 F.3d 998 (9th Cir. 2002) ....... 8

## NOTICE OF MOTION AND MOTION TO EXCLUDE

**PLEASE TAKE NOTICE** that on June 30, 2026,[1] or as soon thereafter as this matter may be heard, in Courtroom 9, 19th Floor of the United States District Court for the Northern District of California, located at the San Francisco Courthouse, 450 Golden Gate Ave., San Francisco, California, 94102, Defendant Capital One Financial Corporation ("Defendant" or "Capital One") will and hereby does move this Court to exclude the opinions reflected in the Expert Report of Eric Krause (ECF No. 187-53), and any other opinions of Mr. Krause that Plaintiffs seek to introduce.

## STATEMENT OF RELIEF SOUGHT

Capital One seeks an order excluding Mr. Krause's opinions pursuant to Federal Rule of Evidence 702.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Eric Krause, Plaintiffs' damages expert, purports to opine that Capital One should pay class members at least $2.79 billion in this case. He does so even though he is unqualified to offer his opinions, which rest on unsupported assumptions and are the product of unreliable methodologies. This Court should exclude Mr. Krause's opinions for at least three reasons.

*First*, Mr. Krause is not qualified to offer these opinions. Most of Mr. Krause's career has focused on valuing oil and energy leases, patents, and other forms of intellectual property. He had no experience—academic, professional, or otherwise—in valuing personal data until late 2024, when he began offering cookie-cutter opinions in information-sharing lawsuits involving the value of data disclosed by healthcare providers. He nevertheless claims he is qualified to opine on the value of the personal financial information at issue in this case, even though it is the first time he has been asked to do so and even though he has no training and has never published on this issue. Mr. Krause's lack of prior experience is reason enough to exclude him.

---

[1] Capital One believes judicial efficiency would be served if this motion was heard on the same day as Plaintiffs' motion for class certification. That motion for class certification is currently noticed for April 28, 2026, but that hearing date was closed when Capital One filed this motion.

*Second*, Mr. Krause's damages opinions wrongly assume the same basket of "core" data—a basket of data that Mr. Krause needs others to define for him—was transmitted for each class member across the entire class period. As he testified, his opinions rest on "the assumption . . . that the same data was effectively shared across technologies, across parties." *See* ECF No. 215-6 ("Krause Tr.") 212:15-18. Plaintiffs' own data transmissions refute this—they confirm that Mr. Ingraham and Ms. Williams had entirely different data transmitted about them to different third parties—yet Mr. Krause never even *looked* at what information was transmitted about the Plaintiffs. Mr. Krause's deliberate decision to turn a blind eye toward what was actually shared and calculate damages accordingly—an exercise that Mr. Krause admitted he did not undertake due to the "individualized" nature of this inquiry, *id.* at 93:4—confirms that his opinions are unreliable. If Mr. Krause cannot even account for differences among the data shared for the two Plaintiffs, his opinions cannot be used to calculate classwide damages.

*Third*, Mr. Krause offers a grab-bag assortment of damages approaches, hoping that at least one survives Rule 702. But each suffers from multiple independently fatal flaws that reflect they are the product of an unreliable methodology that rests on unsupported assumptions. For example, his opinion about the "fair market value" of the data at issue is little more than an arbitrary number generated from inapposite benchmarks—an approach that confirms Mr. Krause's lack of experience. Likewise, his opinion about how much Capital One has been "unjustly enriched" fails to isolate gains achieved because of the allegedly unlawful conduct and to account for benefits received by class members. And his opinion about what measure of restitution is appropriate is based on the cost of a data deletion service that Mr. Krause admits would not fix the alleged harm here.

Rule 702 demands more. Given his lack of qualifications, Mr. Krause's opinions are not expert opinions at all. Nor do his opinions satisfy the requirements of Rule 702, because they are not helpful to the trier of fact and are not the product of a "reliable application of principles and methods to the facts of the case." Fed. R. Evid. 702. This Court should therefore exclude Mr. Krause's opinions.

## BACKGROUND

### A. Mr. Krause's Qualifications

The bulk of Eric Krause's prior work as a damages expert related to the oil industry, focusing mainly on the value of "oil and gas mineral interests." *See* ECF No. 187-53 ("Krause Rep.") ¶ 5 &

Appendix B; Krause Tr. 52:11–17. Mr. Krause has no specialized training or experience in valuing personal or financial information, and he has never researched or published anything on this topic. *See* Krause Rep. Appendix A; Krause Tr. 44:18-20; 266:20–267:8. And although this case involves digital marketing, Mr. Krause has no experience with that industry, other than assisting his colleagues in intellectual property matters. Krause Tr. 50:13-51:8.

All of Mr. Krause's experience valuing personal data of any kind is limited to litigation work that he started in late 2024, and he has *never* valued personal financial information until he was hired to do so in this case. *See id.* 29:12–31:4, 54:4-12; *see also id.* 266:20-268:10 (admitting his only experience valuing personal data comes from other "cases" and that he has never been asked to value this kind of data "by any company for any purpose unrelated to litigation"). As Mr. Krause testified, "all of the cases" where he opined on the value of data (aside from this one) "involve . . . healthcare industry participants." *Id.* 31:1-4. That work came in cases where he offered opinions as to the value of improperly disclosed "health data and patient status," including communications between the patient and the healthcare entity that revealed medical and treatment information. *See id.* 29:12–31:4, 280:12-20; *see also In re Betterhelp, Inc. Data Disclosure Cases*, Case No. 3:23-cv-01033-RS (N.D. Cal. May 15, 2025), ECF No. 176-7, ¶ 20 (Krause report valuing data that revealed, for example "signing up for therapy and counseling services, paying for services, taking mental health assessments or test[s], or reviewing advice articles about specific conditions and treatments"). Mr. Krause has never worked with, much less testified about, the personal financial information at issue now before this case. *See* Krause Tr. 54:4-12, 279:20-280:2, 283:2-20.

