Lynn A. Toops (*pro hac vice*)
Natalie Lyons, No. 293026
Vess A. Miller, No. 278020
Lisa M. La Fornara (*pro hac vice*)
Emily D. Herrin (*pro hac vice*)
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenmalad.com
nlyons@cohenmalad.com
vmiller@cohenmalad.com
llafornara@cohenmalad.com
eherrin@cohenmalad.com

*Attorneys for Plaintiffs and the Proposed Class*
*Additional Counsel Listed in Signature*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

GARY INGRAHAM and DEIA WILLIAMS, individually, and on behalf of all others similarly situated,

Plaintiffs,

v.

CAPITAL ONE FINANCIAL CORPORATION, d/b/a CAPITAL ONE, d/b/a CAPITAL ONE, NATIONAL ASSOCIATION, d/b/a CAPITAL ONE, N.A., d/b/a CAPITAL ONE SHOPPING,

Defendant.

Case No. 3:24-cv-05985-TLT

**PLAINTIFFS' OPPOSITION TO CAPITAL ONE'S MOTION TO EXCLUDE PLAINTIFFS' EXPERT ERIC KRAUSE**

Complaint Filed: August 26, 2024

Date: April, 21, 2026
Time: 2:00 P.M.

Judge: Hon. Trina L. Thompson

## TABLE OF CONTENTS

II. INTRODUCTION .......... 1
III. RELEVANT BACKGROUND .......... 2
A. Mr. Krause's Qualifications .......... 2
B. Mr. Krause's Fair Market Valuation Damages Model .......... 4
i. Mr. Krause Reliably Assessed the "Fair Market Value" of the PII. .......... 6
ii. Mr. Krause Reliably Derived the Value of the Disclosed PII Through Assessment of Analogous Pricing Comparators. .......... 7
iii. Mr. Krause's Conservative Valuation of the PII Disclosed by Capital One is Reliably Based on These Valuation Principles. .......... 10
C. Mr. Krause's Unjust Enrichment Model .......... 11
D. Mr. Krause's Restitution Model .......... 12
IV. APPLICABLE STANDARD .......... 13
V. ARGUMENT .......... 14
A. Mr. Krause is an eminently qualified valuation and appraisal expert .......... 14
B. Mr. Krause's Damages Models Reliably Turn on Plaintiffs' Theory of Harm and "Proper" Reliance on the Opinions of Plaintiffs' Technical Expert. .......... 17
C. Mr. Krause's Fair Market Valuation is Reliable. .......... 20
D. Mr. Krause's Unjust Enrichment Model is Reliable. .......... 23
E. Mr. Krause's Restitution Model is Reliable. .......... 24
VI. CONCLUSION .......... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accellion, Inc. Data Breach Litig.*,
2025 WL 2799102 (N.D. Cal. Sept. 30, 2025) ....................16

*Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*,
738 F.3d 960 (9th Cir. 2013)....................13

*Am. Home Assurance Co. v. Makita Corp. of Am.*,
752 F. Supp. 3d 1028 (N.D. Ind. 2024)....................21

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014)....................18

*Beaty v. Ford Motor Co.*,
2021 WL 3109661 (W.D. Wash. July 22, 2021)....................25

*Bennett v. United States*,
2018 WL 6265092 (C.D. Cal. Mar. 22, 2018)....................16

*Blockchain Innovation, LLC v. Franklin Res., Inc.*,
2024 WL 5483606 (N.D. Cal. Oct. 22, 2024)....................15, 16, 22

*Brown v. Brewer*,
2010 WL 2472182 (C.D. Cal. June 17, 2010) ....................20, 21, 22

*Cavalier v. University Health Systems, Inc.*,
No. 207369-2 (Knox Cty. Ch. Ct. Tenn. Jan. 7, 2026)....................25

*Chiaro, et al. v. The Methodist Hospitals, Inc.*,
No. 49D01-2305-PL-017931 (Marion Super. Ct. Ind. Oct. 14, 2025)....................25

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ....................17, 19

*Daubert v. Merrell Dow Pharmaceuticals*,
Inc., 509 U.S. 579 (1993)....................4, 13, 21

*Dermfx, Inc. v. Obagi Med. Prods., Inc.*,
2017 WL 2684548 (C.D. Cal. Mar. 24, 2017)....................25

*Doe v. Children's Hospital Medical Center of Akron*,
No. CV-2024-01-0093 (Summit C.P. Ohio Oct. 14, 2025)....................25

*Doe v. Margaret Mary Community Hospital, Inc.*,
No. 49D01-2308-PL-031254 (Marion Super. Ct. Ind. Dec. 18, 2025*)* ....................25

*Doe v. Reid Hospital & Health Care Services*,
No. 89D01-2311-PL-000074 (Wayne Super. Ct. Ind. Nov. 30, 2025) ....................................25

*Doe v. SSM Health Care Corporation*,
No. 2222-CC10014-01 (City of St. Louis Cir. Ct. Mo. Sept. 2, 2025) ....................................25

*Donahoe v. Arpaio*,
2013 WL 5604349 (D. Ariz. Oct. 11, 2013) ....................................14, 15

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025) ....................................13

*Fleece v. Diagnostic Services Holdings, Inc.*,
No. 49D01-2305-PL-019711 (Marion Super. Ct. Ind. Dec. 18, 2025) ....................................25

*Fleece v. Hancock Regional Health*,
No. 49D01-2305-PL-020713 (Marion Super. Ct. Ind. Dec. 18, 2025) ....................................25

*Fujifilm Corp. v. Motorola Mobility LLC*,
2015 WL 1737951 (N.D. Cal. Apr. 8, 2015) ....................................18

*Hangarter v. Provident Life & Acc. Ins. Co.*,
373 F.3d 998 (9th Cir. 2004) ....................................14

*Holley v. Gilead Scis., Inc.*,
2024 WL 538535 (N.D. Cal. Jan. 29, 2024) ....................................21

*In re Johnston*,
2013 WL 1844751 (Bankr. W.D. Va. Apr. 12, 2013) ....................................20, 21

*Lassalle v. McNeilus Truck & Mfg., Inc.*,
2017 WL 3115141 (N.D. Cal. July 21, 2017) ....................................19

*Lemarr v. Goshen Health System*,
No. 20D02-2404-PL-000090 (Elkhart Super. Ct. Ind. Dec. 16, 2025) ....................................25

*Leyva v. Medline Indus., Inc.*,
716 F.3d 510 (9th Cir. 2013) ....................................19

*Marini v. Adamo*,
995 F. Supp. 2d 155 (E.D.N.Y. 2014), *aff'd,* 644 F. App'x 33 (2d Cir. 2016) ....................................20

*McLaughlin v. Am. Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008) ....................................13

*In re MDL-731 Tax Refund Litig. of Organizers & Promoters of Inv. Plans Involving Book Props. Leasing*,
989 F.2d 1290 (2d Cir. 1993) ....................................2, 20

*Metlyn Realty Corp. v. Esmark, Inc.*,
763 F.2d 826 (7th Cir. 1985) ....................................20

*Nash-Perry v. City of Bakersfield*,
2023 WL 8261305 (E.D. Cal. Nov. 29, 2023) ........ 13

*Nelson v. Am. Fam. Mut. Ins. Co.*,
262 F. Supp. 3d 835 (D. Minn. 2017), *aff'd,* 899 F.3d 475 (8th Cir. 2018) ........ 20

*Otto v. LeMahieu*,
2021 WL 1615311 (N.D. Cal. Apr. 26, 2021) ........ 16

*In re Pac. Fertility Ctr. Litig.*,
2021 WL 842739 (N.D. Cal. Mar. 5, 2021) ........ 14

*In re POM Wonderful LLC*,
2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ........ 19

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) ........ 1, 21

*In re Rail Freight Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) ........ 19

*Rojas v. Marko Zaninovich, Inc.*,
2011 WL 6671737 (E.D. Cal. Dec. 21, 2011) ........ 19

*Shrader v. Pape Trucks, Inc.*,
2020 WL 5203459 (E.D. Cal. Sept. 1, 2020) ........ 15

*Sines v. Darling Ingredients Inc.*,
2023 WL 3841741 (D.N.J. June 6, 2023) ........ 19

*Suther v. Skagit County Public Hospital District No. 1*,
No. 25-2-00449-29 (Skagit Super. Ct. Wash. Nov. 21, 2025) ........ 25

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*,
978 F. Supp. 2d 1053 (C.D. Cal. 2013) ........ 18

