Lynn A. Toops (*pro hac vice*)
Natalie Lyons, No. 293026
Vess A. Miller, No. 278020
Lisa M. La Fornara (*pro hac vice*)
Emily D. Herrin (*pro hac vice*)
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenmalad.com
nlyons@cohenmalad.com
vmiller@cohenmalad.com
llafornara@cohenmalad.com
eherrin@cohenmalad.com

*Attorneys for Plaintiffs and the Proposed Class*
*Additional Counsel Listed in Signature*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| GARY INGRAHAM and DEIA WILLIAMS, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CAPITAL ONE FINANCIAL CORPORATION, d/b/a CAPITAL ONE, d/b/a CAPITAL ONE, NATIONAL ASSOCIATION, d/b/a CAPITAL ONE, N.A., d/b/a CAPITAL ONE SHOPPING,<br><br>Defendant. | Case No. 3:24-cv-05985-TLT<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO CAPITAL ONE'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) AND 12(h)(3)**<br><br>Complaint Filed: August 26, 2024<br><br>Date: April 21, 2026<br>Time: 2:00 p.m.<br><br>Judge: Hon. Trina L. Thompson |

**REDACTED**

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES .... 1
I. INTRODUCTION .... 1
II. FACTUAL BACKGROUND .... 3
A. Capital One Deploys a Broad, Hidden Ecosystem of Tracking Technologies for Marketing and Profit Purposes .... 3
B. Capital One Collected and Transmitted Plaintiffs' Personally Identifying Information and Private Financial Information to Third Parties. .... 8
C. Capital One's Disclosures Do Not Cover Its Collection and Transmission Practices and Customers Aren't Compensated for the Use of Their Data. .... 12
III. PROCEDURAL STANDARD .... 13
IV. ARGUMENT .... 14
A. Because Plaintiffs Have Been Injured by Capital One's Uniform Policy, They Have Standing to Challenge All Aspects of That Policy—Including All Technologies Used. .... 14
B. Capital One Misapprehends the Injuries-in-Fact Inquiry. .... 16
C. Plaintiffs Acted Consistently with Their Expectation of Privacy. .... 23
D. Plaintiffs Have Article III Standing to Seek Injunctive and Declaratory Relief. .... 25
V. CONCLUSION .... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Avocent Redmond Corp. v. Rose Electronics*,
2012 WL 2916327 (W.D. Wash. July 6, 2012) .......... 1

*Bass v. Facebook, Inc.*,
394 F. Supp. 3d 1024 (N.D. Cal. 2019) .......... 18

*Bowen v. Energizer Holdings, Inc.*,
118 F.4th 1134 (9th Cir. 2024) .......... 14, 22

*Breen v. City of Concord*,
2019 WL 13587745 (N.D. Cal. Dec. 10, 2019) .......... 15

*Campbell v. Facebook, Inc.*,
951 F.3d 1106 (9th Cir. 2020) .......... 23

*In re Capacitors Antitrust Litig.*,
154 F. Supp. 3d 918 (N.D. Cal. 2015) .......... 16

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .......... 16

*Doe v. Tenet Healthcare Corp.*,
789 F. Supp. 3d 814 (N.D. Cal. 2025) .......... 15

*Dream Gamers of Ariz., Inc. v. PC Onsite*,
561 F.3d 983 (9th Cir. 2009) .......... 17

*Facebook, Inc. v. Power Ventures, Inc.*,
252 F. Supp. 3d 765 (N.D. Cal. 2017) .......... 25

*In re Facebook, Inc. Consumer Priv. User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) .......... 14

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... 17, 23

*Fox v. Ritz-Carlton Hotel Co., LLC*,
997 F.3d 1039 (11th Cir. 2020) .......... 15

*Gabrielli v. Haleon US Inc.*,
2025 WL 2494368 (N.D. Cal. Aug. 29, 2025) .......... 14, 20, 22

*Garmong v. Tahoe Reg'l Planning Agency*,
806 F. App'x 568 (9th Cir. 2020) .......... 16

*In re Google Inc. Gmail Litigation*,
2014 WL 1102660 (N.D. Cal. Mar. 18, 2014)........................................................................25

*In re Google Referrer Header Priv. Litig.*,
2014 WL 1266091 (N.D. Cal. Mar. 26, 2014)........................................................................16

*Holland-Hewitt v. Allstate Life Ins. Co.*,
343 F.R.D. 154 (E.D. Cal. 2022)........................................................................16

*John-Charles v. California*,
514 F.3d 878, 892 (9th Cir. 2008)........................................................................15

*Kellman v. Spokeo, Inc.*,
2024 WL 2788418 (N.D. Cal. May 29, 2024)........................................................................17

*Kirola v. City of San Fran.*,
860 F.3d 1164 (9th Cir. 2017)........................................................................15

*Lakes v. Ubisoft, Inc.*,
777 F. Supp. 3d 1047 (N.D. Cal. 2025)........................................................................25

*Limon v. Circle K Stores, Inc.*,
2020 WL 3060753 (E.D. Cal. Jun. 9, 2020)........................................................................17

*Loreto v. Ariz. Bd. of Regents*,
2024 WL 4487026 (D. Ariz. Mar. 7, 2024)........................................................................1

*Melandres v. Arpaio*,
784 F.3d 1254 (9th Cir. 2015)........................................................................15

*Meyer v. Portfolio Recovery Assocs., LLC*,
707 F.3d 1036 (9th Cir. 2012)........................................................................25

*Mikulsky v. Bloomingdale's, LLC*,
713 F. Supp. 3d 833 (S.D. Cal. Jan. 25, 2024)........................................................................25

*Mikulsky v. Noom, Inc.*,
2024 WL 251171 (S.D. Cal. Jan. 22, 2024)........................................................................19

*Northstar Financial Advisors Inc. v. Schwab Investments*,
779 F.3d 1036 (9th Cir. 2015),
*as amended on denial of rehearing and*
*rehearing en banc* (Apr. 28, 2015)........................................................................17

*Plantronics, Inc. v. Am. Home Ass. Co.*,
2014 WL 2452577 (N.D. Cal. May 30, 2014)........................................................................23

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025)........................................................................19, 20

*Safe Air for Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004) .......... 14

*Scheibe v. Fit Foods Distribution, Inc.*,
2023 WL 7434964 (S.D. Cal. Nov. 8, 2023) .......... 15