## B. Mr. Krause's Damages Opinions

### *1. Mr. Krause's Opening Report*

Mr. Krause purports to offer three approaches for valuing the data at issue here: unjust enrichment, restitution, and fair market value. For all of his opinions, Mr. Krause attempted to value an amorphous "core, uniform set of personally identifying information that was transmitted across all classes and to each third party . . . that allowed third parties to identify putative class members." Krause Rep. ¶ 49. Mr. Krause is crystal clear that he did not define the contours of the "core, uniform set" of data that was the basis of his opinion. Instead, he is relying on Plaintiffs' technical expert Dr. Serge Egelman to define this

basket of data for him. *See id.* 67:1-4; 92:2-94:1; *see also id.* 67:6-11 (conceding he did not make "any independent effort to determine what data can be used to identify" anyone).

But Dr. Egelman never defined that core set either—not in his expert report, his supplemental report, or his deposition. Neither Dr. Egelman's 208-paragraph, 111-page expert report nor his 32-paragraph, 13-page supplemental report mentions a "core, uniform set of personally identifying information" once, and they certainly do not identify one that exists across all technologies in this case. *See* ECF No. 187-15 ("Egelman Rep."); ECF No. 187-23 ("Egelman Supplemental Rep."). Although Mr. Krause suggested at his deposition that Dr. Egelman identifies this core set "specifically in Sections G and H" of Dr. Egelman's opening report, *see* Krause Tr. 92:10-15, neither section actually does so. *See* Egelman Rep. ¶¶ 173–204 (sections G and H of Dr. Egelman's report, discussing Dr. Egelman's "Examination of Produced Materials" and "Capital One's Privacy Policies"); *see also infra* § II.

Setting aside his inability to define the precise contours of the information he is valuing, Mr. Krause concedes that he is only offering a damages opinion as to a "core set of data [that] can be utilized to identify a user." Krause Tr. 76:9-10; *see also id.* 140:18-21 ("If there was information shared that didn't allow for identification in your hypothetical, I don't know what the value of that would be."). In other words, if information was shared that falls outside of this "core, uniform set" of data, Mr. Krause assumes that class members are not entitled to recover damages for it. *See, e.g.*, *id.* 92:25-93:1 [redacted] *id.* 115:1-2 ("the [redacted] I don't recall being part of the core basket of information" because "that is not what was necessary for personal information"); *id.* 116:3-10 [redacted] not necessary for damages methodology). And neither Mr. Krause nor Dr. Egelman ever grappled with the fact that for much of the data at issue, including data shared for analytics purposes, the data has been anonymized so that a third party cannot link that data to a particular individual without access to Capital One's internal records—access third parties do not have. *See, e.g.*, ECF No. 215-44 ("Trowbridge Decl.") ¶¶ 18–22; ECF No. 215-31 ("Ager Decl.") ¶¶ 13, 25; ECF No. 215-38 ("Morawetz Decl.") ¶¶ 10, 21–22; ECF No. 215-16 ("Schnell Rep.") ¶ 78 Table 1. Presumably, Mr. Krause would agree that class members are not entitled to recover damages for this anonymized information, either.

Mr. Krause further assumed that Dr. Egelman is correct that this same amorphous "core uniform data set" was transmitted for all class members. Krause Tr. 81:2-17; *see also* 212:15-18 (conceding his opinions are "pursuant to the assumption from Dr. Egelman that the same data was effectively shared across technologies, across parties"). He agreed that he assumed that every visitor to a Capital One website "had the same information shared with the same third parties across the entire class period." *Id.* 103:7-24. He further assumed "that the same type of information . . . the same core uniform data set that was provided in the server-to-server technology was . . . ultimately provided through the tracking tags as well." *Id.* 81:11-17. Mr. Krause did not investigate Dr. Egelman's conclusions and simply assumed everything Dr. Egelman reported was correct. *Id.* 66:3-21. He did not even review the records of what information was shared about the Plaintiffs in this case. *Id.* 130:8-14.

Mr. Krause's first damages opinion is based on a theory of unjust enrichment that Capital One should disgorge the "profits" it "unjustly obtained." Krause Rep. ¶¶ 31, 50. As to that opinion, Mr. Krause relied on a single study that examined a single technology at issue in this case—the Meta Pixel—and concluded that it reduced advertising costs by approximately 31% on average for the companies the study analyzed. *Id.* ¶¶ 55–59; Krause Tr. 164:10-166:4. But most of the companies in that study were outside the United States and were not in the financial services industry. Krause Rep. ¶ 56; Krause Tr. 165:15-166:4. Mr. Krause did not examine or analyze any cost savings or efficiencies realized from any other technology at issue in this case, Krause Tr. 141:8-143:1, and he undertook no work to determine Capital One's actual advertising savings attributable to the Meta Pixel or any other technology. From there, Mr. Krause then simply assumed without evidence that Capital One's digital marketing budget was 53.8% of its overall marketing spend based on a single survey of mostly dissimilar companies from different industries, *id.* 150:17-22, 152:23-153:16, and then applied his 31% cost-savings estimate to his estimate of Capital One's digital marketing budget to conclude that Capital One was "unjustly enriched" by $2.79 billion. Krause Rep. ¶ 63. In the process, he assumed without analysis that class members did not receive any benefit from Capital One's conduct.

Next, Mr. Krause opined on damages under a theory of restitution, which, according to him, is meant to "focus[] on the cost of mitigating the harm" allegedly suffered by Plaintiffs and putative class members. Krause Rep. ¶ 64. Mr. Krause compared the harm alleged here to a data breach—a situation

where a malicious hacker illegally steals information from a database—and his measure of restitution was $32.25 per class member to purchase three months of a data deletion service that would "scan[] and remove[] customer personal information from data broker sites." *Id.* ¶¶ 65, 68. But as Mr. Krause conceded at his deposition, this case does not involve a data breach, and there is no evidence that any of the information here was even shared with a data broker site, and he had no reason to believe that the data deletion service could even delete any information that Capital One shared with any third party. Krause Tr. 190:15-191:18. In other words, Mr. Krause had no evidence that his chosen data deletion service would—or even could—do what he hoped and mitigate Plaintiffs' alleged harm.