*United States v. Chang*,
207 F.3d 1169 (9th Cir. 2000) ........ 16

*United States v. Garcia*,
7 F.3d 885 (9th Cir. 1993) ........ 14

*United States v. Holguin*,
51 F.4th 841 (9th Cir. 2022) ........ 13

*United States v. Mendoza-Paz*,
286 F.3d 1104 (9th Cir. 2002) ........ 21

*United States v. Simmons*,
470 F.3d 1115 (5th Cir. 2006) ........ 22

*In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prods. Liab. Litig.*, 424 F. Supp. 3d 781 (N.D. Cal. 2020)....13

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, 2015 WL 12731924 (D. Del. Nov. 4, 2015)....18

*Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227 (9th Cir. 2017)....13

*Whitaker-Pine v. Board of Trustees of the Flavius J. Witham Memorial Hospital*, No. 49D01-2305-PL-020025 (Marion Super. Ct. Ind. Dec. 5, 2025)....25

*White v. Ford Motor Co.*, 312 F.3d 998 (9th Cir. 2002)....16

*Wisconsin Alumni Rsch. Found. v. Apple, Inc.*, 135 F. Supp. 3d 865 (W.D. Wis. 2015)....18

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015)....18

*Wyler v. Holland Am. Line-USA, Inc.*, 348 F. Supp. 2d 1206 (W.D. Wash. 2003)....15

**Court Rules**

Fed. R. Evid. 702....*passim*

**Other Authorities**

AICPA, *Statement on Standards for Valuation Services No. 1: Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset* (SSVS No. 1), 2007.... 5

Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* (3d. Ed.) (2012)....15

Dawson, Peter C., *Finding the Fact of Fair Market Value in Litigation: Clarifying the Substantive Distinction Between Concepts of Value Is Imperative* (2019).... 6

FASB, *Accounting Standards Codification (ASC) Topic 820 "Fair Value Measurement"* ASC 820-10-35 .... 5

Fehrenbach David, Carolina Herrando, *The effect of customer-perceived value when paying for a product with personal data: A real-life experimental study*, Journal of Business Research 137 (2021)....17

Feijóo, Claudio, *et al.*, *Exploring the economic value of personal information from firms' financial statements*, International Journal of Information Management 34, no. 2 (2014)....10

Goldfarb, Avi and Catherine E. Tucker, *Privacy Regulation and Online Advertising*, Management Science 57, no. 1 (2011) ....................................................................11

IRS Rev. Rul. 59-60, 1959-1 C.B. 237.....................................................................5, 6

Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla, *Valuing personal data with privacy consideration*, Decision Sciences 52, no. 2 (2021)................................................... 9

Liu, Huan, Kai Li, Yan Chen, and Xin (Robert) Luo, *Is personally identifiable information really more valuable? Evidence from consumers' willingness-to-accept valuation of their privacy information*, Decision Support Systems (2023)...............7, 8

Nils Wernerfelt, *et al. Estimating the Value of Offsite Tracking Data to Advertisers: Evidence from Meta. Marketing Science* 44(2) (2025).........................................................10

IBM & Ponemon Institute, *Cost of a Data Breach Report 2024* (2024)...................................... 9

Pratt, S. & Aniculita, A., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, 29-31, 5th ed. (2008), 481-82.................................................................5, 6

Wu, Zhiyan and Jifeng Luo, *Online information privacy and price: A theoretical model and empirical tests*, Information & Management 59 (2022): 103583 ......................... 8

# I. INTRODUCTION

Plaintiffs have put forth an expert on class-wide damages, Eric Krause, with decades of experience in finance and valuation, over hundreds of valuations of assets and more than a hundred cases as a testifying expert, with no exclusions under Fed. R. Evid. 702. His proffered opinion in this case patently meets the requirements of Rule 702. In his Report, Supplemental Report, and deposition, Mr. Krause details his extensive qualifications, why they will be uniquely "helpful" to the trier of fact on damages, as well as the highly relevant facts and reliable methodologies underlying his three proposed models, based on valuation, unjust enrichment, and restitution theories.

Capital One's Motion to Exclude interchangeably turns on inapposite legal assertions, misleading (and even false) characterizations of Mr. Krause's opinion and testimony and its own refusals to produce responsive, relevant discovery. Their irrelevant assertions entirely fail to undermine that Mr. Krause's damages models turn on relevant facts and reliable methodologies:

**(1) Valuation Damages Model.** Mr. Krause [redacted] Krause laid-out the established principles underlying his valuation, reliably applied those principles to relevant facts and arrived at a "conservative" baseline valuation ($95) of the PII at issue here, a "conclusion" that is far less important than the "soundness of his methodology." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010).

Capital One's insistence on inapposite assertions about Mr. Krause's valuation expertise and methodology rather reveal its gross misunderstanding of valuation itself. Standard-bearing organizations and agencies, treatises and courts across the country agree, as stated by the U.S. Court of Appeals for the Second Circuit: "Nor are we troubled by the fact that each of the appraisers' valuations of the Properties may contain an irreducible subjective element. The appraisal of any property that does not have frequently traded identical substitutes will necessarily be guided by both

objective and subjective considerations." *In re MDL-731 Tax Refund Litig. of Organizers & Promoters of Inv. Plans Involving Book Props. Leasing*, 989 F.2d 1290, 1299 (2d Cir. 1993). Perhaps Capital One's inapt position reflects that its rebuttal damages expert has never conducted a professional valuation of an asset. This model is reliable under Rule 702.

**(2) Unjust Enrichment Model.** To assess the economic value of benefits unjustly retained by Capital One through its unauthorized disclosures, [redacted] Each assertion by Capital One against this model is undermined by its failure to produce the digital marketing expenditures that Krause testified to repeatedly seeking. Capital One simply has no ground to oppose reliable proxies while it maintains the posture of refusing to provide direct evidence. This model is reliable under Rule 702.

**(3) Restitution Model.** Mr. Krause likewise assessed the cost of mitigating the harm to the Classes from Capital One's unauthorized disclosure of PII to Google, Meta, Adobe and others. With no existing mechanism for clawing back the PII from those third parties, Krause reliably modeled the cost of a data deletion service as a proxy for a remedy that would return Plaintiffs and members to their position before Capital One's improper disclosures. Capital One's assertions against this model amount to an argument that, because no mechanism exists to retrieve the PII that it disclosed to Google, Meta and others, Plaintiffs and putative members have no recourse, *even if Capital One is found liable*. It has no ground here. This model is reliable under Rule 702.

Put simply, Mr. Krause's models are eminently relevant and reliable under Rule 702, and Capital One has wholly failed to demonstrate otherwise. The Motion should be denied.

## II. RELEVANT BACKGROUND

### A. Mr. Krause's Qualifications

Plaintiffs' damages expert, Eric Krause, has decades of experience in finance and asset

valuation. Ex. 1[1] ("Krause Dep."), 266:5-10; ECF No. 187-53 ("Krause Rep."), App. A. Since 2008, Mr. Krause has served as Director at Applied Economics Consulting Group, Inc., a firm that "conducts economic and financial analyses for a wide variety of clients across several industries." Krause Rep., ¶ 2; Krause Dep., 45:17-22 (same). He has a bachelor's degree in economics and a master's degree in business administration, with a concentration in finance, from University of Texas at Austin. *Id.* at ¶ 2, App. A. From 2008 to 2025 he was a testifying expert in 132 cases, often on behalf of a corporate defendant. Krause Rep., App. B; *see also* Krause Dep., 54:17-19 (Krause has "offered an opinion in a class action on behalf of [the] defendant [ ] numerous times").

Mr. Krause has "rendered valuation opinions in numerous litigation and non-litigation matters" as to *both* tangible and intangible assets:

> My experience includes engagements involving the valuation of both tangible and intangible assets, as well as nontraded interests that lack readily observable market data. These assignments require the application of specialized economic and valuation methodologies to determine the fair market value or economic damages associated with assets that are unique, illiquid, or otherwise not actively traded. Such assets have included ownership interests in closely held companies, various forms of intellectual property such as patents and trade secrets, oil and gas mineral interests, non-compete and employment agreements, goodwill, and contingent or executory contract rights. Each of these assignments required careful consideration of both market-based and income-based approaches, along with professional judgment in addressing the inherent uncertainties of valuing non-traded and often highly specialized assets.

Krause Rep., ¶ 5. He testified to "[t]wenty-three years of valuation experience across a number of assets[,] both marketable assets, nonmarketable assets, traded assets, nontraded assets. [He has] been responsible for performing valuations for hundreds of assets[.]" Krause Dep., 266:5-10. Krause further testified that the PII in this case is akin to "a nontraded asset[, which] is an asset that there is no robust, transparent public-exchange-type marketplace in which it's transacted." *Id.* at 213:13-19. He further described: "There are numerous assets that exist out there that are nontraded assets that have value; [*i.e.*] intellectual property, goodwill, closely held business interests, there are contracts, data." *Id.* at 213:20-23. He has "significant amount of experience in valuing [ ] nontraded assets across

[1] All exhibits cited in this motion are attached to the Declaration of Lynn A. Toops ("Toops Decl."), attached hereto.

a number of asset classes," including, *e.g.*, "nontraded assets such as patents, licenses, goodwill, closely held compan[ies], private company interests, control premiums, discounts for lack of marketability[.]" *Id.* at 267:6-8, 268:10-17.