*Schwarzschild v. Tse*,
69 F.3d 293 (9th Cir. 1995) .......... 1

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 19

*Williams v. DDR Media, LLC*,
2023 WL 5325896 (N.D. Cal. Aug. 18, 2023) .......... 21

**Statutes**

Cal. Civ. Code. § 1798.140 .......... 21

**Rules**

Fed. R. Civ. P. 12(b)(1) .......... 25

Fed. R. Civ. P. 12(h)(3) .......... 25

**Other Authorities**

*The Intellectual History of Unjust Enrichment*,
133 Harv. L. Rev. 2077 (2020) .......... 18

Wright, Miller, Federal Practice & Procedure,
Civil 3d § 1505 .......... 17

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Fact discovery closed more than four months ago, and expert discovery closed two months ago. Yet only now, smack in the middle of substantial class-certification briefing, does Capital One purport to identify standing defects. That timing is no accident. The arguments Capital One advances are intertwined with its merits defenses and its opposition to class certification, and they could have (indeed, should have) been presented in its class-certification brief. Instead, Capital One filed a separate motion in a transparent effort to evade the Court's page limits, secure extra briefing by another name, and accelerate its determination in conjunction with class certification.[1]

Capital One's procedural flimsiness aside, Capital One's motion tries to airbrush this case into something abstract and harmless. But the record shows the opposite. Capital One built a broad, hidden tracking ecosystem—that evaded blocking efforts—to capture information from consumers applying for credit and sent it to Meta, Google, Adobe, and others, so it could improve targeting, sharpen ad performance, reduce marketing costs, and extract more value from each application. That is not a one-off technical glitch. It is a uniform, undisclosed business practice affecting the class of millions of Capital One customers. And once Plaintiffs showed that their personal and financial information was in fact collected and transmitted through Capital One's practice (as they alleged in their Complaint), they established the concrete injury needed for Article III standing. The facts have only bore out and improved since Plaintiffs filed their Complaint. There is no standing defect.

Capital One's contrary argument depends on slicing its own uniform practice into artificial pieces—technology by technology—and then insisting Plaintiffs must separately establish standing

---

[1] Courts view this practice with "disfavor." *See, e.g.*, *Loreto v. Ariz. Bd. of Regents*, 2024 WL 4487026, at *3 (D. Ariz. Mar. 7, 2024); *Avocent Redmond Corp. v. Rose Electronics*, 2012 WL 2916327, at *1 (W.D. Wash. July 6, 2012) (striking four dispositive motions filed under local rules discouraging the filing of successive motions). Capital One's maneuver is especially egregious here because its motion also functions as a summary-judgment motion, even though the summary-judgment deadline is not until July 10, 2026. By having, in effect, moved for summary judgment and insisting on a ruling before a class is certified, Capital One waives any one-way intervention objections. *See Schwarzschild v. Tse*, 69 F.3d 293, 297 (9th Cir. 1995) ("By obtaining summary judgment before notice had been sent to the class, the defendants waived their right to have such notice given and to obtain a judgment that was binding upon the class.").

for every permutation. That is not the law. Plaintiffs need not show that every named plaintiff's data traveled through every tool in Capital One's tracking stack to challenge the same overarching policy that injured them in the same basic way. Those kinds of variations are not a basis to defeat standing.

Nor can Capital One escape standing by relabeling some of these tools as "analytics." The record shows that, whatever label Capital One prefers, the technologies all operated in the same way: [redacted]. So the injury here does not rise or fall on whether Capital One chose to sort a particular transmission into the "analytics" bucket or the "advertising" bucket. That taxonomy was just an internal label Capital One used to bless some of its most troubling data-sharing—[redacted]. Based on the claims asserted, the injuries common to each class member are the unauthorized transmission and exploitation of Plaintiffs' personal and financial information, without their knowledge, consent, or compensation. On this record, that injury is not speculative. It is concrete. It doesn't matter that Capital One used different tools (sometimes a hammer, sometimes pliers) to extract a series of nails (consumer data) from the same wall (its application system).

The facts also defeat Capital One's attempt to wave away the disclosures as anonymous or routine. As a threshold problem, Capital One's approach of sharing so-called hashed or anonymized data directly contradicts with the Federal Trade Commission's position, which has repeatedly cautioned that hashing doesn't *really* make data anonymous. [redacted]. Plaintiffs' expert further [redacted] and the

FTC agrees. At a minimum, that creates a factual dispute Capital One cannot resolve on a Rule 12(b)(1) motion dressed up as a standing challenge.

In the end, Capital One's motion fails because it asks the Court to do exactly what Article III does not permit: resolve merits-laden factual disputes under the banner of jurisdiction and ignore the concrete injury shown in the record. Plaintiffs have adduced evidence that Capital One, through a uniform policy, transmitted their personally identifying and private financial information to third parties in ways its disclosures did not cover, and both it and the third parties profited. Capital One has even testified that some of this data is not even subject to its privacy disclosures. That is more than enough to establish standing. The motion to dismiss must be denied.

## II. FACTUAL BACKGROUND

### A. Capital One Deploys a Broad, Hidden Ecosystem of Tracking Technologies for Marketing and Profit Purposes.

[redacted]. (ECF No. 187-11, Ex. 9, Dep. of Conner Robert Boles ("Boles Dep."), 19:11-12; 21:13-14; 24:12-16 ("[redacted]," "[redacted]").) After all, "[redacted]." (ECF No. 187-14, Ex. 12).

Whether for so-called "website analytics purposes," "marketing analytics," or targeted "advertising," the tracking technologies Capital One uses all function the same. [redacted]. (*See* ECF No. 187-15, Expert Report of Dr. Serge Egelman ("Egelman Rep."), ¶ 15; *id.* ¶ 133 (describing "[redacted]"); *id.* ¶ 139 (describing "[redacted]"); ECF No. 187-8, Ex. 6 ("[redacted].").) [redacted]." (Egelman Rep. ¶ 15.)

Or, Capital One gains "[redacted]." (Egelman Rep. ¶ 133.)

Whatever their purpose, the data flowing through Capital One's sprawling ecosystem of tracking technologies [redacted]. (ECF No. 187-7, Ex. 5, Rule 30(b)(6) Dep. of Melissa Wing ("Wing Dep."), 263:25–264:1.) Although Capital One tries to draw a distinction, third parties also benefit from the so-called "analytics" tools that Capital One claims benefit only itself. For example, Capital One paints Adobe Analytics as a benign tool that it "'purely uses' to understand how customers interact with the Capital One website."[2] (Def.'s Mtn. to Dismiss ("Mot.") at 5.) Yet that explanation does not square with the data being shared: [redacted]. (Egelman Rep. ¶¶ 136–38.) And this Court has already rejected Capital One's sanitized account, holding that "the Online Privacy Policy . . . does not state that it releases the customer's personal information such as employment information and credit card preapproval or approval status." (ECF No. 59 at 6).