Finally, with his third approach, Mr. Krause attempted to calculate the fair market value of the data. *See* Krause Rep. ¶¶ 80–155. But Mr. Krause did not attempt to value the actual data allegedly transmitted in this case. Instead, he looked to third-party sources that valued bundles of data not at issue here, then relied on his own subjective "appraiser judgment" to arbitrarily weigh a series of different factors to conclude the value of data shared here was approximately $95 per class member.[2] But there is no evidence that any class member values their data that way, nor any evidence that any third party would pay Capital One that much to access this data. As a fallback, Mr. Krause misread a document produced in [redacted], and concluded that each putative class member's data is worth at least that, [redacted]

### 2. *Mr. Krause's Supplemental Report*

In December, Capital One produced additional documents in advance of a court-ordered deposition related to server-to-server technologies, including pertaining to new technologies not addressed in Mr. Krause's original report. But Mr. Krause unequivocally declared that the newly produced information,

---

[2] As discussed further below, Mr. Krause attempted to estimate the value associated with an individual's "willingness to pay" to protect privacy, an individual's "willingness to accept compensation to relinquish" data, the "benefit gained" by third parties in acquiring data, and the "cost" incurred by a company in responding to data breaches. *See* Krause Rep. ¶¶ 95, 103, 115, 125. His $95 value reflects a 40% weight assigned to each of the first two factors and a 10% weight assigned to each of the last two factors. *Id.* ¶¶ 151–52.

which reflected the transmission of certain different information from what he had previously considered, did "not alter [his] damages theories or methodologies in any respect." ECF No. 187-54 ("Krause Supplemental Rep.") ¶ 11; *see also*, *e.g.*, Krause Tr. 103:25-104:8 129:2-21 (confirming that "the new information" had no "impact" on his prior opinions).

**PROCEDURAL STANDARD**

Courts analyzing the admissibility of expert testimony at the class certification stage must ensure that it "rests on a reliable foundation and is relevant to the task at hand." *In re Accellion, Inc. Data Breach Litig.*, 2025 WL 2799102, at *1 (N.D. Cal. Sept. 30, 2025). Federal Rule of Evidence 702 requires that an expert be "qualified" by "knowledge, skill, experience, training, or education," and establishes four threshold requirements for the admission of expert testimony:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (Rule 702's relevance and reliability requirements apply at the class certification stage).

Rule 702 was amended "in December 2023 to expressly require a proponent of expert testimony"—in this case, Plaintiffs—to "demonstrate[ ] to the court that it is more likely than not that the four admissibility requirements [of Rule 702] are satisfied." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025) (internal alterations and quotations omitted). The 2023 amendment "sought to clarify and emphasize that proffered expert testimony must meet the admissibility requirements of Rule 702 by a preponderance of the evidence." *Id.* (internal quotations omitted). "Before the amendment, many courts had erroneously held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." *Id.* (internal quotations omitted). "The amendment also aimed to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id.* (internal

quotations omitted). In other words, "[j]udicial gatekeeping is essential to ensure that an expert's conclusions do not go beyond what the expert's basis and methodology may reliably support," and there is "no presumption in favor of admission." *Id.* (internal quotations omitted).

## ARGUMENT

This Court should exclude the opinions of Mr. Krause for at least three independent reasons. *First*, Mr. Krause is not qualified to opine about the damages associated with the collection or transmission of the personal or financial information here because he has never previously attempted to value personal financial information before and brings no specialized expertise to bear. *Second*, his analysis rests on an unsupported assumption—that the same set of data was transmitted for each class member—that conflicts with the evidence and makes no attempt to account for the fact that different information was transmitted about different individuals. *Third*, each of his damages approaches reflects fatal methodological problems and relies on faulty assumptions.

### I. The Court Should Exclude Mr. Krause Because He Is Unqualified.

As a threshold matter, Mr. Krause is not qualified to offer opinions about the value of the data in this case. This is Mr. Krause's first attempt to value information collected by a financial services company or to value personal financial information. Krause Tr. 29:12–31:4, 54:4-12. In fact, Mr. Krause's experience valuing *any* kind of personal data is relatively new: he did not attempt to do so until late 2024, and he has done so only for litigation purposes and in cases involving the disclosure of health care information. *Id.* at 267:15-19. Mr. Krause has not taken any specific training or classes in valuing data, and he has not conducted published research on the subject. *See* Krause Rep. Appendix A; Krause Tr. 44:18–20.

The Ninth Circuit has long held that an expert may not offer opinions "when testifying outside his area of expertise." *White v. Ford Motor Co.*, 312 F.3d 998, 1008–09 (9th Cir. 2002). An expert's "qualifications must be appropriate to the subject matter of the expert's testimony," and the expert's experience must "relate[] to issues in dispute such that the expertise would be helpful to the trier of fact." *Blockchain Innovation, LLC v. Franklin Resources, Inc.*, 2024 WL 5483606, at *9 (N.D. Cal. Oct. 22, 2024) (expert's "general experience" with proprietary technology and intellectual property did not make him qualified to value trade secrets). Thus, being an expert in one area is not enough for an expert to be

qualified to offer opinions in all areas. *See United States v. Chang*, 207 F.3d 1169, 1173 (9th Cir. 2000) (professor with expertise in foreign currency and securities was not qualified to opine on detecting counterfeit securities); *In re Accellion, Inc.*, 2025 WL 2799102, at *2–4 (damages expert with accounting and valuation experience not qualified to opine on "the risk of identify theft that arises from the disclosure of personal information" and "steps that class members should take to mitigate that risk"); *Bennett v. United States*, 2018 WL 6265092, at *4–5 (C.D. Cal. Mar. 22, 2018) (economist not qualified to opine on valuation of business because he lacked "any certification or accreditation in valuation," and had no "special training, experience, or certification" as to asset in question).