In the hundreds of cases where Mr. Krause has served as a testifying expert, *see* Krause Rep., App. A, he has never been excluded as unreliable or unqualified under Rule 702 or *Daubert.* Krause Dep., 55:1-9 (testifying to one "supplemental report" that was "limited," but "not for *Daubert*"—for "reliance on materials that the court deemed to have been produced by the defendant in that case untimely").

Capital One paints Krause's significant valuation experience as narrowly focused on oil and gas. ECF No. 217 ("Mot."), 1-3, 9. Not true. When asked about his "fields of expertise," Krause testified that he is an expert in "economics and valuation," including in "oil and gas" and with "significant experience in the intellectual property valuation industry specifically." Krause Dep., 51:9-22. As he further testified, just "50 to 60 percent" of his expert experience is in oil and gas. *Id.* at 52:11-17.

### B. Mr. Krause's Fair Market Valuation Damages Model

Mr. Krause sought to determine "whether economic and financial damages stemming from the Defendant's alleged unauthorized collection and transmission of Plaintiffs' and putative Class Members' personally identifying and financial information ('PII') can be reasonably established and valued on a class-wide basis." Krause Rep., ¶ 1; *see also* ECF No. 187-54 ("Krause Supp. Rep."), ¶ 1 (same). In service of this objective, he applied principles from the well-established methodology of asset valuation (*i.e.*, appraisal). Describing the applicable valuation principles, as applied to the PII here, Krause explains, "[u]nlike assets such as shares of common stock, in the real world inactive and non-traded assets (such as the [PII] at issue in this matter) lack a sufficiently active market for trade that can be used as reference to determine their current market price." Krause Rep., ¶ 85. To determine the value, therefore, "valuation of these assets is done using the Fair Market Value Standard [ ], which is commonly accepted as the most widely-recognized standard for valuations." *Id.* Further, "[a]ppraiser judgment" is the "critical element of valuation" as to non-traded assets—"[u]nlike actively traded securities, where market prices are directly observable"—the value of which "require

professional expertise to interpret economic evidence and apply valuation methodologies in a reasoned manner." *Id.* at ¶ 140.

In support, he points to several authoritative sources, including guidance from the U.S. Internal Revenue Service, emphasizing that:

> "*no formula can be devised that will be generally applicable*" to the broad array of valuation problems that arise, and that sound valuation depends instead on the appraiser's informed judgment after consideration of all relevant facts. [IRS Revenue Ruling 59-60] goes on to state that "[a] sound valuation will be based upon all the-relevant facts, but *the elements of common sense, informed judgment and reasonableness must enter into the process of weighing those facts and determining their aggregate significance*."

*Id.* at ¶ 90 (quoting IRS Rev. Rul. 59-60, 1959-1 C.B. 237) (emphasis added). These principles are further echoed by standard-bearing organizations like the American Institute of Certified Public Accountants ("AICPA") and the Financial Accounting Standards Board ("FASB"). *Id.* (AICPA affirms, "valuation of interests in closely held businesses, intangible assets, and other nonmarketable interests necessarily involves subjective judgment" (citing AICPA, *Statement on Standards for Valuation Services No. 1: Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset* (SSVS No. 1), 2007, Appendix C, ¶ 73)); *id.* at ¶ 142 (FASB affirms where there is "little or no market activity" for buying and selling an asset, "judgmental estimations are essential" because "market evidence is insufficient" (citing FASB, *Accounting Standards Codification (ASC) Topic 820 "Fair Value Measurement"* ASC 820-10-35, https://asc.fasb.org/Home).

Instead of a mathematical formula or calculation, valuation of intangible assets with no traded market involves an "implicit weighting scheme." Krause Rep., ¶ 143 (quoting Pratt, S. & Aniculita, A., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, 29–31, 5th ed. (2008), 481-82). Valuation experts "present the final value estimate without an explicit quantitative weighting" through a "valuation synthesis process" that is "qualitative" in nature. *Id.* (quoting Pratt, *Valuing a Business*, *supra*, pp. 481-82 (quotations omitted)). This recognized synthesis involves "the need for judgmental inputs (referred to by the FASB as 'Level 3 Inputs')." *Id.* at ¶ 142 (citing FASB, *Topic 820, supra*, Section 820-10-35). Notably, these authorities affirm that valuation may be based on "unobservable inputs to measure fair value if relevant observable inputs are not available, thereby

*allowing for situations in which there is little, if any, market activity* for the asset[.]" *Id.* (citing FASB, *Topic 820, supra*, Section 820-10-35) (emphasis added). Thus, as Krause states: "Appraiser judgment is indispensable in applying standard approaches (*e.g.*, the income, market, and cost methods) to estimate fair market value in a hypothetical marketplace between willing buyers and sellers where direct market evidence is unavailable." *Id.* at ¶ 90 (citing Pratt, *Valuing a Business*, *supra*, pp. 29-31).

**i. Mr. Krause Reliably Assessed the "Fair Market Value" of the PII.**

As detailed in his Report, Supplemental Report, and deposition, Mr. Krause applied the "commonly accepted and recognized valuation technique" called the "Market Approach" (Krause Rep., ¶¶ 40, 154) to value the "core, uniform set of personally identifying information that was transmitted across all classes and to each third party." *Id.* at ¶ 49. Krause valued the PII under the well-established "fair market value" which looks to: "the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell[.]" *Id.* at ¶ 86 (quoting IRS Rev. Rul. 59-60, 1959-1 C.B. 237); *id.* at ¶ 85 ("commonly accepted as the most widely-recognized standard for valuations"). Under this approach, "the seller and buyer are *hypothetical*, the value is determined in a *hypothetical* transaction, and that transaction occurs within a *hypothetical* market." *Id.* at ¶ 86. Use of fair market value thus "resolves an issue associated with many intangible, inactive, or non-traded assets, namely that 'there need not be a [real-world] 'market' to establish a [hypothetical] 'market value''"; "'the fact that there may be no such buyers in the real-world marketplace, for such a property, is irrelevant.'" *Id.* at ¶ 87 (quoting Dawson, Peter C., *Finding the Fact of Fair Market Value in Litigation: Clarifying the Substantive Distinction Between Concepts of Value Is Imperative* (2019), pp. 19, 27). Put another way, the non-existence of a "robust, transparent, public [ ] marketplace" for an asset "does not preclude it from having value, and the fair-market value construct accounts for that," which is why Krause "utilized that methodology here." Krause Dep, 213:24-214:2.

So Capital One is wrong that Mr. Krause did not "attempt to value the data [that it] transmitted." Mot., 6. Application of fair market value to the PII *is* the well-established and eminently reliable mechanism by which he *did* value the PII. It's not surprising that Capital One misses this key

point, as its rebuttal expert to Mr. Krause has *no* professional experience in asset valuation.[2]

To arrive at the fair market value of a non-traded asset, like PII, "appraisers regularly rely on analogous benchmarks and empirical research to inform a hypothetical market construct, while exercising professional judgment to make reasoned adjustments for differences in context and asset characteristics." Krause Rep., ¶ 139. As Krause emphasizes: "[t]he use of these benchmarks does not undermine the validity of the analysis; rather, it reflects the accepted practice of adapting available data to value assets for which no organized market exists." *Id.* (citing Dawson, *supra*). Here, Krause "rel[ied] on analogous benchmarks, comparable asset substitutes, proxy transactions, reference markets, and empirical research" to "estimate a fair market value for the data at issue." *Id.* at ¶ 91.

Capital One *falsely* claims that Mr. Krause "did not define the contours of the 'core uniform set' of data" that he valued in his Report. Mot., 3-4. In fact, Krause delineated each piece of data that "was uniformly transmitted" (Krause Rep., ¶ 146) as to Plaintiffs and putative members—referring to the detailed "list" in his Report. *Id.* at ¶ 145 (detailing the "core" data received by Adobe, Meta, and Google). Based on his review of the report of Plaintiff's expert, Serge Egelman, and discussions with Dr. Egelman, Krause further detailed his "understand[ing]" that "the type of data that was uniformly transmitted . . . can be utilized to identify and generate identifying, quasi-identifying, and demographic attributes for users consistent with those studied in the academic literature cited throughout this report." *Id.* at ¶ 146.