Capital One's effort to dress this up as innocuous "analytics" fails on its own terms anyway. As Plaintiffs' unchallenged expert explained, [redacted]. (Egelman Rep. ¶ 133.) [redacted]. (*Id.* ¶ 141). So even under

[2] In support of this claim, Capital One relies on a declaration from a witness who testified at two depositions, which it attached to its Opposition to Plaintiffs' Motion for Class Certification. Plaintiffs object to Capital One's blatant use of sham declarations that contradict deposition testimony and will file a motion to strike these inappropriate aspects of the declarations used. In addition, to the extent Capital One relies on any of its expert reports, Plaintiffs also intend to move to strike those reports. Plaintiffs will file these motions by the Court-ordered deadline, March 27, 2026.

Capital One's preferred labels, these tools were not merely inward-facing diagnostics. They were part of the same data-extraction machinery.

Capital One does not—because it cannot—seriously dispute that these technologies collect broad swaths of customer information. For example, [redacted]:

- [redacted]
- [redacted]
- [redacted]

(*See, e.g.*, ECF No. 215-44 ("Trowbridge Decl.") at 4.) Any big data machine receiving these transmissions—and, frankly, any human paying attention—knows exactly what they mean. And these transmissions to third parties are not disclosed to customers, as this Court already found. (ECF No. 59 at 6.)

Instead of fighting the wide variety of data it transmits, Capital One balks no-harm, no-foul because the data is anonymized—so only Capital One could know what this data means or trace it back to an individual. This is false and directly rebutted by record evidence. *First*, [redacted] (ECF No. 199-3, Ex. Y, Dep. of Melissa Wing ("Wing Dep."), 211:21–212:4; ECF No. 199-5, Ex. AA, Ager 30(b) Dep. 104:20-21 ("[redacted]"); *id.* 105:21–23 ("[redacted]"); *id.* 108:2–3 ("[redacted]").)

Further, the FTC disagrees. "Companies [who] often claim and act as if data that lacks clearly identifying information is anonymous" because hashed identifiers and "unique advertising and device

identifiers" allow "third parties to circumvent operating system privacy controls, identify individuals, [and] infer the identity of an individual user."[3] The FTC warns: "Regardless of what they look like, all user identifiers have the powerful capability to identify and track people over time, therefore **the opacity of an identifier cannot be an excuse for improper use or disclosure.**" *Id.* (emphasis in original). Dr. Egelman's unchallenged report says [redacted]. (ECF No. 187-23, Supp. Report of Serge Egelman ("Egelman Supp. Rep."), ¶¶ 16–19; ECF No. 187-49, Ex. 55 (Meta's production of data that was transmitted by Capital One); ECF No. 187-50, Ex. 56 ([redacted]).) After all, [redacted].

In any event, it is no secret that the third parties who receive the data use it for their own benefit, too. They are even up front about it. As Dr. Egelman points out, "[redacted]. (Egelman Rep. ¶¶ 122, 126, 143.)

Capital One's suggestion that the third parties, like Meta, Google, and Adobe, are somehow contractually prohibited from using the data for other purposes is just wrong. (Mot. at 9.) These third parties offered Capital One take-it-or-leave-it clickthrough terms that Capital One could not negotiate. [redacted]. (ECF No. 187-11, Ex. 9, Dep. of Conner Robert Boles ("Boles Dep."), 19:11–12; 21:13–14; 24:12–16 ("[redacted]

[3] Staff in the Office of Technology, *No, Hashing Still Doesn't Make Your Data Anonymous*, Federal Trade Commission (July 24, 2024), *available at* https://www.ftc.gov/policy/advocacy-research/techat-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous.

[redacted]").) And the contracts Capital One agreed to say exactly that:

- [redacted]."[4] (ECF No. 187-21, Ex. 19, at 4.)
- [redacted]."[5] (ECF No. 187-22, Ex. 20.)
- ***Google*** states that by using its products, "you give Google a perpetual, irrevocable, worldwide, sublicensable, royalty-free and non-exclusive license to Use content, submitted, posted, or displayed to or from the APIs" and it may use all data it receives to "improve Google products and services." Google, *Google APIs Terms of* Service, *available at* https://developers.google.com/terms (last accessed Mar. 20, 2026). Likewise, Google admits that it uses information "shared by sites and apps to deliver our services, maintain and produce them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and our partners' sites and apps." Google, *Privacy Disclosure Policy*, https://policies.google.com/technologies/partner-sites (last accessed Mar. 20, 2026).

The takeaway is simple. [redacted]. As Plaintiffs' unchallenged Dr. Egelman explains, "[redacted]

---

[4] [redacted] Mot. at 8.

[5] [redacted]

[redacted].” (Egelman Rep. ¶ 30.) “[redacted].” (*Id.* ¶ 32.)

### B. Capital One Collected and Transmitted Plaintiffs’ Personally Identifying Information and Private Financial Information to Third Parties.

Capital One does not meaningfully dispute that it transmitted Plaintiffs’ data through several technologies. For some technologies, [redacted]. (*See, e.g.*, ECF No. 215-44, Trowbridge Decl., ¶ 31 (Figure 5), ¶ 37 (Figure 6)). But it does not dispute that those technologies were in effect when Plaintiffs applied for their credit card applications. [redacted]. The following tables summarize the transmissions for Plaintiff Gary Ingraham.