This rule renders Mr. Krause unqualified and his opinions inadmissible. Although Mr. Krause has experience valuing *other* assets like high-value oil and gas royalties or patents which are frequently bought and sold, those assets are meaningfully different from valuing personal data that is not sold on the open market. "*[G]eneral* experience" with offering damages opinions about other kinds of assets does not provide Mr. Krause with the requisite experience and qualifications to offer damages opinions about the specific data "at issue in this litigation." *Otto v. LeMahieu*, 2021 WL 1615311, at *5 (N.D. Cal. Apr. 26, 2021) (striking expert report); *see also Rearden, LLC v. Walt Disney Pictures*, 152 F.4th 1058, 1077–78 (9th Cir. 2025) (affirming exclusion of damages expert's opinion valuing profits from certain assets because expert "failed to explain how his professional experience rendered him qualified" to perform analysis and conceded he "lacked knowledge" about the asset in question).

Other factors confirm Mr. Krause's lack of qualifications. Mr. Krause only started analyzing the value of personal data for litigation purposes, Krause Tr. 267:20-268:17, and the Ninth Circuit has instructed that a "very significant fact to be considered" is whether an expert's opinions grow naturally out of their experience "independent of" litigation or—as is the case here—"whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995); *see also Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1422–23 (9th Cir. 1998) (excluding expert who developed opinion "expressly for the purpose of testifying" and had no research supporting his conclusion); *Reyes v. Apple, Inc.*, 2025 WL 1223550, at *4 (N.D. Cal. Apr. 28, 2025) (similar). Further, given his near-zero digital marketing experience, *see* Krause Tr. 60:16-62:24, Mr. Krause is especially unsuited to offer opinions about the relative cost-savings from these kinds of

technology (as to his unjust enrichment opinion), or what it would cost to "mitigate" risks like identity theft (as part of his restitution opinion). Krause Rep. ¶ 65; *see also In re Accellion, Inc.*, 2025 WL 2799102, at *2–4.

In short, because Mr. Krause has no specialized "training, education, skill, and experience in the field of [personal data] valuations," his opinions should be excluded. *Blockchain Innovation*, 2024 WL 5483606, at *10.

**II. Mr. Krause Does Not Understand the Data at Issue, Making His Opinions Unreliable.**

Plaintiffs seek damages for Capital One's alleged disclosure of "sensitive Personal and Financial Information" to third parties, regardless of whether the information was identifiable or actually *used* to identify anyone. Compl. ¶ 192; *see also, e.g.*, *id.* ¶ 1 (seeking damages for disclosure of "Personal and Financial Information to Third Parties"); ECF No. 187-1 at 1 (seeking to certify classes of individuals who had "personally identifiable information collected or transmitted"). But Mr. Krause admits that his damages opinions do not apply to any particular individual unless "information necessary to identify them" has been transmitted to a third party. Krause Tr. 137:23-138:3; *see also id.* 140:18-21 ("If there was information shared that didn't allow for identification in your hypothetical, I don't know what the value of that would be. I have not studied that.").

The problem for Mr. Krause is that he did not attempt to determine what data *would* be sufficient to identify a particular class member. Instead, he has assumed—without evidence—that the same "information" was "transmitted as to every member of the class throughout the entire time period." *See id.* 94:2-8; *see also id.* 103:7-12 (testifying as to his assumption that all visitors to Capital One's website "had the same information shared with the same third parties across the entire class period"); 98:19-99:6 (testifying that his "same damages methodologies would apply" across all technologies and all time periods). He further assumes that there exists within this information a "core uniform data set" of information that allows third parties to identify a particular individual, and he is relying on Plaintiffs' technical expert to tell him what that "core uniform data set" is. *See id.* at 76:4-10; *see also* 269:20-270:4.

This approach suffers from three critical and fatal flaws that show Mr. Krause has not employed a rigorous methodology. First, Mr. Krause's assumption that the same data was transmitted about each class member—the lynchpin of his analysis—has no support in the record. Plaintiffs' own data confirms

that different information was transmitted about them at different times through different technologies for different purposes. *See* Trowbridge Decl. ¶¶ 7, 15–17, 29, 32, 41, 45–48; Morawetz Decl. ¶¶ 13–17; Ager Decl. ¶¶ 17–22, 55, 68. Yet Mr. Krause never looked at what information was shared about the Plaintiffs, *see* Krause Tr. 130:8-14—perhaps because, if he had, it would have revealed that his assumption did not match the actual evidence. Plaintiffs are not alone: individualized inquiries are needed to determine what data may have been collected and transmitted about a particular individual through a particular technology at a particular time based on a particular user's own privacy settings. *See* Trowbridge Decl. ¶¶ 35, 40–41; Morawetz Decl. ¶¶ 13–17, 23–29; Ager Decl. ¶¶ 17–22, 55, 69; *see also* Schnell Rep. ¶ 78 Table 1. An opinion that relies on a critical yet unsupported assumption—in this case, that all class members had the same data set shared with the same third parties—renders an expert's methodology fatally flawed. *See, e.g.*, *Pavo Solutions LLC v. Kingston Tech. Co., Inc.*, 2019 WL 8138163, at *16–17 (C.D. Cal. Nov. 20, 2019) (excluding opinion of damages expert because of "unsupported assumptions" and reliance on speculation); *Good Tech. Corp. v. Mobileiron, Inc.*, 2015 WL 4090431, at *6 (N.D. Cal. July 5, 2015) (excluding opinions of damages expert because methodology was "unsound" and lacked evidence in support).

Second, Mr. Krause does not—and cannot—ever define the "core, uniform set" of data that he is valuing. Krause Rep. ¶ 49. When asked at his deposition what makes up this "core" set of data, Mr. Krause repeatedly pivoted to Plaintiffs' expert Dr. Egelman to answer this question for him. *See* Krause Tr. 55:10-18, 55:23-56:2, 65:25-66:7, 66:16-67:21, 69:15-22, 73:14-20, 75:7-18, 81:11-17, 92:2-93:7, 93:17-94:1, 94:16-99:15, 100:6-17, 101:17-25, 109:15-23, 113:12-24, 114:7-115:8, 115:20-117:5. And when he was asked whether the fact that certain data was transmitted by some technologies but not others would mean that the data would not be included in the core set, Mr. Krause could not answer for himself, pointing again back to Dr. Egelman. *Id.* 81:11-17, 92:21-93:7, 94:16-97:12, 114:7-115:4, 148:10-149:1. This renders Mr. Krause's opinions nonsensical: he never explains how he can offer a damages opinion based on "the entire basket of that uniform set of data" when he does not know what falls within that data had has "made no efforts to value subcomponents of that" basket of data. *Id.* 109:6-9; *see also* 101:6-102:11, 108:6-20, 109:15-23, 110:21-112:7, 114:18-115:19, 115:20-116:2.