**ii. Mr. Krause Reliably Derived the Value of the Disclosed PII Through Assessment of Analogous Pricing Comparators.**

To value the "core" PII disclosed by Capital One, Mr. Krause considered source information under four broad categories relevant to the valuation: (1) "[t]he amount one would accept to relinquish their data"; (2) "[t]he amount one would spend to protect their data"; (3) "[t]he potential harm from data exposure"; and (4) "[t]he benefit a data holder could gain from acquiring data." Krause Rep., ¶ 81. *See also* Krause Dep., 209:18-21 ("I concluded an estimate of fair-market value based on a number of inputs that could be categorized into four kind of benchmarking indicators of value."). As he

[2] As Plaintiffs will detail in their forthcoming Rule 702 Motion, Capital One's expert, Dr. Lorin Hitt, testified that he "did not evaluate" Mr. Krause's application of fair market value and appeared to be unfamiliar with even the most basic valuation concepts. Ex. 2 ("Hitt Dep."), 146:6-13; *see id.* at 157:22-158:14 (has never applied valuation approaches).

testified, Krause further "weighed each [benchmark] based on [their] relevance." *Id.* at 210:15-18.

Krause approached valuation of the PII in this case by applying "[t]wo primary approaches for valuing personal information in the context of fair market valuation": the "protection and product perspectives" *Id.* at ¶ 92 (citing Liu, Huan, Kai Li, Yan Chen, and Xin (Robert) Luo, *Is personally identifiable information really more valuable? Evidence from consumers' willingness-to-accept valuation of their privacy information*, Decision Support Systems (2023)). The first perspective "reflects the willingness to pay" to protect personal information, and the second "reflects the willingness to accept" a price to sell personal information. *Id.* Valuations under the willingness to accept ("WTA") typically "exceed" those under the willingness to pay ("WTP") context; "[s]tated another way, it is an empirical fact that 'people value privacy more when they have it than when they do not.'" *Id.* at ¶ 44 (quoting Wu, Zhiyan and Jifeng Luo, *Online information privacy and price: A theoretical model and empirical tests*, Information & Management 59 (2022): 103583).

Using this framework, Krause identified several reliable pricing metrics that informed his preliminary estimate of the uniform data in this case. As to each input, he provided detailed explanation of his basis for determining it was relevant to the valuation, as well as the weight he applied to the particular input. Krause Rep., ¶¶ 92-136.

**Willingness to Pay Pricing Inputs**. Under the WTP valuation approach, Mr. Krause considered, *e.g.*, services that monitor and remove personal information from data brokers and search databases. Krause Rep., ¶¶ 96-102, Ex. 2 (referencing, *e.g.*, DeleteMe, Privacy Bee, Incogni.com, ReputationDefender, and Privacy Shield). As Krause describes, the pricing associated with these services "provide[s] a baseline market valuation of personal information from the WTP perspective," *i.e.* "the price a consumer would be willing to pay to protect their information via scrubbing it from data broker websites on the internet." *Id.* at ¶ 99. As to this benchmark, Krause "calculated the net present value of accessing comparable data services at the median annual subscription cost" over a five-year period at $445. *Id.* at ¶ 100; *see also id.* at ¶¶ 97-99, Ex. 2 (summary of data remediation services and pricing). Further, he explains that he applied a "75% downward adjustment" to the value, based on, *inter alia*, the "broader and more generalized" scope of information covered by data remediation services, *id.* at ¶¶ 100-102, testifying that the services have "substantially greater

offerings and services than would be reasonable to apply to just this core uniform set of data." Krause Dep., 219:10-16. Comparing it to a home appraisal: if "you're appraising its value, and your closest comp [is] the house next-door, which is three times bigger and has a pool and has all kind of other modernized features that make it more valuable," the appraiser needs to make "adjustments" to "account for those differences." *Id.* at 219:16-220:2.

**Willingness to Accept Pricing Inputs**. Under the WTA valuation approach, Mr. Krause considered, *e.g.*, a study conducted "to quantify the value of personal information" through a "second-price sealed-bid procurement auction." Krause Rep., ¶ 106 (citing Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla, *Valuing personal data with privacy consideration*, Decision Sciences 52, no. 2 (2021)); *id.* at ¶¶ 106-113 (discussing study). Noting that an auction is "an accepted method in economic literature relating to valuation and price discovery," Krause further explained that "participants are incentivized to bid their true valuation." *Id.* Study participants submitted bids representing the "minimum payment" they would accept for their personal information, which comprised "four categories" of information: "direct identifiers, quasi-identifiers, nonprivate attributes (e.g., demographic information), and private attributes." *Id.* at ¶ 107. The study arrived at an estimated value of the combined personal information at $189.40. *Id.* at ¶ 108. Despite the "substantial overlap between the specific items being auctioned" and the PII here, Krause Dep., 228:11-15, the study datasets "encompass a broader range and greater depth of personal information" than the "core" PII valued here, Krause Rep., ¶ 110. [redacted]

**Costs from Data Exposure.** Mr. Krause also considered "per-record" costs for personal information, from the "longest-running empirical" study on costs of a data breach to companies, noting that the study's findings "offer well-documented benchmarks for the per-record costs of compromised data, which can be evaluated and adapted by appraisers as reliable evidence for estimating fair market value in a hypothetical marketplace." Krause Rep., ¶ 125 (citing Ponemon Institute "Cost of a Data Breach" Reports published in 2024 and 2025). As Krause describes, the study provides a comparison between the per record costs for PII and anonymized data, allowing him to determine a "premium" ($45.67) attributable to personal information. *Id.* at ¶ 127; Krause Dep.,

258:17-21. As to the relevance of data breach costs, he testified they "are a[n] excellent indicator of the value placed on this data," in terms of a "firm's willingness to undertake those costs in order to remediate and undo the disclosure of data." *Id.* at 257:20-258:2. Just like the other benchmarks, he made adjustments to reflect differences between this comparator and the PII here, *id.* at 258:3-6, including an adjustment to reflect a premium associated "post-breach costs" for the financial industry, arriving at a "fair market value of approximately $67.23 per record." Krause Rep., ¶¶ 131-136.

**Benefits Obtained from PII**. Finally, Mr. Krause looked to the "measurable value" of PII to Google and Facebook. Krause Rep., ¶¶ 114-122; Krause Dep., 245:12-17; *see also id* at 245:20-25 (noting, "Facebook provides the most relevant data set, mainly because they are a company that is driven by ownership of this information, and its revenues are driven by leveraging this information for advertising purposes"). Pointing to information reflecting the premium placed on advertising that applies "behavioral targeting" through PII, Krause assessed an "estimated value range of approximately $372.07 to $887.76." *Id.* at ¶ 119; *see id.* at ¶¶ 114-118 (citing, *e.g.*, Nils Wernerfelt, *et al. Estimating the Value of Offsite Tracking Data to Advertisers: Evidence from Meta. Marketing Science* 44(2) (2025); Feijóo, Claudio, *et al.*, *Exploring the economic value of personal information from firms' financial statements*, International Journal of Information Management 34, no. 2 (2014)); *see also* Krause Dep., 248:5-10 (noting that the Feijóo study "evaluat[ed] the economic value to Facebook of any particular user"). As Krause makes clear: this per record estimated value range "does not directly equate to the fair market value of the subject dataset," but "it serves as a comparative benchmark that illustrates the magnitude of the economic utility and revenue-generating capacity that Meta realizes from the commercial exploitation of comparable personal information." *Id.* at ¶ 119. Thus, he applied a 75% "downward adjustment" of the fair market value to $157.48, reflecting "the more limited characteristics of the subject dataset." *Id.* at ¶ 121; *see also* Krause Dep., 249:10-13 ("low weighting" applied; "underlying data was substantially richer" than the "core data set" here).

#### iii. Mr. Krause's Conservative Valuation of the PII Disclosed by Capital One is Reliably Based on These Valuation Principles.

Applying his valuation expertise, Mr. Krause arrived at a "baseline" valuation of $95 per user, noting that the "that WTA and WTP reference points, together with empirical breach-related cost

analyses, provide the best available evidence for establishing benchmarks of economic value." Krause Report, ¶ 155; Krause Deposition, 208:17-22. Finally, Krause emphasizes that "the $95 per user valuation represents a nominal and conservative baseline value for the personal and protected financial information unlawfully transferred by the Defendant." Krause Report, ¶ 155. [redacted]

Capital One itself has also valued the PII it collects. After a data breach in 2019, it agreed to pay $190 million to its victims.[3]

### C. Mr. Krause's Unjust Enrichment Model

Pointing to evidence that Capital One has been enriched at the expense of the PII it collected and disclosed, Mr. Krause has put forth a damages model that "measure[s] the economic value of the benefit(s) unjustly obtained by Capital One as a direct result of the improper collection and disclosure of Plaintiffs' and Class Members' personally identifying and financial information." Krause Rep., ¶ 50. [redacted] *Id.* at ¶¶ 33-36. To determine the "degree of enrichment," Krause relied on research that "quantifies how access to personal data affects the performance and cost-effectiveness of digital marketing," research that consistently found that data like that disclosed by Capital One is a benefit to advertisers. *Id.* at ¶ 53; *see id.* at ¶¶ 54-59 (discussing Goldfarb, Avi and Catherine E. Tucker, *Privacy Regulation and Online Advertising*, Management Science 57, no. 1 (2011), pp. 57-71; Wernerfelt, *supra*).