| Application Date | Technology | Data Transmitted | Sources |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | • Egelman Rep. ¶¶ 161–64, 165–68, 174–77, 178–85.<br>• ECF No. 187-57, Ingraham’s 5th Supp. Responses to 1st Set of Interrogatories;<br>• ECF No. 187-57, Ingraham’s 6th Supp. Responses to 1st Set of Interrogatories;<br>• ECF No. 187-18, Capital One Suppl. Resp. to Interrogatory No. 1;<br>• ECF No. 187-7, Wing Ind. Dep., 157:3–8, 163–69, 180–98;<br>• ECF No. 187-4, Trowbridge Ind. Dep., 62–76, 101–02, 140–46, 168–71, 201, 226–28; |

| | | | |
|---|---|---|---|
| [redacted] | | [redacted] | • ECF No. 187-25, Trowbridge 30(b)(6) Dep., 68:14–17, 69:5–6, 13–21, 70:24–71:23, 74:1–4, 74:19–75:3, 94:3–25, 97:2–25, 107:2–25, 117:9–25, 121:20–22:16.<br>• ECF No. 187-35, CAPONE-SHAH-0038420 ([redacted]). |
| [redacted] | [redacted] | [redacted] | • Egelman Rep. ¶¶ 165–68, 178–185;<br>• ECF No. 187-57, Ingraham's 6th Supp. Responses to 1st Set of Interrogatories;<br>• ECF No. 187-18, Capital One Suppl. Resp. to Interrogatory No. 1;<br>• ECF No. 187-4, Trowbridge Ind. Dep., 148:20–149:25, 159:4–160:5. |
| [redacted] | [redacted] | [redacted] | • Egelman Rep. ¶¶ 169–72, 186–97;<br>• Egelman Supp. Rep.;<br>• ECF No. 187-57, Ingraham's 6th Supp. Responses to 1st Set of Interrogatories;<br>• ECF No. 187-18, Capital One Suppl. Resp. to Interrogatory No. 1;<br>• ECF No. 187-49, PIXEL_CAPITALONE_000000002 - 000000004 ([redacted]);<br>• ECF No. 187-4, Trowbridge Ind. Dep., 65:17–66:3, 210:13–212:21. |

| | | | |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | • Egelman Rep.<br>• Egelman Supp. Rep. ¶¶ 16–19;<br>• ECF No. 187-57, Ingraham's 6th Supp. Responses to 1st Set of Interrogatories;<br>• ECF No. 187-31, CAPONE-SHAH-00038437 ([redacted]);<br>• ECF No. 187-51, CAPONE-SHAH-0004081 ([redacted]);<br>• ECF No. 187-49, PIXEL_CAPITALONE_000000002 ([redacted]).<br>• ECF No. 187-17, Morawetz Dep., 16:1–10, 71:21–25, 89:7–10, 113:19–25. |
| [redacted] | [redacted] | [redacted] | • Egelman Rep.;<br>• Egelman Supp. Rep. ¶¶ 4–12;<br>• ECF No. 187-57, Ingraham's 6th Supp. Responses to 1st Set of Interrogatories;<br>• ECF No. 187-12, Ager 30(b)(6) Dep., 55:3, 57:8, 65:16–19, 68:5–8;<br>• ECF No. 187-46, CAPONE-SHAH-00040798 (spreadsheet);<br>• ECF No. 187-59, CAPONE-SHAH-00040793<br>• ECF No. 187-60, CAPONE-SHAH-00040795 (schema). |

The following table summarizes the transmissions for Plaintiff Williams:

| Application Date | Technology | Data Transmitted | Sources |
|---|---|---|---|
| [redacted] | [redacted] | [redacted]<br>[redacted] | • Egelman Rep. ¶¶ 161–68, 174–85;<br>• ECF No. 187-58, Williams's 5th Supp. Responses to 1st Set of Interrogatories;<br>• ECF No. 187-58, Williams's 6th Supp. Responses to 1st Set of Interrogatories;<br>• ECF No. 187-18, Capital One Suppl. Resp. to Interrogatory No. 1;<br>• ECF No. 187-7, Wing Ind. Dep., 157:3–8, 163–69, 180–98;<br>• ECF No. 187-4, Trowbridge Ind. Dep., 55:32–62:36, 62–76, 101–02, 140–46, 168–71, 201, 226–28;<br>• ECF No. 187-25, Trowbridge 30(b)(6) Dep., 65, 68:14–17, 69:5–6, 13–21, 70:24–71:23, 74:1–4, 74:19–75:3, 94:3–25, 97:2–25, 107:2–25, 117:9–25, 121:20–22:16, 130:1–15;<br>• ECF No. 187-35, CAPONE-SHAH-00038420 ([redacted]); |
| [redacted] | [redacted] | [redacted]<br>[redacted] | • Egelman Rep. ¶¶ 165–68, 178–85;<br>• ECF No. 187-58, Williams's 6th Supp. Responses to 1st Set of Interrogatories;<br>• ECF No. 187-18, Capital One Supp. Resp. to Interrogatory No. 1;<br>• ECF No. 187-4, Trowbridge Ind. Dep., 148:20–149:25, 159:4–160:5. |

| | | | |
|---|---|---|---|
| [redacted] | [redacted] | [redacted]<br>[redacted] | • Egelman Rep. ¶¶ 169–72, 186–97;<br>• Egelman Supp. Rep.;<br>• ECF No. 187-58, Williams's 6th Supp. Responses to 1st Set of Interrogatories;<br>• ECF No. 187-18, Capital One Suppl. Resp. to Interrogatory No. 1;<br>• ECF No. 187-35, CAPONE-SHAH-00038420;<br>• ECF No. 187-4, Trowbridge Ind. Dep., 65:17–66:3, 210:13–212:21. |
| [redacted] | [redacted] | [redacted]<br>[redacted] | • Egelman Rep.;<br>• Egelman Supp. Rep. ¶¶ 4–12;<br>• ECF No. 187-58, Williams's 6th Supp. Responses to 1st Set of Interrogatories;<br>• ECF No. 187-12, Ager 30(b)(6) Dep. 55:3, 57:8, , 65:16–19;<br>• ECF No. 187-46, CAPONE-SHAH-00040798 ([redacted]);<br>• ECF No. 187-59-60, CAPONE-SHAH-00040793 & CAPONE-SHAH-00040795 ([redacted]). |

### C. Capital One's Disclosures Do Not Cover Its Collection and Transmission Practices and Customers Aren't Compensated for the Use of Their Data.

This Court already recognized that Capital One's policy "does not state that it releases [a] customer's personal information such as employment information and credit card preapproval or approval status." ECF No. 59, Order on Mot. to Dismiss, at 6. That is true across the board for all

Capital One's policies. Against that backdrop, Plaintiffs could not consent to sharing information that was never disclosed in the privacy policy to begin with.

And as shown above, discovery proved Capital One shared a trove of data with third parties, and then some. [redacted][6] [redacted].[7] See supra pp. 8–11. [redacted]. ECF No. 187-7, Wing Dep., 218:13–19.

Capital One also [redacted] ECF No. 187-7, Ex. 5, Wing Dep., 263:25–264:1.