Dr. Egelman has not defined this core data set, either. Mr. Krause's report refers to Dr. Egelman's report, *see* Krause Rep. ¶ 49, and Mr. Krause at his deposition said the core set is "described specifically in Sections G and H of Dr. Egelman's report." Krause Tr. 92:10-15. But Section H of Dr. Egelman's report discusses only Capital One's privacy policies. *See* Egelman Rep. ¶¶ 198–204. While Section G does include Dr. Egelman's views on what data he believes is shared by each technology individually, he never identifies a "core, uniform" set across them. *See* Egelman Rep. ¶¶ 173–197. Dr. Egelman's report does not otherwise reference or define a "core, uniform" set of information, and Dr. Egelman did not identify one at his deposition.

Third, Mr. Krause's analysis rests on the assumption that individual variations as to the data transmitted for each class member do not affect the value of that information—a premise Mr. Krause elsewhere disavows. For example, Mr. Krause's fair market value approach relied on a study—the Li Study—that assigned a value to a very different basket of data from the data at issue here. Mr. Krause acknowledges the data is different, and he applied a "60% downward adjustment" to the value of the data in the Li Study to account for differences in the "range" and "depth" of information transmitted as compared to what he believed was "the more uniform dataset transmitted in this matter." Krause Rep. ¶¶ 110, 113; *see also infra* § III.A.

Having acknowledged that differences in the "range" or "depth" of information matter, Mr. Krause was obligated to account for these differences, but he did not do so. Plaintiffs' experiences prove the point: despite having different data transmitted to different third parties, Mr. Krause concludes both (along with any other class member) are entitled to the exact same damages. *See* Krause Tr. 88:24-89:20. Likewise, [redacted], *see* ECF No. 201-2 at 2, yet Mr. Krause "excluded" this information from his damages analysis. *Id.* 92:25-93:4; *see also* Krause Supplemental Rep. ¶¶ 10–11 ("The inclusion and clarification of additional data-transmission technologies . . . . do not alter my damages theories or methodologies in any respect."). His "internally inconsistent" opinion that both acknowledges that differences in what data is transmitted matter while simultaneously ignoring them is methodologically unsound and should be excluded. *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1085

(C.D. Cal. 2013) (excluding "internally inconsistent" expert opinion); *see also Lassalle v. McNeilus Truck & Mfg., Inc.*, 2017 WL 3115141, at *4–5 (N.D. Cal. July 21, 2017) (excluding expert and noting that inconsistencies "indicate a lack of reliable reasoning and methodolog[y]").

Mr. Krause was candid about why he made these assumptions: an analysis that must account for differences among data elements transmitted would create "individualized issues." Krause Tr. 92:16-93:7; *see also id.* 299:21-23 ("the methods I used are specifically designed to avoid individual factual inquiry"). This renders Mr. Krause's opinions inadmissible because damages opinions in class actions "should resolve individualized issues, not sidestep them altogether." *Sines v. Darling Ingredients Inc.*, 2023 WL 3841741, at *12 (D.N.J. June 6, 2023) (excluding damages expert). Mr. Krause cannot "ignore" the actual evidence in this case, "exclude[] data" that does not fit his conclusions, and instead rely solely on his "own assumptions" to generate his opinions. *Rojas v. Marko Zaninovich, Inc.*, 2011 WL 6671737, at *4 (E.D. Cal. Dec. 21, 2011) (affirming striking of expert report that contained "serious methodological flaws").

## III. Mr. Krause's Opinions Should Be Excluded for Additional Reasons.

Mr. Krause's opinions suffer from additional flaws that demand their exclusion. Each of Mr. Krause's approaches contains methodological flaws, relies on faulty assumptions that lack support in the record, and reflects a mismatch between his opinions and the facts of this case. These errors render all of Mr. Krause's opinions inadmissible.

### A. Mr. Krause's Fair Market Value Methodology Is Unreliable and Rests on Flawed Assumptions.

Mr. Krause reached his primary opinion that the fair market value of the data allegedly shared in this case is approximately $95 for each class member by arbitrarily picking four different measures of value based on inapposite data points, and then subjectively weighing those values based on his own judgment. *See* Krause Rep. ¶¶ 95, 103, 115, 125; *id.* ¶¶ 80–155; *see also*, *e.g.*, Krause Tr. 225:22-228:1. Mr. Krause cannot point to any other analysis from *anywhere* that followed the same approach that he has taken here, or that it can even be replicated. *See id.* 225:22-226:4, 265:3-266:16, 299:4-15. He justifies his approach as based entirely on his "own expertise," *id.* 226:15-19, which is nonexistent in a case involving this kind of data. Mr. Krause's methodology does not pass muster here, and nothing requires

this Court "to admit [expert] opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The Ninth Circuit has outlined four nonexclusive factors that may bear on determining the reliability of a particular scientific theory or technique: "(1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community." *Murray v. S. Route Maritime SA*, 870 F. 3d 915, 922 (9th Cir. 2017) (citing *Daubert*, 509 U.S. at 593–94). "[A]ny step that renders [an expert's] analysis unreliable . . . renders the expert's testimony inadmissible. That is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Metabyte, Inc. v. Canal+Technologies, S.A.*, 2005 WL 6032845, at *2 (N.D. Cal. June 17, 2005) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)) (modifications in original).