[3] *See* https://www.capitalonesettlement.com/Content/Documents/ Notice.pdf.

After noting that Capital One had not produced "requested information concerning [its] return on investment from marketing through third-party platforms," Krause applied a metric from the CMO Survey as a proxy—collecting information from hundreds of "marketing leaders" at U.S. companies—indicating that digital marketing accounted for 53.8% of total marketing activities. *Id.* at ¶ 61-62 & n. 79 (citing 30th Edition of The CMO Survey). Using that metric to estimate Capital One's digital marketing spending, Krause applied the "median advertising benefit" from the Wernerfelt study (*id.* at ¶¶ 55-58) to estimate that it had been "unjustly enriched" from Plaintiffs' and putative members' PII at approximately $2.79 billion. *Id.* at ¶ 62-63. *See also* Krause Supp. Rep., ¶ 7 (revised class definitions have "no impact" on "damages theories," including unjust enrichment).

**D. Mr. Krause's Restitution Model**

Finally, Mr. Krause assessed the "cost of mitigating the harm through data deletion services" as a restitutionary measure. Krause Rep., ¶ 64; *id.* at ¶¶ 64-79. Under the framework of "restor[ing] the injured part[ies] to [their] position [ ] before the alleged harm," Krause looked to data deletion services as a proxy for costs "reasonably incur[red] to restore [customers'] position had they sought to remediate the disclosure independently," *i.e.* a "functional equivalent" of "replacement" by "eliminating exposed data from circulation to the greatest extent technologically feasible." *Id.* at ¶¶ 65-66. Described *supra* Section II(B)(ii), Krause assessed these services across several providers. Ultimately he based this model on "the most comparable" service (DeleteMe®) which charges $10.75 per month, along with credible information that a "90-day timeframe" is the minimum period to "achieve meaningful deletion of categories of personal information from data broker website." Krause Rep., ¶¶ 71-74; Krause Dep., 183:1-5 (discussing "conversation with Mr. Jerry Thompson at CyEx about minimum deletion time necessary to do at least one round of data deletion"). Thus, he derived "a conservative and preliminary estimate of the per-person cost necessary to remediate the harm from Defendant's alleged disclosure is $32.25 per putative class member." *Id.* at ¶¶ 68-79; *see also* Krause Dep., 183:1-5 ("[I]t's extremely conservative. . . There is no perfect way to quantify the impact of going to Meta and Google and Adobe. Data deletion services don't provide the ability to get into their data.. . . So I utilize the data-deletion services that are described in this section of my report as a proxy

for that cost of restitution. But I do think it's extremely conservative."); *see also* Krause Supp. Rep., ¶ 7 (revised class definitions have "no impact" on "damages theories," including unjust enrichment).

Indeed, Capital One itself has engaged in remediating privacy harms with such identity protection services. After a data breach in 2019, it provided its victims with at least three years of identity defense services from Pango.[4]

## III. APPLICABLE STANDARD

Fed. R. Evid. 702 requires the Court to find "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 509 U.S. 579, 589 (1993). Rule 702 specifically requires that the proffered expert be "qualified as an expert by knowledge, skill, experience, training, or education," and that the expert "demonstrate[ ] to the court that it is more likely than not that":

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. *Id.*

"Rule 702 should be applied with a 'liberal thrust' favoring admission." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (quoting *Daubert*, 509 U.S. at 588 (quotations omitted)). Of course this does not mean that "there is [a] presumption in favor of admission," as a recent amendment to Rule 702 clarifies.[5] *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049-50 (9th Cir. 2025). "[T]he Ninth Circuit has emphasized that the [court's] gatekeeping function is meant to 'screen the jury from unreliable nonsense opinions, but not to exclude opinions merely

[4] *See* https://www.capitalonesettlement.com/Content/Documents/Notice.pdf.

[5] Capital One makes hay out of the 2023 amendment (Mot., 7-8), which simply "clarif[ied]" that "expert testimony must meet the admissibility requirements of Rule 702 by a preponderance of the evidence," but "did not 'impose[ ] any new, specific procedures,' and was 'simply intended to clarify' existing law." *Engilis*, 151 F.4th at 1049; *see also Nash-Perry v. City of Bakersfield*, 2023 WL 8261305, at *13 (E.D. Cal. Nov. 29, 2023) ("[T]he changes are not substantive."). Courts in the 9th Circuit have "long recognized" that the preponderance burden of proof applies to Rule 702. *Engilis*, 151 F.4th at 1049 (collecting cases). *See also McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) (noting "a court should not treat *Daubert's* dictum about scientific validity as authority for increasing the burden of proof imposed by substantive law" (quotation omitted)).

because they are impeachable.'" *In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prods. Liab. Litig.*, 424 F. Supp. 3d 781, 790 (N.D. Cal. 2020) (quoting *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596). As the Ninth Circuit further makes clear: "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." *United States v. Holguin*, 51 F.4th 841, 858 (9th Cir. 2022); *see also* Rule 702 Advisory Committee Notes (2000) ("Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony. . . . In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.").

## IV. ARGUMENT

### A. Mr. Krause is an eminently qualified valuation and appraisal expert.

Rule 702 "contemplates a broad conception of expert qualifications"; the Rule "lays at least the *minimal foundation* of knowledge, skill, and experience required in order to give 'expert' testimony." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015-16 (9th Cir. 2004) (citation and quotations omitted) (emphasis original). The Rule is "broadly phrased and intended to embrace more than a narrow definition of qualified expert." *Id.* Any "lack of particularized expertise" if any at all, "goes to the weight of the testimony, not its admissibility." *Donahoe v. Arpaio*, 2013 WL 5604349, at *7 (D. Ariz. Oct. 11, 2013) (citing *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993)); *In re Pac. Fertility Ctr. Litig.*, 2021 WL 842739, at *3 (N.D. Cal. Mar. 5, 2021) (same).

There can be no question as to Mr. Krause's qualifications as an expert in valuation and appraisal. With decades of experience performing valuations "for hundreds of assets"—including 132 matters where he has served as a testifying expert, not once excluded for his qualifications or the reliability of his methodology—his valuation *experience* is unassailable. *See supra* Section II(A). Further, his extensive experience *includes* "nontraded assets" like the PII at issue in this case—testifying to a "significant amount of experience in valuing [ ] nontraded assets across a number of

asset classes," including "nontraded assets such as patents, licenses, goodwill, closely held company[ies], private company interests, control premiums, discounts for lack of marketability, things like that." Krause Dep., 267:6-8, 268:10-17. So he is well-versed in valuation *and* in valuing assets requiring the use of pricing comparables outside of publicly traded markets—*like the PII here.*

Critically, this expertise in valuation is applicable across assets. As stated in the recognized treatise on valuation, *Investment Valuation*:

> Every asset can be valued, but some assets are easier to value than others and the details of valuation will vary from case to case. Thus, valuing of a real estate property will require different information and follow a different format than valuing a publicly traded stock. *What is surprising, however, is not the differences in valuation techniques across assets, but the degree of similarity in basic principles of valuation*.

Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* (3d. Ed.) (2012), p. 1 (emphasis added). Of course, this authoritative commentary on valuation directly contradicts Capital One's absurd assertion that Krause should be required to take "specific training or classes" on valuing PII. Mot., 8. Krause has not only opined as to the "basic principles of valuation," he has shown how they apply to the PII in this case—a demonstration he's uniquely qualified to make, given his years-upon-years of experience and hundreds of valuations, of traded and non-traded assets, discussed *supra* Section II(A). This is a curious position from Capital One, which retained a rebuttal damages expert with no valuation experience whatsoever. *See supra* n.2.