## III. PROCEDURAL STANDARD

As an initial matter, Defendant's motion improperly attempts to have the Court decide disputed issues of material fact on a Rule 12(b)(1) motion that are intertwined with the merits of Plaintiffs' claims. But the Ninth Circuit, and courts in this District, have held that courts may not do so. Instead, on a Rule 12(b)(1) motion, "when jurisdictional issues are intertwined with an element of the merits of the plaintiff's claim, the court must . . . leave the resolution of material factual disputes

---

[6] [redacted] Egelman Rep. ¶ 75. [redacted]." *Id.* ¶ 87. The FTC is in alignment with Dr. Egelman. *See supra* p. 6 n.3.

[7] [redacted]

to the trier of fact." *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1142–43 (9th Cir. 2024) (internal quotations and citations omitted). As Judge Orrick recently put it, "courts cannot resolve 'jurisdictional questions [that] are intertwined with the merits of a claim.'" *Gabrielli v. Haleon US Inc.*, 2025 WL 2494368, at *6 (N.D. Cal. Aug. 29, 2025) (quoting *Bowen*, 118 F. 4th at 1134).

"'[J]urisdictional issue[s] and substantive issues' are deemed 'intertwined [when] the question of jurisdiction is dependent on the resolution of factual issues going to the merits,'" such as when the issue of standing is intertwined with an element of the plaintiff's claim. *Id.* (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)). "In privacy cases, the standing and merits inquiries will often be intertwined. For example, the extent to which you have a reasonable expectation of privacy relates not only to whether you've stated a claim for invasion of privacy but whether you were injured by the invasion in the first place." *In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 788 (N.D. Cal. 2019). "And this will be often true of consent – if you agree to the disclosure of your personal information, it may be difficult to argue that you've been 'injured' in a legal sense by the disclosure you permitted." *Id.* "Because courts presume success on the merits when evaluating standing, these are not standing issues in privacy cases." *Id.*

## IV. ARGUMENT

### A. Because Plaintiffs Have Been Injured by Capital One's Uniform Policy, They Have Standing to Challenge All Aspects of That Policy—Including All Technologies Used.

Capital One's standing argument fails at the threshold. It says that Plaintiffs do not have "standing" to challenge *all* technologies that violated the proposed Classes' rights in the exact same way. But this argument ignores the fact that Plaintiffs' personal and financial information ***was*** collected and transmitted by Adobe Analytics, Google Analytics, Google Marketing Tags, Meta Pixel, Meta CAPI, and Google ADH/UPMD. This encompasses every single tracking technology in this lawsuit except for Skai/Kenshoo, which collected and transmitted the same data as Meta CAPI and Google ADH/UPMD. That alone defeats Capital One's argument.

Even setting that aside, Capital One's argument incorrectly conflates Article III standing with the typicality analysis under Rule 23.[8] Mot. at 14–15. Once the named plaintiff has suffered an injury, concerns regarding "dissimilarity in injuries suffered are relevant only to class certification, not standing." *Melandres v. Arpaio*, 784 F.3d 1254, 1261 (9th Cir. 2015) (concluding plaintiffs had standing to challenge a pattern or practice of racial profiling Latino drivers and passengers, even though plaintiff may have been stopped under different circumstances than class members); *Kirola v. City of San Fran.*, 860 F.3d 1164, 1176 (9th Cir. 2017) ("The class definition is broad enough to encompass every facility discussed at trial, whether Kirola personally visited that facility or not[;]" the district court erred by limiting her claims only to "facilities that were visited by Kirola"); *Fox v. Ritz-Carlton Hotel Co., LLC*, 997 F.3d 1039, 1047 (11th Cir. 2020) (concluding plaintiff had standing where he dined in one restaurant even though he did not dine in 94 other restaurants); *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 836 (N.D. Cal. 2025) (holding plaintiff had standing to challenge "use of Pixel on Defendants' website that Plaintiffs do not allege visiting"); *Scheibe v. Fit Foods Distribution, Inc.*, 2023 WL 7434964, at *8 (S.D. Cal. Nov. 8, 2023) (concluding "[w]hether Plaintiff may represent claims by other consumers based on the labeling for other flavors of Mutant GEAAR powder is a question to be resolved" on a motion for class certification).

Apart from saying none of Plaintiffs' information was transmitted through certain technologies, which is wrong anyway, Capital One fails to develop *any* argument that its practices of collecting and transmitting Plaintiffs' data in violation of its privacy disclosures were not meaningfully uniform.[9] But, as Plaintiffs have shown, Capital One uniformly collected and

[8] In its opposition to Plaintiffs' motion for class certification, Capital One explicitly references this argument under the typicality rubric, representing that "its separate motion explains why [Plaintiffs] do not have Article III standing to pursue their claims and theories of relief." ECF No. 214 at p. 25. That maneuver confirms what this filing really is: a transparent end-run around the Court's page limits. To the extent Capital One intends to rely on this argument as a reason to deny class certification under typicality, but didn't develop it in its class certification motion, it has waived the opportunity to do so by not briefing it, as it should have, in its class certification motion. *John-Charles v. California*, 514 F.3d 878, 892 (9th Cir. 2008) (holding party "failed to develop any argument on this front, and thus has waived it"). Nor is *this* motion the appropriate vehicle to address typicality issues.

[9] And Capital One cannot do so on reply. *See Breen v. City of Concord*, 2019 WL 13587745, at *2–3 (N.D. Cal. Dec. 10, 2019) ("[I]t is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers.").

transmitted Plaintiffs' and putative class members' data, across the board, in violation of the privacy policy that (it does not dispute) affects all website visitors. *See supra* at pp. 8–11; *In re Google Referrer Header Priv. Litig.*, 2014 WL 1266091, at *3 (N.D. Cal. Mar. 26, 2014) ("Plaintiffs' personal claims are similar, if not identical, to those of any and all absent class members since Plaintiffs were subjected to Defendant's storage and disclosure policies as users of Defendant's search engine"). And Capital One readily concedes that several technologies transmitted Plaintiffs' data. Mot. at 3–9. So whatever may be said for any meaningful differences between technologies, those arguments go to *typicality* and thus class certification, not Article III standing. *See Holland-Hewitt v. Allstate Life Ins. Co.*, 343 F.R.D. 154, 187–88 (E.D. Cal. 2022) (concluding plaintiff had standing to challenge different insurance policies where "the same operative set of concerns [exists], the alleged violations of the Statutes, for pre-2013 and post-2013 policy holders"). As for *standing*, by showing an injury from the uniform practice (*i.e.*, that their data was undisputedly collected and transmitted by at least *one* technology), Plaintiffs have an injury to challenge Capital One's entire tracking ecosystem, not just the technologies that transmitted its data.