Mr. Krause's methodology does not satisfy any of these factors. It instead depends on his so-called, self-proclaimed "appraiser judgment." *See* Krause Rep. ¶¶ 90, 138–144. Even if relying on an appraiser's judgment is appropriate in some cases, Mr. Krause does not have the necessary qualifications or experience to reliably deploy that judgment here in a case involving personal financial information that Mr. Krause has never previously analyzed or valued. *See supra* at § I; *see also Abu-Lughod v. Calis*, 2015 WL 12731921, at *2 (C.D. Cal. July 1, 2015) (excluding an expert opinion because despite relying on a sufficient methodology, the expert had insufficient experience with the industry to assess what was considered normal behavior).

Moreover, in valuing each putative class member's data at $95—an opinion that does not depend on knowing *what* information was actually shared about each class member, *see supra* at § II—Mr. Krause does not "follow" any "discernable methodology" beyond his own subjective views. *Netfuel, Inc. v. Cisco Sys., Inc.*, 2020 WL 1274985, at *6–7 (N.D. Cal. 2020). He has no "documentation, academic sources, or other support" for his various adjustments. *Id.* at 225:22–226:4. His "judgment" is not testable, not replicable, not peer-reviewed, and not governed by any standards. It is simply whatever he believes is reasonable. That is inherently unreliable, and does not "reflect[] a reliable application of [] principles and methods to the facts of the case." Fed. R. Evid. 702(d); *see also Am. Home Assurance Co. v. Makita Corp.*

*of Am.*, 752 F. Supp. 3d 1028, 1041 (N.D. Ind. 2024) ("[I]t is impossible to test a hypothesis generated by a subjective methodology because the only person capable of testing or falsifying the hypothesis is the creator of the methodology."). The Court should exclude opinions that are based on Mr. Krause's "subjective belief," *Holley v. Gilead Scis., Inc.*, 2024 WL 538535, at *2 (N.D. Cal. Jan. 29, 2024) (granting motion to exclude), where his damages opinion comes from a "black box in which data is fed at one end and from which an answer emerges at the other," *Netfuel*, 2020 WL 1274985, at *7 (excluding damages opinion).

A review of the approach Mr. Krause took to each of the four factors in his analysis confirms the unreliability of his analysis. First, Mr. Krause's valuation opinion assigns a 40% weight to the value a consumer would be willing to accept as payment for his or her data, which Mr. Krause says is $75.76. Krause Rep. ¶ 113. But Mr. Krause completely ignores how individual consumers would value the data at issue, Krause Tr. 284:6-9, even though individuals' subjective privacy considerations reflect whether they value their information at all or whether (as Ms. Williams and Mr. Ingraham have done) they would freely give it away by posting the information on social media. *See* ECF No. 215-13 ("Hitt Rep.") ¶¶ 110–14; ECF No. 215-5 ("Ingraham Tr.") 233:1-24 (posting employment information on social media); ECF No. 215-10 ("Williams Tr.") 49:15-19, 52:12-19 (same).

Instead, the value Mr. Krause assigned to this factor is derived exclusively from the Li Study, which concluded that a particular basket of data is worth $189.40. Krause Rep. ¶ 108. The basket of data in the Li Study involved data not implicated here—such as race, gender, marital status, and ethnicity—and it did not analyze the vast majority of the twelve main data elements mentioned in Plaintiffs' class certification motion. *See* ECF No. 187-1 at 1; Hitt Rep. ¶ 86 (discussing data elements at issue in Li Study); *see also* Krause Tr. 228:8-229:3 (acknowledging that data from Li Study varies from data here). Mr. Krause concedes these differences, but he did not look for a better comparison to use as a baseline. Instead, he simply assumed—without any basis beyond his own judgment, *see* Krause Tr. 228:16-231:5, 234:10-235:6, 242:21-243:10—that these differences meant the basket of data here was worth 60% less than the basket of data analyzed in the Li case. Krause Rep. ¶¶ 110, 113. Mr. Krause's "apples and oranges" comparison of dissimilar data highlights the unreliability of his chosen methodology. *See Goodness Films, LLC*, 2014 WL 12780291, at *2–3 (C.D. Cal. May 19, 2014) (excluding damages opinion

because it relied on unreliable comparisons); *see also Lucas v. MGM Resorts Int'l*, 724 F. Supp. 3d 1142, 1155–56 & n.98 (D. Nev. 2024) (excluding expert as unreliable and collecting cases excluding experts for faulty comparisons).

Next, Mr. Krause assigned a 40% weight to the cost a consumer would pay to "protect their information via scrubbing it from data broker websites on the internet," which he says is $111.25. Krause Rep. ¶ 99. His analysis assumes a consumer would use the same data deletion and protection services as his restitution model in order to protect their data, this time—arbitrarily—using the cost of a five-year subscription rather than the three-month subscription in his restitution model. *See id.* ¶¶ 97, 99–102; *see also infra* § III.C. Again, this is an apples-and-oranges comparison: Mr. Krause is attempting to value what a consumer would pay to avoid the harm alleged here, but the actual measure would be how much an individual would pay to access a Capital One website that does not collect and transmit data to companies like Meta and Google, not the cost of data deletion services used to remove data from data broker sites that never received any data transmitted by Capital One. Krause Rep. ¶ 99. Again, Mr. Krause concedes that these services do not "protect" the data at issue here. *See infra* § III.C. Indeed, Mr. Krause acknowledges this is not a good fit—admitting that "the data products offered under these subscription models encompass a broader and more generalized scope of information and privacy than the data at issue in this matter"—so he applies a whopping 75% downward adjustment to the value instead of looking for a better comparator. *Id.* ¶¶ 101–02.

The flaws continue. Mr. Krause assigned a 10% weight to what he believed the value would be to Meta and Google from the "benefit gained" from their users' data. *Id.* ¶ 116–21 (discussing "the imputed economic benefit per individual data record derived from Meta's monetization of user information through its Meta tracking technology and related digital advertising infrastructure"). But unlike Meta's or Google's use of data provided to them by their own users, there are numerous contractual prohibitions and restrictions on the use of data received from Capital One by the third parties here, contracts that Mr. Krause admits he ignored. *See, e.g.*, ECF No. 215-49 ("Wing Decl.") ¶¶ 18–33; Krause Tr. 195:11-196:14. As with other factors, Mr. Krause concedes this value "does not directly equate to the fair market value of the subject dataset," but instead of finding a proper comparison, he again arbitrarily adjusts the value down by 75%. Krause Rep. ¶¶ 119–121.