Nor does Rule 702 require Krause to have extensive experience in the precise asset that he is valuing, as Capital One asserts. Mot., 8-10. *See, e.g.*, *Wyler v. Holland Am. Line-USA, Inc.*, 348 F. Supp. 2d 1206, 1211 (W.D. Wash. 2003) (defendants' "suggest[ion] that such an[y] expert [should] have direct experience on a modern vessel the size of the ZAANDAM," was "too narrow to disqualify plaintiff's expert testimony"); *Donahoe v. Arpaio*, 2013 WL 5604349, at *8 (D. Ariz. Oct. 11, 2013) (former attorney general "ha[d] no direct experience with federal racketeering cases," but his "general experience in litigation and with the work of public prosecutors meets the 'minimal foundation' to give opinions on this application of their work"); *Shrader v. Pape Trucks, Inc.*, 2020 WL 5203459, at *7 (E.D. Cal. Sept. 1, 2020) (proffered expert had "sufficient relevant experience to opine as an expert on the standard of care in the trucking industry").

A look under the hood of Capital One's cases further demonstrates that this challenge is without merit. For example, in *Blockchain Innovation*, cited by Defendant, the plaintiff proffered a valuation expert who had "never been qualified to serve as an expert" and whose qualifications did not include *any* education, training or experience in valuation. *Blockchain Innovation, LLC v. Franklin Res., Inc.*, 2024 WL 5483606, at *9-*10 (N.D. Cal. Oct. 22, 2024). The court excluded him, emphasizing: "expertise in an industry, without more, does not qualify [a witness] to testify about valuation methodology." *Id.* at *10. *See also Bennett v. United States*, 2018 WL 6265092, at *4 (C.D. Cal. Mar. 22, 2018) (cited by Defendant) (proffered valuation expert was "a certified vocational expert and rehabilitation counselor" with no appraisal or valuation experience). As it turns out, an expert in "valuation methodology," like Krause, is the appropriate person for this task.

Nor does this constitute a situation where an expert is offering testimony "outside his expertise," the basis on which the expert in *In re Accellion* was excluded. *In re Accellion, Inc. Data Breach Litig.*, 2025 WL 2799102, at *2-*3 (N.D. Cal. Sept. 30, 2025) (cited by Defendant) (proffered expert's qualifications in "[a]ccounting and valuation" were "a far cry from the identity theft issues that Plaintiffs have asked Mr. Korczyk to opine on"). As the court emphasized there, "[o]ne would not expect an accountant to have any specialized knowledge about how a criminal actor might use personal information to conduct identity theft. Nor would one expect an accountant to have any particular insight into how best to thwart identity thieves." *Id. See also White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002), *opinion amended,* 335 F.3d 833 (9th Cir. 2003) (cited by Defendant) (where the proffered expert's "opinion on how the accident occurred *did not rely on his metallurgy expertise at all*," it was the opinion of "[a] layman, which is what an expert witness is when testifying outside his area of expertise" (emphasis added)).[6] Here, Mr. Krause's *valuation*

[6] Capital One's remaining cases do not provide the support it claims. *See United States v. Chang*, 207 F.3d 1169, 1173 (9th Cir. 2000) (proffered expert had no "training or experience, practical or otherwise, detecting counterfeit securities," his "practical experience in international finance" did not amount to "practical experience determining whether a particular security is counterfeit"); *Otto v. LeMahieu*, 2021 WL 1615311, at *2, *5 (N.D. Cal. Apr. 26, 2021) (proffered expert, retained to assess what information about a cryptocurrency was available to different audiences, "concede[d] he ha[d] no specific experience with the cryptocurrency platform or asset (XRB) at issue").

opinion rests firmly on the foundation of his extensive *valuation* expertise.

Capital One's last-ditch arguments fail too. The notion that Mr. Krause's opinion regarding the fair market value of the PII disclosed by Capital One did not "grow naturally" from his decades of experience in valuation is belied by the Report itself, which (over and over) connects his findings to the "basic principles" of valuation. Krause Rep., ¶¶ 80-155. And its attempt to exclude Krause's *damages* opinions based on his lack of experience in digital marketing or risk mitigation is undermined by Capital One's own case law. *See In re Accellion*, 2025 WL 2799102, at *2-*3 (expertise in "[a]ccounting and valuation" did not qualify to talk about actual "identity theft issues"). Clearly, Krause's opinions about the *costs* of risk mitigation are reliably based on his foundational expertise in finance (Krause Rep., ¶¶ 2-3), applied to reliable metrics of those very costs.

### B. Mr. Krause's Damages Models Reliably Turn on Plaintiffs' Theory of Harm and "Proper" Reliance on the Opinions of Plaintiffs' Technical Expert.

Mr. Krause's opinions measuring the class-wide damages in this matter reliably turn on Plaintiffs' claims that Capital One "captured and improperly disclosed" PII to third parties, in violation of legal requirements to "maintain the confidentiality of personally identifying and financial information." Krause Rep., ¶¶ 19, 20; Krause Dep., 92:19-21 ("The economic harm here is the disclosure of that data without the consent and control of the putative class members."). Krause thus recognizes that the "personally identifying" nature of the disclosed information is essential to Plaintiffs' theory of the harm that—*as a damages expert*—he seeks to measure. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (class-wide "model purporting to serve as evidence of damages . . . must measure only those damages attributable to that theory"); *see also* Krause Dep., 294:21-23 ("As a damages expert, it's my role to assume liability on behalf of the plaintiffs.").

In support of his valuation of the disclosed PII, he made further findings as to the "private value" of "personal information" "beyond its use as a bare commodity." Krause Rep., ¶ 81 (collecting authorities). As he states, "[t]he value of personal information is thus inherently related to the value of privacy, which is a question that has been researched in multiple fields including decision science, economics, information systems, management, health care, and marketing." *Id.* (citing, *e.g.*, Fehrenbach David, Carolina Herrando, *The effect of customer-perceived value when paying for a*

*product with personal data: A real-life experimental study*, Journal of Business Research 137 (2021), pp. 222-232). Throughout the extensive description of his valuation methodology, he describes this empirical evidence that the value of personal information is "inherently related" to the value of privacy. *See id.* at ¶¶ 80-155. So Krause's valuation turns on the essential harm pled by Plaintiffs—that Capital One disclosed their *private, personal* information to third parties without permission—and the *economic value* associated with the privacy of that information.

Capital One's attempt to smear Mr. Krause for relying on Plaintiffs' technology expert, Dr. Egelman falls flat (Mot., 11-12)—especially in the absence of a motion to exclude Dr. Egelman. As court after court recognizes, "there is nothing wrong" with Krause's reliance on another expert's opinion; "in patent cases, damages experts routinely rely on facts and opinions provided by technical experts when rendering their damages analysis." *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, 2015 WL 12731924, at *6 (D. Del. Nov. 4, 2015) (collecting cases); *see, e.g.*, *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1321 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) ("Experts routinely rely upon other experts hired by the party they represent for expertise outside of their field."); *Fujifilm Corp. v. Motorola Mobility LLC*, 2015 WL 1737951, at *4 (N.D. Cal. Apr. 8, 2015) (noting it was "acceptable for [marketing expert] to rely on Fujifilm's technical experts"); *Wisconsin Alumni Rsch. Found. v. Apple, Inc.*, 135 F. Supp. 3d 865, 889 (W.D. Wis. 2015) ("[I]t *is* proper for an expert to rely on the opinions of other experts, so long as all of those opinions are reliable and non-speculative, and subject to weighing by the trier of fact." (emphasis original)). This makes sense: Krause is not a technology expert; his reliance on the opinions of Egelman, who Capital One has not challenged, is appropriate.

So, Mr. Krause didn't *assume* that the "core" set of PII was uniformly disclosed as to Plaintiffs and class members (Mot., 10-13); he properly relied on the Report of Plaintiffs' technical expert, Dr. Egelman, as well as his discussions with Egelman, whose opinions Capital One has not challenged in this case. Capital One's assertions depend on *ignoring* the lists of data identified by Krause that comprise these "core" sets (Krause Rep., ¶ 145), as well as his testimony that he developed those lists through *discussions* with Dr. Egelman. Krause Dep., 111:19-24. As he further testified, "as I understand from Dr. Egelman, it's the combination of these data points that allows for that

identification." *Id.* at 100:3-5. [redacted] ECF No. 187-15 ("Egelman Rep."), ¶ 173; *see also id.* at ¶¶ 174-177 ([redacted]), ¶¶ 178-185 ([redacted]), ¶¶ 186-197 ([redacted]). And once again, Capital One's case support for this argument provides no support at all.[7]

Capital One's unsupported assertions that "different information was transmitted about them at different times through different technologies" (Mot., 11) are wrong. [redacted] *See generally* ECF No. 187-1, 5-10; Egelman Rep., 35-39, 52-75. [redacted] *Id.* Mr. Krause valued a core set of this data, transmitted as to everyone, and he valued it conservatively. In any event, the reliability of Krause's valuation of the "core" uniform data disclosed as to all Plaintiffs and putative class members turns on the factual and methodological bases for his valuation. R. 702. *See In re POM Wonderful LLC*, 2014 WL 1225184, at *2 (C.D. Cal. Mar. 25, 2014) (*Comcast* does not require a plaintiff "to demonstrate through common evidence the precise amount of damages incurred by each class member"). "Rather … *Comcast* holds that, under rigorous analysis, 'plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Id.* (quoting *Leyva v. Medline Indus., Inc.,* 716 F.3d 510, 514 (9th Cir. 2013)).[8]

---

[7] Unlike Krause's robust support for his opinions, Capital One's cases showcase examples of grossly unsupported expert opinions. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1085 (C.D. Cal. 2013) (expert's "internally inconsistent" testimony about whether driver was "in control" relied on tire marks that expert admitted were not "conclusive one way or another as to whether the driver is in control of the vehicle"); *Lassalle v. McNeilus Truck & Mfg., Inc.*, No. 16-CV-00766-WHO, 2017 WL 3115141, at *4 (N.D. Cal. July 21, 2017) (proffered expert's "opinion on the event triggering the cause of death," rendering "his misreading of the records and mistake as to the actual cause of death [ ] troubling. His report is based on an incorrect assumption that renders his opinions on the trigger event irrelevant").