### B. Capital One Misapprehends the Injuries-in-Fact Inquiry.

Capital One veers further off course, attempting to "evaluate the named plaintiffs' Article III standing on a highly general, rather than specific claim by claim basis." *In re Capacitors Antitrust Litig.*, 154 F. Supp. 3d 918, 924 (N.D. Cal. 2015). But "[t]he Supreme Court has expressly directed that Article III standing must be measured claim by claim." *Id.* at 924–25 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)); *see also Garmong v. Tahoe Reg'l Planning Agency*, 806 F. App'x 568, 571 (9th Cir. 2020) (reversing dismissal for lack of Article III standing where the district court did not conduct "a claim-by-claim analysis"). The devil is in the details, and Capital One's inappropriately high level of abstraction—untethered to any of the claims at issue—misses the relevant injuries pertinent to each claim. Correcting for this error, Plaintiffs plainly establish an injury for each claim.

As for Capital One's assertion that Plaintiffs cannot rely on post-complaint conduct (Mot. at 15), Plaintiffs have Article III standing based on pre-complaint conduct alone, and so they can

challenge post-complaint conduct as part of Capital One's ongoing practice. Still, Capital One is wrong that post-complaint evidence cannot support standing. In *Northstar Financial Advisors Inc. v. Schwab Investments*, 779 F.3d 1036, 1044 (9th Cir. 2015), *as amended on denial of rehearing and rehearing en banc* (Apr. 28, 2015), the Ninth Circuit clarified that even when, unlike here, a plaintiff lacked standing at the time of the filing of the complaint, but later events (e.g., assignment of a claim) provided a basis for standing, the proper way to cure the defect was to permit the jurisdictional facts to be added in a supplemental pleading, not to dismiss the case. This course of action is appropriate here—if Plaintiffs' claims were dismissed for lack of standing, but that lack of standing could be cured by post-complaint transmissions, the obvious recourse would be to refile the claims. *See, e.g.*, *Limon v. Circle K Stores, Inc.*, 2020 WL 3060753, at *2 (E.D. Cal. Jun. 9, 2020). For good reason, a supplemental pleading allows parties "to correct a defective complaint and circumvents 'the needless formality and expense of instituting a new action when events occurring after the original filing indicated a right to relief." *Schwab Investments*, 779 F.3d at 1044 (quoting Wright, Miller, Fed. Practice & Proc., Civil 3d § 1505). Thus, the Court should consider both pre- and post-complaint conduct—or at the very least, permit Plaintiffs to file a supplemental pleading—so that Plaintiffs are not forced to file another lawsuit over post-complaint conduct.[10]

1. *Unjust Enrichment*

Capital One does nothing to challenge Plaintiffs' standing with respect to their claims for unjust enrichment. This defect alone defeats Capital One's motion. *Dream Gamers of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 995 (9th Cir. 2009) (concluding arguments that are "not specifically and distinctly argued in [the] opening brief" are waived). In any event, unjust enrichment has historical common law roots and thus constitutes a concrete injury under the framework set forth in *TransUnion*. *See Kellman v. Spokeo, Inc.*, 2024 WL 2788418, at *5 (N.D. Cal. May 29, 2024); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020) ("Because California law recognizes a

[10] Adopting Capital One's rule would produce an absurd result: a new lawsuit every time a named plaintiff submitted another application. That would spawn duplicative litigation, waste judicial and party resources, and create a moving-target theory under which the case could never meaningfully reach trial because a new related dispute would always be around the corner.

legal interest in unjustly earned profits, Plaintiffs have adequately pleaded an entitlement to Facebook's profits from users' personal data sufficient to confer Article III standing."); *The Intellectual History of Unjust Enrichment*, 133 Harv. L. Rev. 2077, 2078–87 (2020) (describing unjust enrichment's common-law foundations). Here, the record shows [redacted]—as shown above. *See supra* pp. 8-11. Plaintiffs did not, and could not, consent to the sharing of that data—including [redacted] as this Court already determined. *Id.* Although Plaintiffs maintain a privacy injury, that inquiry is irrelevant to whether Plaintiffs have standing to assert an unjust enrichment claim.

To this end, Plaintiffs have developed an entire damages model relative to this injury. ECF No. 187-53, Expert Report of Eric Krause ("Krause Rep."), ¶¶ 157–61 (valuing Capital One's unjust enrichment, Plaintiffs' cost to mitigate effects of data disclosure, and value of data secretly taken). And Capital One admitted it didn't compensate Plaintiffs for the unconsented use of their data. ECF No. 187-7, Wing Dep., 263:25–264:1. Plaintiffs have therefore demonstrated an Article III injury to support their unjust enrichment claim.

2. *Negligence*

For Plaintiffs' negligence claim, this Court has already concluded that "[t]he lack of reasonable care in the handling of personal information can foreseeably harm the individuals providing the information." ECF No. 59 at 9 (citing *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1039 (N.D. Cal. 2019)). As shown earlier, Capital One's multitude of disclosures—some of which *it doesn't even keep track of*—that ran contrary to its "duty of care . . . to protect their personal information" suffices to establish standing for the negligence claim. *Id.*

Capital One largely focuses on an invasion of privacy injury. Because these other bases exist for Plaintiffs' standing, the Court need not address it. But to the extent Plaintiffs need to show a privacy injury to sustain their claims, they have. Capital One's analysis proceeds from a fundamentally flawed premise based on cases that are easily distinguishable from this case. That is,

Defendant argues, based on cases involving "session-replay technology," that the information transmitted must be "highly offensive." But this is not a "session-replay technology" case, and Defendant's own cases admit that the sharing of "private information" is sufficient for standing.

Defendant's primary case is *Popa v. Microsoft Corp.*, 153 F.4th 784 (9th Cir. 2025).[11] As the Ninth Circuit explained:

> This case centers on the use of so-called "session-replay technology." In simple terms, session-replay technology allows a business to capture and reproduce customers' interactions with its website. More technically, the software "embed[s] snippets of JavaScript computer code" on a website, "which then deploys on each website visitor's internet browser for the purpose [of] intercepting and recording the website visitor's electronic communications with the . . . website, including their mouse movements, clicks, keystrokes . . . , URLs of web pages visited, and/or other electronic communications in real-time." The session-replay provider then "use[s] those [w]ebsite [c]ommunications to recreate website visitors' entire visit to" the website. A business utilizing this technology can then access useful consumer data, including "detailed heatmaps of a website that provide information about which elements of a website have high user engagement, how far website users scrolled on the website, and the total clicks within a given area on the website." In essence, session-replay technology helps a business to determine which parts of its website are effective with customers and which are not.