Lastly, Mr. Krause assigns a 10% weight to the "costs" an average company would incur in responding to data breaches, which he assumes would be approximately $67 here. *Id.* ¶ 136. But the "costs" he assumed a company would incur are "help desk and inbound communications, issuing of new accounts and credit cards," "product discounts," and "credit monitoring services." *See id.* ¶ 130; *id.* ¶¶ 125–36. None of those costs are implicated here: Mr. Krause admitted that this is "not a data breach case" and could not point to anything to suggest that Capital One has incurred *any* costs comparable to those incurred by an entity responding to a data breach. Krause Tr. 206:14-207:4, 259:1-8.

Perhaps recognizing the vulnerabilities with his $95 opinion, Mr. Krause offers a fallback opinion [redacted] but this opinion is no more reliable. It rests on a single page of a single document produced by Capital One [redacted] *See* ECF No. 187-9 at 6. At best, this document could only support [redacted] This document cannot support Mr. Krause's damages opinions for at least three reasons. First, there is no evidence that Capital One [redacted] and Mr. Krause makes no attempt to say [redacted] Second, Capital One [redacted] Third, the [redacted]

**B. Mr. Krause's Unjust Enrichment Opinion Is Unreliable and Rests on Flawed Assumptions.**

Mr. Krause's unjust enrichment opinion assumes that Capital One has been unjustly enriched to the tune of $2.79 billion in purported "marketing efficiencies" that Capital One saved from using the third-party tracking technologies and the transmission of at-issue data. Krause Rep. ¶ 35. As Mr. Krause

testified, in his opinion the "benefit" unjustly obtained does not depend either on what technology Capital One used to transmit information or on what information Capital One actually shared. Krause Tr. 141:24-142:22, 148:21-149:1. There are numerous problems with Mr. Krause's analysis which renders this opinion inadmissible.

*First*, by focusing only on purported money that Capital One saved on marketing efforts, Mr. Krause's unjust enrichment opinions cannot be used as a measure of Plaintiffs' claimed damages for information shared only for analytics purposes, such as to debug Capital One's website. This includes information shared through Adobe Analytics and Google Analytics. *See* Trowbridge Decl. ¶¶ 6–7, 29.

*Second*, Mr. Krause did not attempt to determine whether the perceived "marketing efficiencies" he focuses on were "attributable to the underlying wrong," as opposed to other digital marketing practices that are not at issue here. This defect alone renders his opinion flawed. *See, e.g.*, *Bargetto v. Walgreen Co.*, 2024 WL 3493260, at *8, *10 (N.D. Cal. June 14, 2024) (Thompson, J.) (plaintiffs seeking to recover under unjust enrichment must show that the defendant's profit "is attributable to the underlying wrong").

*Third*, Mr. Krause's assessment of the marketing efficiencies Capital One generated from the information-sharing practices at issue here turns on two studies involving other entities that are poor proxies for Capital One or the conduct at issue here.

To start, Mr. Krause assumed that Capital One reduced its digital marketing expenses by 31% based on a single study—the Wernerfelt Study. Krause Rep. ¶ 16 But this study examined the marketing efficiencies gained only from using the Meta Pixel, and it cannot be used to prove damages for a Plaintiff like Ms. Williams (who did not have information shared through the Meta Pixel) or for Plaintiffs whose information was shared through other technologies. *See* Trowbridge Decl. ¶¶ 43, 47. Even as to the Meta Pixel, the Wernerfelt Study involved tens of thousands of companies, most of which were outside the United States and most of which were not in the financial services industry. Krause Tr. 162:20-164:24. This study therefore is an unreliable means of determining the marketing efficiencies *Capital One* may have achieved through its use of the Meta Pixel, let alone the myriad other technologies at issue. And, again, Mr. Krause's opinions further assume, without basis, that *all* of those efficiencies are attributable to conduct that violates the law.

Mr. Krause compounded these errors by failing to investigate what Capital One's actual at-issue digital marketing expenses are. Plaintiffs failed to develop this evidence through litigation. As a result, Mr. Krause relies on another survey, the CMO survey, and then assumes that Capital One's digital marketing expenses are the same proportion of its overall marketing budget as the companies studied in that survey. *See* Krause Tr. at 149:10–16 ("Q: Did you see any evidence of what Capital One's actual digital marketing budget is? A: "I . . . was not able to identify what allocation would apply. So as a result, I relied on survey information from hundreds of businesses in the U.S."). Again, Mr. Krause's source is a poor one: as he admits, the companies in that survey "are a broad variety of companies across a number of industries," and the banking and credit card companies in that survey are "not a very large" portion of the companies surveyed. *Id.* 152:23–153:4; 164:15–24. Mr. Krause has no evidence that this is a reliable proxy for Capital One's actual digital marketing budget—a key factor in his unjust enrichment methodology. Mr. Krause further compounds this error by wrongly assuming that Capital One spent the exact same percentage on digital marketing every year and achieved the exact same percentage in cost-savings every year, during the class period. *See* Krause Rep. Exhibit 1. This is flatly inconsistent with the record, because Capital One used different digital marketing technologies at different times which transmitted different data throughout that period. *See* Hitt Rep. ¶ 71 ("As an economic matter, it is expected that the use of different website technologies and different data would generate *different* economic outcomes."). Mr. Krause's flawed methodology would result in the exact same proportion of "unjust enrichment" for *any* company that used the Meta Pixel, regardless of how they used it, whether they used other digital marketing technologies, and what their actual digital marketing budgets were.