[8] Capital One's case law does not provide otherwise. Its cases—involving an expert who created a set of defendant's data "based upon his own assumptions regarding how the data should work" and failed

### C. Mr. Krause's Fair Market Valuation is Reliable.

Ignoring the well-founded valuation principles undergirding Mr. Krause's opinion—affirmed by the IRS, standard-bearing organizations and valuation treatises—Capital One argues that his reliable application those reliable principles is in fact unreliable. Mot., 13-17. Only by ignoring Mr. Krause's *extensive* findings and the repetitious authorities on the nature of valuation and the "judgment" that is reliably applied by the valuation expert, can Capital One make its assertions here.

Courts across the country have found expert valuations reliable notwithstanding the very subjectivity Capital One attacks. In a case involving refunds of penalties to the IRS, the Second Circuit was not "troubled by the fact that each of the appraisers' valuations of the Properties may contain an irreducible subjective element"; as it emphasized, "[t]he appraisal of any property that does not have frequently traded identical substitutes will necessarily be guided by both objective and subjective considerations." *In re MDL-731 Tax Refund Litig.*, 989 F.2d at 1299; *Brown v. Brewer*, 2010 WL 2472182, at *27 (C.D. Cal. June 17, 2010) ("[F]inancial valuation is not an exact scientific methodology. Estimations, predictions, and inferences based on professional judgment and experience are key ingredients in any valuation. In a variety of contexts, the circuit courts have noted that economic valuation is less than an 'exact science.'"); *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 830 (7th Cir. 1985) ("The process of valuation is inexact[.]")

The reliability of a valuation opinion—especially where apples-to-apples comparables are not readily available—turns on the very explication that Mr. Krause has provided here. As described by a bankruptcy court, in valuing the debtor's residence: "When examining a question of valuation, the Court finds an estimate of value that includes a methodology to be more persuasive because a methodology allows the Court to critically evaluate the reasoning behind a valuation." *In re Johnston*, 2013 WL 1844751, at *3 (Bankr. W.D. Va. Apr. 12, 2013) (appraiser's admission that "finding

---

to "confirm" that "his calculations" reflected what the defendant "actually paid its employees," *Rojas v. Marko Zaninovich, Inc.*, 2011 WL 6671737, at *4 (E.D. Cal. Dec. 21, 2011), and a real estate appraiser's "average diminution in value" across properties that treated equally "plaintiffs who suffered damages with plaintiffs who did not suffer damages," *Sines v. Darling Ingredients Inc.*, 2023 WL 3841741, at *12 (D.N.J. June 6, 2023)—say nothing about Mr. Krause's valuation of the uniform PII that was transmitted here. Unlike in *Sines*, Krause is assessing the same data that was disclosed by Capital One in the same way as to everyone.

comparable sales was difficult and involved subjective choices" was *not* unreliable where "appraisers were able to detail their methodology and explain the subjective choices involved in arriving at their conclusions"); *see also Marini v. Adamo*, 995 F. Supp. 2d 155, 173, 181 (E.D.N.Y. 2014), *aff'd,* 644 F. App'x 33 (2d Cir. 2016), *and* 644 F. App'x 33 (2d Cir. 2016) (emphasizing, "it is uncontroverted that there is a subjective component to valuing coins"; but "that subjective component does not render the expert testimony unreliable given the widely-accepted valuation publications and other methods (such as auction records) that are utilized . . . [to] determine the current market value of coins").

Described *supra* Section II(B), Mr. Krause has detailed his valuation methodology in spades. Applying fair market value, "the most widely-recognized standard for valuations," he describes the "critical" element of an appraiser's judgment as to "non-traded assets," like the PII here, that "lack a sufficiently active market for trade that can be used as reference to determine their current market price." *Supra* Section II(B), pp. 4-5. He further explains the "implicit weighting scheme" applied in these situations, as recognized by valuation treatises. *Id.* at p. 5 (noting, valuations may be based on "unobservable inputs" where "observable inputs are not available, thereby *allowing for situations in which there is little, if any, market activity* for the asset"). He describes how "analogous benchmarks and empirical research" inform the relevant "hypothetical market," under the fair market value construct and provides detailed explanations of the benchmarks he applied, their relevance to the PII, and the reasons underlying his "implicit weighting" of those benchmarks. *Id.* at pp. 6-7; *see supra* Section II(B); Krause Rep., ¶¶ 80-155. *Cf. Brown*, 2010 WL 2472182, at *28 (valuation expert's "less than fully reasoned explanations for his choices" court denied motion to strike "given the inherent element of judgment in these financial valuation analyses" (citing Rule 702)).

So this is not "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."[9] Mot., 13. Mr. Krause lays out the connection between the principles of fair market valuation, the pricing benchmarks and weighting applied to the valuation of PII here, and the "conservative"

[9] Nor do Capital One's cases support its assertions that Krause's *valuation* opinion is undermined by his reliable use of appraiser judgment. *See Am. Home Assurance Co. v. Makita Corp. of Am.*, 752 F. Supp. 3d 1028, 1041 (N.D. Ind. 2024) (expert on *batteries* could not rely on "subjective assessments or his plain say-so"); *Holley v. Gilead Scis., Inc.*, 2024 WL 538535, at *2 (N.D. Cal. Jan. 29, 2024) (physician's belief that patient had chronic kidney disease not based on any actual evidence).

valuation ($95) he reaches as to the "core" data he is valuing—a "conclusion" that is far less important than the "soundness of his methodology." *Primiano*, 598 F.3d at 564.

This is why courts have found that the *Daubert* factors are flexible when assessing a valuation opinion under Rule 702. *See, e.g.*, *United States v. Mendoza-Paz*, 286 F.3d 1104, 1112 (9th Cir. 2002) (rejecting argument that "valuation expert's testimony should have been excluded because it was not subject to empirical testing, could not be reviewed for error rates, and the estimates it contained had not been accepted in any expert community," noting that "*Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony" (citations omitted)); *Brown*, 2010 WL 2472182, at *27 (noting, as to "areas of expertise" like valuation, where "the research, theories and opinions cannot have the exactness of hard science methodologies," courts "are given broad discretion to determine whether *Daubert's* specific factors are, or are not, reasonable measures of reliability" (quoting *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006)).

Capital One's remaining arguments depend on ignoring well-established principles under fair market valuation (Mot., 15-17): (1) The assertion that Krause "ignores" how "individual consumers" value the PII is antithetical to the fair market value concept itself, which turns on *hypothetical* buyers and sellers, *see supra* Section II(B); *see also* Krause Dep., 58:22-59 (explaining, valuation of any individual's preferences is "completely irrelevant to . . . fair-market value assessment"; further testifying that individual preferences are "highly subjective" and "specific to individual's biases and references. A fair market valuation removes all of that. It quantifies and estimates the value of what an asset or entity would transact for . . . in a hypothetical marketplace between a willing buyer and a willing seller"); (2) Capital One's thin arguments against Krause's reliable "weighting" of each benchmark—repeatedly asserting that weighting reflects a need for a better comparator—likewise run counter to well-accepted principles of valuation. *See supra* pp. 5-6; *see also Blockchain Innovation*, 2024 WL 5483606, at *4 (finding "the persuasiveness of [the expert's] comparable company valuation analyses is a question of persuasive weight for the jury to consider, rather than a question of admissibility, because any selection of comparable companies is inherently the product of 'expert judgment'").[10]

[10] Notably, Capital One points the Court to the expert report of its rebuttal expert, Lorin Hitt, for these

Finally, Capital One balks at the "minimum floor for the value of the data" described by Mr. Krause, [redacted] Mot., 17. It offers little to contradict Krause's assessment that [redacted] Krause Rep., ¶ 83. As Krause testified, [redacted]

**D. Mr. Krause's Unjust Enrichment Model is Reliable.**

Capital One lodges several complaints against Mr. Krause's measurement of the value of benefits it received through the PII that it collected and disclosed to third parties. Mot., 17-18. Notably, all of its complaints—including its criticisms of the proxies used by Krause—could be rectified *by Capital One*, in responding to discovery requests regarding its "return on investment from marketing through third-party platforms." *See supra* Section II(C).