*Id.* at 786. In short, the "session-replay technology" in *Popa* merely allowed the business to see how users interacted with the website and did not transmit financial or other private information. Indeed, the Court in *Popa* noted that "*TransUnion* specifically cited '. . . disclosure of private information . . .' as examples of 'harms traditionally recognized as providing a basis for lawsuits in American courts,'" for standing purposes. *Id.* at 792 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)). But *Popa* emphasized that "[a]t most, Popa alleges that [the technology] gathered her pet-store preferences and her street name" and not any "financial information," which could have been "private information." *Id.* at 791. Pet-store preferences are nothing like [redacted]. *See supra* pp. 8-11.

[11] Defendant cites a slew of "session-replay technology" cases, all of which do not involve the type of data transmission alleged here. (Mot. at 16 (citing *Mikulsky v. Noom, Inc.*, 2024 WL 251171, at *4 (S.D. Cal. Jan. 22, 2024).)

In *Gabrielli v. Haleon US Inc.*, 2025 WL 2494368, at *6 (N.D. Cal. Aug. 29, 2025), Judge Orrick recently distinguished *Popa* in circumstances similar to those here. In that case, the technology at issue "permit[ted] the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their . . . website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data." As Judge Orrick concluded, "As other courts in this Circuit have held in similar cases, I conclude that Gabrielli's allegations that [Defendant] deprived him of control of personal information regarding his digital activity and profile are enough to show a concrete injury to his right to privacy and, subsequently, Article III standing." *Id.*

Here, as in *Gabrielli*, the information that is being shared is not "session-replay" info akin to what a store clerk would see if she observed customer behavior in a retail location. Instead, it consists of information [redacted]. *Id.* at *7. And that information, Plaintiffs thought, was going to a trusted bank. Thus, "[w]hatever information users' input into [Capital One's] website is likely more sensitive than what the plaintiffs in *Popa* inputted into those websites," which involved "a pet food supply website[]." *Id.* Against this backdrop, Plaintiffs suffered a concrete privacy injury through the transmissions from each technology given the types of information transmitted—Meta Pixel, Meta Conversions API, Google Analytics, Adobe Analytics, Google Marketing Tags, and Google Ads Data Hub/UPDM.

Specific to Adobe Analytics, Capital One contends that notwithstanding what information it transmits, Plaintiffs lack any privacy injury because its transmissions are not "individually identifiable" and it is used for routine analytics purposes. (Mot. at 16.) This is false.

Adobe [redacted]

[redacted].” Egelman Rep. ¶ 134. “[redacted]. And this aligns with the FTC’s position on identifiers. *See supra* p. 3, n.6.

What’s more, [redacted]”[12] (ECF No. 187-22, Ex. 20 at 12.) Thus, use of analytics programs where there is “no use by the third party other than storing that information” may be “benign,” *Williams v. DDR Media, LLC*, 2023 WL 5325896, at *7 (N.D. Cal. Aug. 18, 2023), is one thing. But this is something else entirely: [redacted]. And Capital One now purport to claim it knows what third parties do with the information—its own witnesses testified that “[redacted].” (ECF No. 199-3, Ex. Y, Dep. of Melissa Wing (“Wing Dep.”), 211:21-212:4; ECF No. 199-5, Ex. AA, Ager 30(b) Dep. 104:20-21 (“[redacted]”); *id.* 105:21-23 (“[redacted]”); *id.* 108:2-3 (“[redacted]”).) [redacted]

---

[12] [redacted] Mot. at 16 [redacted] Cal. Civ. Code. §§ 1798.140(ai)(2), (ag)(1).

For the same reasons, Capital One's attacks on the information funneled through Google Ads Data Hub/UPDM also fail.[13] Even if Capital One uses Google Ads Data Hub/UPDM as a so-called marketing analytics tool, its use is still not the "routine commercial behavior" that falls short of a "highly offensive" privacy injury. (Mot. at 20.) Like Adobe, using a Google technology requires Capital One to "give Google a perpetual, irrevocable, worldwide, sublicensable, royalty-free and non-exclusive license to Use content, submitted, posted, or displayed to or from the APIs" and it may use all data it receives to "improve Google products and services." Google, *Google APIs Terms of Service*, *available at* https://developers.google.com/terms (last accessed Mar. 20, 2026). So, again, the data transmitted to Google through Google Ads Data Hub is not sitting in a storage container; by Google's own terms of service, it is also being consumed by Google itself—which is exactly what this case seeks to redress.

To the extent that Defendant argues that the transmissions were benign because the identifiers transmitted are hashed or obfuscated, that argument is directly contrary to the FTC's well-documented position. *See supra* p. 3 n.6. [redacted]. Egelman Rep. ¶ 194. Thus, at the very least, a genuine issue of material fact exists, which this court must leave to the trier of fact to resolve. *Bowen*, 118 F.4th at 1142–43; *Gabrielli*, 2025 WL 2494368, at *6 ("courts cannot resolve 'jurisdictional questions [that] are intertwined with the merits of a claim.'").

3. *Statutory Standing*

Unaddressed by Capital One—and thus inappropriately addressed for the first time in a reply, *Breen*, 2019 WL 13587745, at *2–3—Plaintiffs briefly note that even if the Court were to find a lack an Article III injury under the theories addressed above, "the legislative history and statutory text demonstrate that Congress and the California legislature intended to protect these historical privacy

---

[13] Capital One's argument that server-to-server technologies are outside the scope of the Complaint has been separately briefed, and the motion concerning that issue is pending before the Court. As explained in Plaintiffs' Motion for de novo review of the Magistrate Judge's Report and Recommendation (ECF No. 226), those technologies have always been within the scope of the Complaint. *See* ECF No. 1, ¶¶ 42, 43, 356.

rights when they passed the Wiretap Act, SCA, and CIPA." *Facebook Internet Tracking*, 956 F.3d at 598–99. "[T]hese statutory provisions codify a substantive right to privacy, the violation of which gives rise to a concrete injury sufficient to confer standing." *Id.* (citing *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1117–19 (9th Cir. 2020)). Capital One does not dispute any of the injuries under these statutory claims, and so the Court cannot dismiss these statutory claims for lack of standing.