Where other experts cut corners by relying on third-party industry sources rather than attempting to develop or analyze evidence of a defendant's actual practices, courts in this district and elsewhere have excluded those opinions as unreliable. For example, in *Digital Reg of Texas, LLC v. Adobe Systems, Inc.*, 2014 WL 4090550 (N.D. Cal. Aug. 19, 2014), the court excluded the plaintiff's damages expert who attempted to "calculate the percentage of sales Adobe saved" based on the use of a challenged technology, but did not consider "data specific to Adobe" and "instead relied on data spanning the entire software industry." *Id.* at *1–2. The same is true here. By relying on the Wernerfelt Study and CMO survey—studies that involve different companies in different industries using different technologies for different

purposes—Mr. Krause has not "tied" his analysis to "to case-specific factors grounded in reliable data" and instead has offered opinions that contain "multiple flaws" in the "inputs and analysis." *Id.* at *2–4; *see also Pulse Elec., Inc. v. U.D. Elec. Corp.*, 2021 WL 981123, at *42–44 (S.D. Cal. Mar. 16, 2021) (excluding damages expert who sought to estimate product sales but based estimate on "speculative data" and failed to show that "such a percentage would be an appropriate representation" of what he sought to estimate).

*Finally*, Mr. Krause failed to consider any benefits whatsoever to class members from Capital One's use of the technologies at issue. *See, e.g.*, *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 131, 135–36 & n.20 (2009) (explaining that damages evidence would need to consider "the actual value" individuals received for unjust enrichment claim). At his deposition, Mr. Krause admitted that he did not "attempt to determine" whether consumers received any benefits, and rather simply "assume[d] there are no[ne]." Krause Tr. 171:24-172:19. Mr. Ingraham's experience refutes this assumption: he admits that he clicks on advertisements from Capital One because he "like[s]" the company and is interested in seeing the "newest and greatest" credit cards they are offering. Ingraham Tr. 168:18-169:11, 184:3-21. This Court has previously rejected a similar damages expert opinion because it did "not attempt to measure the value of Defendants' [] services," and it should do so again here. *Miller v. Travel Grd. Grp., Inc.*, 2023 WL 7106479, at *17 (N.D. Cal. Sept. 15, 2023) (Thompson, J.) (in refusing to certify class, rejecting damages model for equitable claim under UCL); *see also Valeo Schalter und Sensoren Gmbh v. NVIDIA Corp.*, 2025 WL 3500726, at *4–5 (N.D. Cal. Sept. 26, 2025) (excluding damages expert's unjust enrichment opinion because it did not measure the right metrics); *Kim v. Benihana, Inc.*, 2024 WL 3550390, at *5 (C.D. Cal. May 20, 2024) (excluding damages opinion that "omitted significant variables").

**C. Mr. Krause's Restitution Methodology Is Irrelevant and Unreliable.**

Mr. Krause's restitution opinion is uniquely ill-suited for this case. That opinion attempts to calculate the payment necessary to "restore [Plaintiffs] to the position they were in before the alleged harm occurred by requiring Defendant to pay for the expense of restoring or protecting what was compromised." Krause Rep. ¶ 65. To do so, Mr. Krause assumed that "a service exists that allows for a consumer to remove any information that Capital One provided to a third party from the internet," and then further

assumed that the product he chose as the basis for restitution damages (DeleteMe) provided that service,[3] calculating three months' worth of this service as $32.25 in restitutionary damages. Krause Tr. 183:18-185:3; *see also* Krause Rep. ¶ 79.

These assumptions are dead wrong, because Mr. Krause's chosen data deletion service—or any such service—is employed in data breach cases where personal data can end up on online repositories, but that service cannot delete *this* data. Mr. Krause agrees that services like DeleteMe remove "personal information from online repositories, data brokers, and other platforms," Krause Rep. ¶ 66, yet Mr. Krause admitted that he has no evidence that any information shared by Capital One ended up in the hands of any "online repository, data broker, or other platform," Krause Tr. 190:15-191:1. Nor is Mr. Krause aware of any service, whether DeleteMe or otherwise, that would actually remove any putative class member's data from Adobe, Google, Meta, or Skai. *Id.* 191:2-18. To the contrary, Mr. Krause was told by the same source that he relied on to select DeleteMe that these services would "most likely *not*" be able to delete the information in question from these third parties. *Id.* 199:12-20 (emphasis added); *see also id.* 191:19-192:5. In other words, Mr. Krause measured the cost of remediating the wrong harm.

Having admitted that that the service he is recommending for purposes of restitution will not actually "restore" any putative class member to the same position they were in before their information was transmitted by Capital One or "remediate" any harm they allegedly suffered, Mr. Krause's restitution opinion is "neither relevant nor helpful," and is not "reliable." *Kingsbury v. U.S. Greenfiber, LLC*, 2013 WL 7018657, at *3 (C.D. Cal. Nov. 5, 2013) (excluding restitution opinion where harm seeking to be restored "would not apply" to plaintiff's home and therefore restitution would not remediate harm). "In the end, [Mr. Krause's] opinion is based on far too many unreliable assumptions to clear" the Rule 702 gate and must be excluded." *Mercer Global Advisors, Inc. v. Hewitt*, 2024 WL 5423015, at *7 (C.D. Cal. Oct. 31, 2024).

---

[3] Mr. Krause's selection of the product for which he bases his restitution opinion was based on a single conversation with the CEO of another data deletion services company, a conversation arranged specifically because of the relationship that CEO had with plaintiffs' counsel in another privacy case that Mr. Krause was working on. *See* Krause Tr. 185:23-186:12, 198:13-199:5.

## CONCLUSION

This Court should exclude the opinions of Eric Krause in their entirety.

Respectfully Submitted,

Dated: March 6, 2026

By: /s/ Andrew Soukup

Andrew Soukup (*pro hac vice*)
Nicholas Evoy (*pro hac vice*)
Marianne Spencer (*pro hac vice*)
Jeffrey Huberman (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
asoukup@cov.com
nevoy@cov.com
mspencer@cov.com
jhuberman@cov.com

Kathryn E. Cahoy (Bar No. 298777)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
(650) 632-4735
kcahoy@cov.com

Matthew Q. Verdin (Bar No. 306713)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-7065
mverdin@cov.com

*Attorneys for Defendant Capital One Financial Corporation*