Capital One's insistence that Mr. Krause did not "investigate" its actual digital marketing expenses is rich in light of his repeated testimony otherwise. *See, e.g.*, Krause Dep., 149:10-20 ("I would think that Capital One could provide that information. I know, as I identified early in this deposition, that was something I specifically requested. It was not forthcoming, that I'm aware of."); *id*. at 52:19-22 (noting, the CMO survey is "a reasonable proxy to use in the interim period that hopefully Capital One will provide the actual data and I can calculate it based on that"); *id.* at 151:10-15 ("Since that data wasn't provided by Capital One, despite requests, I needed to assume something other than a hundred percent of the marketing budget would apply. And so I utilized an industry

---

assertions. As will be detailed in Plaintiffs' forthcoming Rule 702 Motion, Dr. Hitt did not even evaluate Mr. Krause's fair market valuation. Nor could he because he has no professional experience in valuation. Hitt Dep., 146:6-13; *see id.* at 157:22-158:14 (has never applied valuation approaches).

standard reliable survey as a proxy for that."); *id.* at 153:25-154:10 ("I'll say that once Capital One makes available the actual allocation of its digital marketing spend, I will be happy to update my report and utilize that actual percentage."). Capital One has no basis in fact or law for this assertion that *Mr. Krause* is to blame for the total absence of direct evidence as to its digital marketing expenses.

In the absence of Capital One's own metrics, Mr. Krause relied on two key studies: the CMO Survey that provides an average percentage for digital marketing of the total marketing budget and the Wernerfelt Study, which studied tens of thousands of companies and arrived at a "median advertising benefit" from PII. *See id.* The CMO survey is "a robust survey of numerous—of hundreds of companies that were asked the specific question of allocation of their digital marketing as a percentage of their overall marketing budget." Krause Dep., 151:5-9. And as to the Wernerfelt study, Krause chose it as a proxy for "cost savings in [the] digital advertising budget," because of "robustness and relevance of the U.S. market in the Wernerfelt study and the sheer size of the study and effort that went into it." *Id.* at 157:5-25. Capital One's counter that Wernerfelt solely studied marketing efficiencies through Meta ignores that the transmitted PII was "the same information that's transmitted across all of the tracking and server-to-server platforms"; "because that data is the same, [ ] it is reasonable to infer . . . that the efficiencies and benefits are comparable." *Id.* at 160:8-17.

Finally, Capital One makes the brazen, unsupported assertion that its taking of PII without Plaintiffs' or putative members' knowledge could be characterized as *providing* a benefit, instead of causing a cognizable harm. Mot., 20. As a counter to this proposition of *benefits* from PII-driven advertising, Mr. Krause responded: "I'm not aware of any benefits. . . . [I]n economics I have observed and generally have seen in the literature that there is a significant economy for *exemption from advertising*, whether it be through various services like streaming platforms or music platforms"; "it generally costs more and people are willing to spend more money to avoid advertising and other intrusive elements." Krause Dep., 172:3-12 (emphasis added). Capital One has no response to this opinion. Mr. Krause's unjust enrichment model is reliable under Rule 702.

**E. Mr. Krause's Restitution Model is Reliable.**

Finally, Capital One asserts that Mr. Krause cannot use data deletion services as a proxy to restore Plaintiffs and putative members to their position before the improper disclosures because those

services cannot delete the PII that it disclosed to third parties like Google and Meta. Mot., 20-21. Effectively, Capital One would render cognizable harm without remedy, insisting that the proxy be capable of an action no available service can take. So, even if Capital One is liable for their harm, Plaintiffs and members are out of luck. In the wake of its own 2019 data breach, Capital One provided similar services to its victims, services that couldn't undo Capital One's breach. *See supra* p. 12. Parties are always looking for proxies to remedy privacy harms, including Capital One.[11]

As Krause testified: there being no "data deletion" service to remove information from Adobe, Google or Meta is "why I'm utilizing this as a proxy." Krause Dep., 191:2-7. "That's what a proxy is. It is as close to what you're trying to achieve as you can if you can't achieve what you're trying to achieve. If it's not possible to actually remediate what Capital One did here in its disclosures, then you have to use the closest proxy you can to estimate that cost to the class members." *Id.* at 203:22-204:3. Courts agree. Relevant proxies are reliable for determining damages, notwithstanding differences between the harm and the proxy used as measurement. *See, e.g.*, *Beaty v. Ford Motor Co.*, 2021 WL 3109661, at *3 (W.D. Wash. July 22, 2021), *amended,* 2023 WL 1879534 (W.D. Wash. Feb. 10, 2023) ("Even assuming that Dr. McCrary's methodology cannot reliably calculate class members' original point-of-sale damages, his analysis of resale data is nonetheless a reliable proxy to determine whether class members who later sold their Class Vehicles suffered any damages."); *Dermfx, Inc. v. Obagi Med. Prods., Inc.*, 2017 WL 2684548, at *12 (C.D. Cal. Mar. 24, 2017) ("An alleged infringer's profits are recoverable in trademark cases on a disgorgement/unjust enrichment theory or as proxy for actual damages[.]"). Mr. Krause's restitution model is reliable under Rule 702.

## V. CONCLUSION

For the foregoing reasons, Capital One's Motion to Exclude the exceedingly reliable opinions and testimony of Plaintiff's proffered expert, Eric Krause, should be denied.

---

[11] Corporate defendants in cases challenging similar tracking practices, using trackers from Google, Meta and others, routinely offer such services to members in class-wide settlements, notwithstanding that the transmitted PII may be irretrievable from those third parties. *See, e.g.*, *Cavalier v. University Health Systems, Inc.*, No. 207369-2 (Knox Cty. Ch. Ct. Tenn. Jan. 7, 2026); *Fleece v. Diagnostic Services Holdings, Inc.*, No. 49D01-2305-PL-019711 (Marion Super. Ct. Ind. Dec. 18, 2025); *Fleece v. Hancock Regional Health*, No. 49D01-2305-PL-020713 (Marion Super. Ct. Ind. Dec. 18, 2025); *Doe v. Margaret Mary Community Hospital, Inc.*, No. 49D01-2308-PL-031254 (Marion Super. Ct. Ind. Dec. 18, 2025).

Dated: March 20, 2026

Respectfully submitted,

*/s/ Natalie Lyons*
Natalie Lyons, No. 293026
Vess A. Miller, No. 278020
Lynn A. Toops (*pro hac vice*)
Lisa M. La Fornara (*pro hac vice*)
Emily D. Herrin (*pro hac vice*)
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
nlyons@cohenmalad.com
vmiller@cohenmalad.com
ltoops@cohenmalad.com
llafornara@cohenmalad.com
eherrin@cohenmalad.com

J. Gerard Stranch, IV (*pro hac vice*)
Kyle M. Mallinak (*pro hac vice*)
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
gstranch@stranchlaw.com
kmallinak@stranchlaw.com

Lesley E. Weaver, No. 191305
Anne K. Davis, No. 267909
**STRANCH, JENNINGS & GARVEY, PLLC**
1111 Broadway, Suite 300
Oakland, California 94607
(341) 217-0550
lweaver@stranchlaw.com
adavis@stranchlaw.com

Samuel J. Strauss (*pro hac vice* forthcoming)
Brittany N. Resch (*pro hac vice*)
Andrew Gerald Gunem (*pro hac vice*)
**STRAUSS BORRELLI, PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
(872) 263-1100
sam@straussborrelli.com
bresch@straussborrelli.com
agunem@straussborrelli.com

*Counsel for Plaintiffs and the Proposed Classes*

**PROOF OF SERVICE**

I, Natalie A. Lyons, hereby certify that on March 20, 2026, I electronically filed the foregoing document with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which will send electronic notification to all counsel of record.

Dated: March 20, 2026

*/s/ Natalie Lyons*
Natalie Lyons
*Counsel for Plaintiffs and the Proposed Class*

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I attest that the other Signatory has concurred in the filing of the document, which shall serve in lieu of the signature on the document.

Dated: March 20, 2026

*/s/ Natalie Lyons*
Natalie Lyons
*Counsel for Plaintiffs and the Proposed Class*