### C. Plaintiffs Acted Consistently with Their Expectation of Privacy.

Capital One broadly suggests that Plaintiffs "did not hold an actual expectation of privacy" in any data transmission because they "use[d] the Webpages after receiving multiple, clear disclosures that information related to their applications could be shared with third parties for purposes of website analytics and marketing analytics." (Mot. at 22.) But this conflicts with the Court's determination on the motion to dismiss that the policy "does not state that it releases that customer's personal information such as employment information and credit card approval or approval status, which Plaintiffs allege that it collects." (ECF No. 59 at 6.) Capital One does not argue the Court's earlier conclusion on the motion to dismiss was erroneous. Thus, that earlier conclusion remains the law of the case, which "generally precludes a court from reconsidering an issue previously decided by the same court." *Plantronics, Inc. v. Am. Home Ass. Co.*, 2014 WL 2452577, at *3 (N.D. Cal. May 30, 2014).

[redacted]. (ECF No. 187-7, Wing Dep., 218:13–19.) [redacted].

Unable to seriously show that the data transmitted was properly disclosed in its privacy policy, Capital One oddly argues that this lawsuit was based on transmissions whose "only purpose" was "to

be used for Third Party and fourth parties' marketing and sales purposes" and somehow these Complaint allegations do not encompass "website analytics and marketing analytics." (Mot. at 22.) Whatever difference exists between "marketing" and "website and marketing analytics,"[14] it is irrelevant because no matter the purpose of the technology, (1) Capital One still inappropriately sends private data to a third party who (2) data to *still uses the data for its own purposes*. Thus, that falls neatly within the scope of what this case seeks to redress. Consistent with this Court's earlier ruling, Capital One's privacy policy did not cover the data transmitted by the various tracking technologies. By definition, then, Plaintiffs were not on notice of these transmissions even when they visited Capital One's website multiple times over. And Capital One testified that certain of the transmitted data isn't even subject to the policy.

Similarly, Capital One's claim that Plaintiffs "had the choice to turn off data sharing for targeted advertising purposes" misses the point entirely. (Mot. at 24.) [redacted]. *See, e.g.*, Egelman Rep. ¶¶ 112–16 ("[redacted].”), 136–38 (explaining [redacted]). [redacted].

Realizing its own disclosures won't do the trick, Capital One attempts to pivot to Google's, claiming "Ms. Williams . . . was independently on notice through Google's own disclosures." (Mot. at 23.) But how is Williams supposed to know that Capital One uses Google's tracking technologies

---

[14] Capital One never explains what the difference is between using something for "marketing" purposes and using something for "marketing analytics." The difference, whatever it may be, is lost on Plaintiffs, and they do not perceive any difference.

when Capital One does not disclose which third-party technologies it uses?[15] Perplexingly just two paragraphs earlier, in the very same brief, Capital One ***defends*** its ***general disclosures***, citing this Court for the proposition that "the law 'does not require' a 'more granular disclosure' specifying the alleged third party, Meta, by name." *Id.* (citing *Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1057 (N.D. Cal. 2025)). The case it cites—*In re Google Inc. Gmail Litigation*, 2014 WL 1102660, at *15 (N.D. Cal. Mar. 18, 2014)--does not help it. There, the privacy policies at issue all mentioned *Google* to put users on notice. *Id.* That is nonexistent here, and so it is a nonstarter.

### D. Plaintiffs Have Article III Standing to Seek Injunctive and Declaratory Relief.

Capital One misstates the declaratory and injunctive relief sought by Plaintiffs. As spelled out in Plaintiffs' Motion for Class Certification, Plaintiffs seek equitable relief from Capital One's uniform policy of transmitting and permitting third parties to use their data without their permission, and specifically (1) precluding Capital One from intercepting, storing, or using its website users' personally identifying data; (2) requiring Capital One to delete already collected data; and (3) appointing an independent third party to verify that the injunctive relief has been imposed. Contrary to Capital One's assertions, courts routinely recognize the irreparable harm of ongoing data collection or use. *See, e.g.*, *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1045 (9th Cir. 2012); *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782 (N.D. Cal. 2017). As explained earlier, Capital One's transmission of data through tracking technologies is fundamentally distinguishable from "defendants use session replay software" and where the plaintiffs' equitable relief was premised entirely on a CIPA claim. *Mikulsky*, 713 F. Supp. 3d at 846-47. Given the injuries explained above, and because their data has been (and continues to be) compromised, equitable relief is appropriate.

## V. CONCLUSION

The Court should deny Capital One's Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3).

---

[15] [redacted].

Dated: March 20, 2026

Respectfully submitted,


/s/ Lesley E. Weaver
J. Gerard Stranch, IV (*pro hac vice*)
Kyle M. Mallinak (*pro hac vice*)
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
gstranch@stranchlaw.com
kmallinak@stranchlaw.com

Lesley E. Weaver, No. 191305
Anne K. Davis, No. 267909
**STRANCH, JENNINGS & GARVEY, PLLC**
1111 Broadway, Suite 300
Oakland, California 94607
(341) 217-0550
lweaver@stranchlaw.com
adavis@stranchlaw.com

Natalie Lyons, No. 293026
Vess A. Miller, No. 278020
Lynn A. Toops (*pro hac vice*)
Lisa M. La Fornara (*pro hac vice*)
Emily D. Herrin (*pro hac vice*)
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
nlyons@cohenmalad.com
vmiller@cohenmalad.com
ltoops@cohenmalad.com
llafornara@cohenmalad.com
eherrin@cohenmalad.com

Samuel J. Strauss (*pro hac vice* forthcoming)
Brittany N. Resch (*pro hac vice*)
Andrew Gerald Gunem (*pro hac vice*)
**STRAUSS BORRELLI, PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
(872) 263-1100
sam@straussborrelli.com
bresch@straussborrelli.com
agunem@straussborrelli.com

*Counsel for Plaintiffs and the Proposed Classes*

**PROOF OF SERVICE**

I, Lesley E. Weaver, hereby certify that on March 20, 2026, I electronically filed the foregoing document with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which will send electronic notification to all counsel of record.

Dated: March 20, 2026

*/s/ Lesley E. Weaver*
*Counsel for Plaintiffs and the Proposed Class*

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I attest that each of the other Signatories have concurred in the filing of the document, which shall serve in lieu of their signatures on the document.

Dated: March 20, 2026

*/s/ Lesley E. Weaver*
*Counsel for Plaintiffs and the Proposed Class*