Kathryn E. Cahoy (Bar No. 298777)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
(650) 632-4735
kcahoy@cov.com

Matthew Q. Verdin (Bar No. 306713)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-7065
mverdin@cov.com

*Attorneys for Defendant Capital One Financial Corporation*

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

GARY INGRAHAM and DEIA WILLIAMS, individually, and on behalf of all others similarly situated,

Plaintiffs

v.

CAPITAL ONE FINANCIAL CORPORATION, d/b/a CAPITAL ONE, d/b/a CAPITAL ONE, NATIONAL ASSOCIATION, d/b/a CAPITAL ONE, N.A., d/b/a CAPITAL ONE SHOPPING,

Defendant.

Case No. 3:24-cv-05985-TLT

**CAPITAL ONE'S OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE OR LIMIT CAPITAL ONE'S EXPERT RONALD SCHNELL**

Judge: Hon. Trina L. Thompson
Hearing: April 21, 2026
Time: 2:00 p.m.
Ctrm: 9, 19th Floor

**PUBLIC REDACTED**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

I. BACKGROUND ..........................................................................................................2

A. Dr. Serge Egelman's Expert Report..........................................................................2

B. Mr. Ron Schnell's Expert Report...............................................................................4

C. The Parties Exchange Narrow Supplemental Expert Reports. ....................................5

D. The Parties Depose One Another's Experts................................................................6

E. Plaintiffs Seek to Exclude Some, but Not All, of Mr. Schnell's Opinions......................7

II. PROCEDURAL STANDARD .........................................................................................9

III. ARGUMENT ...............................................................................................................10

A. Mr. Schnell Is a Highly Qualified Expert with More than 40 Years of Relevant Experience..................................................................................................................10

B. Plaintiffs' Attempt to Elicit Information from Sealed Proceedings Is Not a Basis to Exclude Mr. Schnell...................................................................................................11

C. Plaintiffs Misrepresent Mr. Schnell's Opinion on Hashing...........................................15

D. Plaintiffs' Criticism that Mr. Schnell Analyzed DII Based on Record Evidence—Not Dr. Egelman's Speculation—Is Meritless.............................................................16

E. Plaintiffs' Attempt to Re-Litigate Their Sanctions Motion Should Be Rejected. ..........18

F. Plaintiffs Cannot Exclude Mr. Schnell Based on His (Correct) Criticism That Dr. Egelman Ignored His Own Testing...............................................................................20

CONCLUSION....................................................................................................................20

## TABLE OF AUTHORITIES

*Arguedas v. Carson*,
2024 WL 253644 (S.D. Cal. Jan. 22, 2024) ... 14

*Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*,
144 F.4th 238 (4th Cir. 2025) ... 13

*Correct Transmission, LLC v. Nokia of Am. Corp.*,
2024 WL 1327906 (E.D. Tex. Mar. 26, 2024) ... 18

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (1993) ... 9

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025) ... 9

*Inventio AG v. Thyssenkrupp Elevator Corp.*,
2014 WL 554853 (D. Del. Feb. 6, 2014) ... 18

*Laatz v. Zazzle, Inc.*,
2025 WL 3205586 (N.D. Cal. Nov. 17, 2025) ... 10

*Matthew Enter. v. Chrysler Group LLC*,
2016 WL 4272417 (N.D. Cal. Aug. 15, 2016) ... 13

*Miller v. Travel Guard Group, Inc.*,
2023 WL 7106479 (N.D. Cal. Sept. 15, 2023) (Thompson, J.) ... 9

*In re Mirena IUD Prods. Liab. Litig.*,
169 F. Supp. 3d 396 (S.D.N.Y. 2016) ... 12

*Morris v. BNSF Ry. Co.*,
790 F. Supp. 3d 1129 (W.D. Wash. 2025) ... 10

*Perry v. Schwarzenegger*,
704 F. Supp. 2d 921 (N.D. Cal. 2010) ... 11

*In re Rail Freight Surcharge Antitrust Litig.*,
2013 WL 12384733 (D.D.C. Nov. 12, 2013) ... 12

*Reynolds & Reynolds Co. v. Alternative Source Inc*,
2014 WL 12558119 (C.D. Cal. Apr. 16, 2014) ... 18

*SEC v. Retail Pro, Inc.*,
2011 WL 589828 (S.D. Cal. Feb. 10, 2011) ... 16

*Stephens v. Union Pac. R.R. Co.*,
935 F.3d 852 (9th Cir. 2019) ... 17

*In re Sulfuric Acid Antitrust Litig.*,
230 F.R.D. 527 (N.D. Ill. 2005) ........ 14

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) ........ 20

**Other Authorities**

Cal. Rules of Pro. Conduct Rule 3.4, 8.4 ........ 14

Fed. R. Civ. P. 26 ........ 14

Fed. R. Evid. 702 ........ *passim*

Fed. R. Evid. 703 ........ 17

## INTRODUCTION

Plaintiffs have taken a shotgun approach to Rule 702 that seeks to exclude all of Capital One's highly qualified experts. That effort includes a motion to exclude Mr. Ron Schnell, an expert with more than four decades of experience in computer science and software fields who submitted a rebuttal report that exposed fundamental flaws in the report Plaintiffs' technical expert offered. None of their criticisms warrant exclusion.

Plaintiffs submitted an expert disclosure from Dr. Serge Egelman that is not grounded in the factual record of this case. His opinions, including that Capital One's use of third-party tools resulted in the transmission of "direct" or "indirect identifiers," rely on his own unsupported speculation. Dr. Egelman opines that indirect identifiers are shared because third parties *might* already have other (unspecified) data that allows for identification. He assumes that third parties *might* try to un-hash data, even though there is no evidence they have ever done so (or would have any reason to). And he states that [redacted].

Mr. Schnell's rebuttal report dismantles Dr. Egelman's opinions. Unlike Dr. Egelman, Mr. Schnell conducted his analysis based on the actual evidence in this case. His report applies Dr. Egelman's definition of "direct" and "indirect identifiers" to the factual record and determines there was no evidence that these identifiers were transmitted to third parties in the way he suggested. Mr. Schnell also rebuts Dr. Egelman's speculation that third parties [redacted] And he opines that based on his review of the record, "Capital One employs robust organizational and technical safeguards to protect user data." ECF 215-16 ("Schnell Rep.") ¶ 11.

Plaintiffs' motion to exclude Mr. Schnell's rebuttal report should be denied. They have no credible argument that he is not qualified, nor do they have any real response to his criticisms of Dr. Egelman's repeated reliance on speculation. Instead, they levy unfounded attacks about miscellaneous portions of the report. They (wrongly) accuse him of failing to disclose confidential information because he referenced protective orders a few times during his seven hours of testimony, while ignoring that the record confirms that none of his opinions rely on information sealed under those protective orders. They nitpick statements in the report about hashing, but fail to rebut his main opinion about hashing. They take

issue with his analysis of "indirect identifiers" because he refuses to engage in the same inappropriate speculation made by Dr. Egelman. Finally, they try to re-litigate a sanctions motion that Judge Kim already denied, and assert that Mr. Schnell's correct observation that Dr. Egelman's opinions ignore his testing should be stricken.

None of these provide a basis to exclude Mr. Schnell, or any portion of his report, and Plaintiffs' motion should be denied.

# I. BACKGROUND

## A. Dr. Serge Egelman's Expert Report.

Plaintiffs' technical expert, Dr. Serge Egelman, submitted a report purporting to opine that Capital One's use of routine website analytics and marketing tools necessarily resulted in the transmission of "personally identifiable information" to third parties Meta, Google, and Adobe, who then "used this data for behavioral advertising purposes." ECF 187-15 ("Egelman Rep.") ¶ 8. Dr. Egelman categorized "personally identifiable" data as either (1) a "direct identifier," which is "data that can be used to identify a person without additional information or with cross-linking through other information that is in the public domain" and (2) an "indirect identifier," which is "data that is 'linked' or 'linkable' to other data that identifies someone or when multiple data points are used in conjunction to identify someone." *Id.* ¶¶ 36-37.

Dr. Egelman offers opinions that are not supported by the factual record of this case. Indeed, less than a third of his 111-page report analyzes Capital One's website or the records produced in this case. He opines that the data transmitted through third party technologies are used in ways the record does not support. *See, e.g.*, *id.* ¶¶ 184, 197, 205. And he provides lengthy analysis of technologies Capital One did not use on its website. *See id.* ¶¶ 18-32 (describing "software development kits" that are not at issue in this case). Where Dr. Egelman does purport to analyze record evidence, his opinions suffer from other deficiencies. For several of the technologies at issue, Dr. Egelman assumes particular data elements are transmitted based on qualified testimony from a Capital One employee describing what *may* be transmitted (*id.* ¶¶ 177, 185, 188), while failing to grapple with the numerous variables that limit or prevent what is *actually* transmitted, such as configuration differences across technologies and over time, user browser choice, user-enabled privacy tools, and ordinary technical error. *See, e.g.*, *id.* ¶ 10 ("[T]here are unlikely

to be any individualized issues based on the specific web browsers used and how they were configured."). His report also ignores data records produced in this litigation that show what was actually transmitted for the named Plaintiffs. For example, he acknowledges the existence of data records showing [redacted] *Id.* ¶ 176.

Dr. Egelman's opinion that Capital One transmits "personally identifiable information" or "PII" to third parties likewise is not supported by evidence. His report asserts that Capital One discloses PII based on the transmission of so-called "direct identifiers" or "indirect identifiers" to Adobe, Meta, and Google, and these identifiers can, either on their own or "in conjunction with other data," identify an individual user. *Id.* ¶¶ 8, 36, 37. But his report lacks critical specifics: it does not state which of the transmitted data elements are "direct identifiers," which are "indirect identifiers," or what combination of data would allow a third party to identify a particular user. *See, e.g.*, *id.* ¶¶ 160, 161, 165, 176. This is particularly problematic because Plaintiffs' damages expert Mr. Krause is relying on Dr. Egelman to identify the "core set" of data elements transmitted for his damages calculation. *See* Ex. E ("Krause Dep.") at 81:11-17, 92:21-93:7, 94:16-97:12, 114:7-115:4, 148:10-149:1; *see also* ECF No. 218-1 at 11–12. He instead appears to rely on his own speculation that data could *theoretically* be linked to an individual using datasets *external* to the transmission but provides no specifics about what those datasets contain. Egelman Rep. ¶ 37.

Finally, Dr. Egelman speculates that all data [redacted] is used for behavioral advertising or marketing. *See id.* ¶¶ 8, 133, 184. He bases that opinion on third-party marketing materials describing *potential* uses of certain tools instead of evidence concerning how Capital One actually deploys those technologies. *See id.* ¶¶ 133, 140, 141, 143. He simply ignores unrebutted testimony by Capital One witnesses [redacted] *See* Schnell Rep. ¶ 64 & n.108-110. He also disregards testimony and evidence [redacted] *Compare* Egelman Rep. [redacted], *with e.g.*, Schnell Rep. ¶ 178.

**B. Mr. Ron Schnell's Expert Report.**

Mr. Schnell submitted a rebuttal in response to Dr. Egelman's report on December 12, 2025. He provided an opinion that Capital One employs robust data protection measures, that Capital One does not transmit direct or indirect identifiers, as defined by Dr. Egelman, [redacted] and moreover, whether and to what extent Capital One transmits information to third parties depends on a variety of factors, including, for example, users' browser settings, private modes, VPNs, and firewalls. Schnell Rep. ¶¶ 9-19. Mr. Schnell's opinion is based on his review of testimony and documents produced in this case and his technical analysis of Capital One's website and source code. *See id.*

In forming the opinions in his report, Mr. Schnell adopted Dr. Egelman's definitions of "direct identifier" and "indirect identifier," using the shorthand "DII" to represent both. *Id.* ¶ 9. As Mr. Schnell explained in his deposition, Dr. Egelman's definition of "indirect identifier"— "data that is 'linked' or 'linkable' to other data that identifies someone or when multiple data points are used in conjunction to identify someone"— is ambiguous as written and required interpretation in order for Mr. Schnell to apply it to the evidence in this case without speculation about what third parties actually do with data or what external datasets third parties have access to. Ex. B ("Schnell Vol. 1 Dep.") at 83:25-84:12; 115:3-12. Accordingly, Mr. Schnell interpreted "indirect identifier" to mean data that the record shows can be used in conjunction with other data, in the same transmission, to actually identify a particular user. *Id.* at 114:15-115:23.

Mr. Schnell's opinions as to which data elements are transmitted are tethered to the record of what is actually transmitted, based on his review of Capital One's source code, his analysis of network transmissions generated by the Capital One website, and his review of the records of data transmissions produced in this case. *See* Schnell Rep. ¶¶ 13, 76, 78; *id.* at 36–43, Table 1. Consistent with that methodology, Mr. Schnell expressly identifies when the record contains no evidence that particular data elements were actually transmitted to third parties, rather than assuming their transmission. *Id.* ¶ 78; *id.* at 36–43, Table 1. Mr. Schnell further accounts for the numerous technical and user-level variables that determine whether any data transmission occurs at all, including differences in browser behavior and user-enabled privacy controls. *See, e.g., id.* ¶¶ 17, 86, 173, 175, 182.

Mr. Schnell also discusses Capital One's use [redacted] *Id.* ¶¶ 59, 69; *id.* at 41, Table 1. He explains that these [redacted] *Id.* at 41, Table 1 & n.185. Mr. Schnell further explained at his deposition that the [redacted] Schnell Vol. 1 Dep. at 42:4-7, 43:2-19, 85:11-18.

Finally, Mr. Schnell does not presume or speculate as to the purposes and use of the data transmitted. Mr. Schnell evaluates how Capital One uses the third-party technologies and data transmitted through them according to the record, not speculation, including Capital One employee testimony and internal documents describing the implementation and use of the at-issue technologies. *See, e.g.*, Schnell Rep. ¶ 64 & n.108-10.

**C. The Parties Exchange Narrow Supplemental Expert Reports.**

Following the close of fact discovery, Magistrate Judge Kim granted Plaintiffs' motion to compel Capital One to provide three hours of additional 30(b)(6) testimony regarding additional technologies. ECF 166. Accordingly, Plaintiffs took the 3-hour deposition of Capital One employee Danielle Ager on December 10, 2025. In advance of this deposition, Capital One voluntarily produced a limited set of newly discovered materials related to the deposition topic. Although Capital One (correctly, according to Judge Kim) viewed this discovery as outside the scope of the case, Capital One produced it as a good faith gesture to avoid raising another discovery dispute to the Court. *See generally* ECF 194-2; ECF 213.

Plaintiffs later indicated they intended to submit a supplemental expert report from Dr. Egelman. ECF 194-2 ¶ 62. In response, Capital One proposed a supplemental expert report submission schedule, which Plaintiffs ignored. *Id.* ¶ 63. Instead, they served Dr. Egelman's supplemental report less than 24 hours before his scheduled deposition, (*id.* ¶ 69), and refused Capital One's request for the deposition to be moved back a single day (*id.* ¶¶ 70-71). Capital One served Mr. Schnell's supplemental rebuttal report shortly thereafter. *Id.* ¶ 75.

Dr. Egelman's supplemental report suffers from the same deficiencies as his original report, including that his opinions rely on speculation untethered from, and in some instances contradicted by,

the record. Dr. Egelman asserts, with no supporting evidence, that the [redacted] ECF 187-23 ("Egelman Supp. Rep.") ¶ 10. But he does not explain [redacted]

[redacted]

*See* 215-31 ¶¶ 36-37; ECF 215-33.

Dr. Egelman also asserted that he was able to "determine" [redacted]. Egelman Supp. Rep. ¶ 9. But his purported determination [redacted] Ex. A ("Egelman Dep.") at 256:7-8.

**D. The Parties Depose One Another's Experts.**

Capital One took Dr. Egelman's deposition as scheduled on January 7, 2026, and Plaintiffs deposed Mr. Schnell on January 8, 2026. ECF 194-2 ¶¶ 73-74. At Plaintiffs' request, Capital One agreed to permit Plaintiffs to continue Mr. Schnell following the service of Mr. Schnell's supplemental rebuttal report, and Plaintiffs deposed Mr. Schnell a second time on January 13, 2026. *Id.* ¶¶ 74-76.

During the seven hours that Plaintiffs deposed Mr. Schnell, Plaintiffs' counsel repeatedly asked Mr. Schnell to speculate about actions third parties might take with respect to companies that are not in the case—a topic outside the scope of either of Mr. Schnell's reports. *See* Schnell Vol. 1 Dep. at 48:12-14, 52:8-9, 59:6-13, 67:19-22; Ex. C ("Schnell Vol. 2 Dep.") at 262:8-11, 265:20-23, 267:6-268:8. In response, Mr. Schnell avoided speculation and instead adhered to the record evidence he reviewed in rebutting Dr. Egelman. *See* Schnell Vol. 1 Dep. at 48:16-17; 59:9-21, 67:23-68:3; Schnell Vol. 2 Dep. at

262:12-25, 265:3-11, 267:11-15. On a handful of occasions, Mr. Schnell explained that he had additional knowledge, unrelated to Capital One and beyond the confines of his rebuttal reports and the evidence in this case, that he could not disclose without violating court-imposed protective orders. Schnell Vol. 1 Dep. at 52:17-23; 59:14-16; 68:2-3. Plaintiffs never pursued the discovery mechanisms available to seek access to information subject to protective orders.

Plaintiffs' counsel also asked Mr. Schnell about a statement he made in his supplemental rebuttal report regarding Meta's use of the "fr" cookie "as its primary key to look up relevant record." Schnell Vol. 2 Dep. at 301:1-19. Mr. Schnell explained that although he "know[s] this from other cases," (*id.* at 301:2) this assertion in his report is "also based on . . . public statements, from Meta" (*id.* at 303:21-24), and he's "not relying on information from that case" for his opinion on the "fr" cookie, but rather everything listed in the appendix of his report (*id.* at 307:6-9). During this second deposition of Mr. Schnell, Capital One's counsel stated that "if you have an issue with a protective order in another action, we can work with you on that." *Id.* at 302:12-17. But Plaintiffs never raised the issue again, nor did they pursue the discovery mechanisms available to seek access to information subject to protective orders.

Although the parties exchanged supplemental expert reports and deposed one another's technical experts regarding the additional discovery, Plaintiffs moved for sanctions against Capital One, arguing that Capital One improperly withheld information regarding server-to-server technologies. On February 27, 2026, Magistrate Judge Kim issued an order recommending the denial of Plaintiffs' motion for sanctions. Judge Kim agreed with Capital One's position that server-to-server technologies were outside the scope of the case: "from the inception, Plaintiffs' case was limited to the transmission of data directly from its website to third parties and did not include server-to-server transmission." ECF 213 at 1–2.

**E. Plaintiffs Seek to Exclude Some, but Not All, of Mr. Schnell's Opinions.**

Although Plaintiffs purport to seek wholesale exclusion of Mr. Schnell, (Mot. at 7), they only challenge *portions* of his opinions. Plaintiffs' Motion makes the following arguments, each directed at different portions of Mr. Schnell's report:

- Plaintiffs argue that Mr. Schnell's refusal to disclose confidential information in response to a handful of deposition questions is "entirely disqualifying," but identify only a single sentence in his reports that is purportedly based on withheld confidential information. Mot.

at 6; ECF 215-17 ("Schnell Supp. Rep. ") ¶ 33[1] ("Meta uses the 'fr' cookie as its primary key to look up relevant records."). They are wrong that this sentence is based on confidential information. *infra* at 11–15, but nevertheless, their challenge attacks only one sentence in paragraph 33 of his supplemental rebuttal report.

- Plaintiffs' argument that Mr. Schnell's report provides "unsupported assertions" about hashing only challenges two paragraphs from his reports. *See* Mot. at 8; Schnell Rep. ¶¶ 59, 69.[2]
- Plaintiffs argue that Mr. Schnell improperly interpreted Dr. Egelman's definition of "indirect identifier," and that his "'apples and oranges' comparison . . . should be excluded from this action." Mot. at 10–11. Plaintiffs specifically object to Mr. Schnell's determination that many elements in Table 1 of his report are not direct or indirect identifiers and request only that Mr. Schnell's opinions on these 24 data elements be excluded." *Id.* at 12; *see* Schnell Rep. at 36–43, Table 1.
- Plaintiffs' argument that Mr. Schnell "blame[s] Dr. Egelman and Plaintiffs for a lack of evidence" regarding server-to-server transmissions and thus his "opinions about what Google and Skai can read or infer from server-to-server transmissions should be excluded" appears only aimed at striking Paragraph 15 of Mr. Schnell's supplemental report. Mot. at 13 (quoting Schnell Supp. Rep. ¶ 15)).
- Plaintiffs argue that in Table 1 of his report, Mr. Schnell "faults Dr. Egelman for relying on testimony from Capital One that certain data elements are shared with Meta," but elsewhere "[r]el[ies] only on the testimony of [a] Capital One employee," Nate Morawetz in paragraphs 48, 55, and note 7. Mot. at 14. This argument appears only to seek to strike paragraphs 48, 55, note 7, and the 13 entries in Mr. Schnell's Table 1, where he states, "Dr.

[1] Plaintiffs cite Paragraph 34 of Mr. Schnell's supplemental report, but Mr. Schnell addresses the "fr" cookie in Paragraph 33 not Paragraph 34. *Compare* Mot. at 6 *with* Schnell Suppl. Rep. ¶¶ 33-34.

[2] Plaintiffs cite Paragraph 70 of Mr. Schnell's report, but the quotation they cite appears in Paragraph 69 not Paragraph 70. *Compare* Mot. at 8 *with* Schnell Rep. ¶¶ 69-70.

Egelman provides no evidence that this data is shared . . . ." *See* Schnell Rep. at 36–43, Table 1.

Plaintiffs do not appear to offer challenges to many of Mr. Schnell's other opinions. For example, Plaintiffs do not contest his foundational technical explanations of two discrete categories of technologies—that browser-based technologies, (*e.g.*, Meta Pixel, Adobe Analytics, Google Analytics, Google marketing tags) send data from the client's browser to a third-party server, while server-to-server technologies (*e.g.*, Meta Conversions API, Google Ads Data Hub/UPDM, Skai SFTP) send data directly from Capital One's server to a third-party server. They do not challenge Mr. Schnell's opinion that Adobe, Google, and Meta do not "tap into" or contemporaneously intercept communications between the user and Capital One. They do not contest his opinions that [redacted]" Mot. at 13. Plaintiffs' failure to challenge these core, foundational opinions underscores that their motion targets only a narrow subset of Mr. Schnell's report and leaves the bulk of his opinions unrebutted.

## II. PROCEDURAL STANDARD

"Expert testimony is admissible if it is both relevant and reliable." *Miller v. Travel Guard Group, Inc.*, 2023 WL 7106479, at *3 (N.D. Cal. Sept. 15, 2023) (Thompson, J.) (citing *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993)), *appeal filed* (9th Cir. No. 25-275). Federal Rule of Evidence 702 requires that expert testimony satisfy four elements:

a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

b) the testimony is based on sufficient facts or data;

c) the testimony is the product of reliable principles and methods; and

d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of expert testimony—here, Capital One—bears the burden of establishing admissibility by a preponderance of the evidence. *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025).

## III. ARGUMENT

### A. Mr. Schnell Is a Highly Qualified Expert with More than 40 Years of Relevant Experience.

Mr. Schnell is a computer scientist with more than four decades of experience developing and evaluating computer operating systems and software and has a breadth of technical expertise, including as an executive at Equifax "in charge of privacy for their Internet marketing division," where he oversaw the implementation and use of internet tracking technologies. Schnell Vol. 1 Dep. at 18:7-13; *see* Schnell Rep., App. A at 1–5. He holds a master's degree in computer science and teaches university-level courses on computer operating systems, computer security, and privacy. Schnell Rep., App. A at 5; Schnell Vol. 1 Dep. at 19:1-13. He has held senior technical leadership roles at Bell Laboratories, IBM, Sun Microsystems, and Equifax, where, as a Vice President, he was responsible for overseeing the development, implementation, and data security of technologies used for internet marketing and analytics. Schnell Rep., App. A at 3–5; Schnell Vol. 1 Dep. at 20:12-22:19. Mr. Schnell routinely evaluates such technologies as a consultant and as an expert in data-privacy and web-tracking litigation. Schnell Rep., App. A at 1–2; App. B at 1–4.

Plaintiffs cannot seriously dispute that Mr. Schnell is qualified. Instead, they accuse him of "lack[ing] intellectual rigor" because he has not published articles on "the subject matter of his opinions in this case." Mot. at 7. Lack of academic publications of course does not mean someone "lack[s] intellectual rigor." Rule 702 thus "does not require an expert to publish articles . . . in order to qualify to give expert testimony." *Morris v. BNSF Ry. Co.*, 790 F. Supp. 3d 1129, 1139 (W.D. Wash. 2025). Indeed, Plaintiffs concede that "an absence of relevant professional publications is not by itself disqualifying." Mot. at 7. Their own damages expert, Eric Krause, would be disqualified on this basis alone if the rule were otherwise. *See* Krause Dep. at 60:3-7 (testifying that he has never "published any papers about how consumers value their data" despite offering opinion on the value of data); Krause Rep., App. A (no publications listed).

"Rule 702 contemplates a *broad* conception of expert qualifications," and Mr. Schnell, with an advanced degree in computer science and 40 years of pertinent technical experience easily clears the qualification threshold. *Laatz v. Zazzle, Inc.*, 2025 WL 3205586, at *13 (N.D. Cal. Nov. 17, 2025)

(emphasis in original) (quotation omitted) (articulating "consensus" of Ninth Circuit courts). Plaintiffs' cited case does not hold otherwise. In fact, it properly recognizes that "peer-reviewed publications are not dispositive of expertise." *See Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 946 (N.D. Cal. 2010), *aff'd sub nom.*, *Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012), *vacated on other grounds sub nom.*, *Hollingsworth v. Perry*, 570 U.S. 693 (2013).

### B. Plaintiffs' Attempt to Elicit Information from Sealed Proceedings Is Not a Basis to Exclude Mr. Schnell.

Plaintiffs seek to exclude Mr. Schnell because he would not divulge confidential information in response to a handful of questions during his seven-hour deposition. This argument fails for the simple reason that none of Mr. Schnell's opinions rely on confidential information from other cases, and that information is thus not subject to disclosure.

Mr. Schnell provided a report rebutting Dr. Egelman's opinion that Capital One transmitted direct identifiers and indirect identifiers to third parties and opining that Capital One employs robust safeguards to protect user data. Schnell Rep. ¶¶ 9, 11. Rather than asking Mr. Schnell about the basis of his opinions, Plaintiffs' counsel spent a significant portion of his deposition attempting to solicit speculation about what third parties might do with respect to data from companies that are not in this case—a topic on which Mr. Schnell did not opine.

For example, Plaintiffs criticize the following exchange from Mr. Schnell's first deposition, when he noted the protective order in another case as the reason he could not reveal more information in response to a question from Plaintiffs that exceeded the scope of his report:

> **Q:** [redacted]
>
> **A:** I have to -- *I haven't seen any evidence of that in this case.*
>
> **Q:** Have you seen evidence of that in any situation?
>
> **A:** I have -- I have some knowledge about what they do, that is under seal and under protective order, and I can't talk about that. The knowledge that I have is -- is under seal.

Schnell Vol. 1 Dep. at 48:12-25 (emphasis added) (objections omitted); *see also id.* at 52:8-14 (testifying he was "not sure how to answer" counsel's "very broad question" about Meta). Plaintiffs' counsel was not asking Mr. Schnell about his opinions offered in the reports he provided in this case or about anything

in the evidentiary record in this case. Rather, they sought his speculation about the conduct of third parties in other cases. The proper mechanism for procuring third-party discovery is not to solicit speculation or information subject to a protective order from an expert, but instead to issue a third-party subpoena. Plaintiffs served subpoenas to Meta, Adobe, and Google in this case but failed to secure any information on this topic.

The other testimony Plaintiffs cite likewise does not establish that any of Mr. Schnell's opinions relied on confidential information. Two of the exchanges simply involve a request from Mr. Schnell to see documents implicated in vague questions from Plaintiffs' counsel. *See* Schnell Vol. 1 Dep. at 59:6-21 (requesting to review Meta's online statements that counsel referenced); *id.* at 67:19-68:8 (requesting to review Dr. Egelman's report in response to counsel's question because his opinions are "focused on what Dr. Egelman said"). In another exchange, counsel asked whether Mr. Schnell had "ever personally audited the internal source code of Meta, Google, Adobe, or Skai." Schnell Vol. 2 Dep. at 251:20-22. The vague question was untethered from Mr. Schnell's opinions—counsel even confirmed she was asking about the review of *any* source code, not even just "in relation to advertising." *Id.* at 251:23-24. And Mr. Schnell appropriately declined to violate a protective order and testify about irrelevant "circumstances" in which he has looked at Google's source code. *Id.* at 252:4-9.

Plaintiffs do not even attempt to connect these exchanges with any specific opinions in Mr. Schnell's reports, and instead generically state that his reports "contain extensive discussions and opinions about what [redacted]." Mot. at 7. This vague statement does not establish that Mr. Schnell's opinions rely on confidential information, particularly since his rebuttal opinion is based on the record in this case, which does not include third parties' conduct in other cases. *E.g.*, Schnell Rep. ¶ 12 ("In my opinion, based on *my analyses and review of produced documents*, I am unaware of user-entered DII being shared with a third party" (emphasis added) (footnote omitted)). This is nothing like the cases Plaintiffs cite where experts refused to testify about topics their reports stated formed the basis of their opinions. *See In re Rail Freight Surcharge Antitrust Litig.*, 2013 WL 12384733, at *6 (D.D.C. Nov. 12, 2013) (expert's opinion that he "witnessed an abrupt and universal change" could be based only on "hundreds of [confidential] contracts" (quotation omitted)); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 471 (S.D.N.Y. 2016) (expert report states expert "based her opinions . . . on her

experience as a 'regulatory reviewer,'" but she refused to testify about conversations related to the review); *Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*, 144 F.4th 238, 255–57 (4th Cir. 2025) (expert's report specifically referenced his employer's services and practices, which he refused to discuss during deposition).

As for the final excerpt concerning Meta's "fr cookie," Plaintiffs' conspicuously omit Mr. Schnell's testimony that he was *not* relying on information from confidential cases for his opinion that "Meta uses the 'fr' cookie as its primary key to look up relevant records." Schnell Supp. Rep. ¶ 33; *see also* Schnell Vol. 2 Dep. at 306:21-307:9 ("I'm not relying on information from that case. . . [A]ll the things I rely on are in the appendix of my report."). He testified that although the "fr cookie" may have also come up in some of his other cases, that was not the "sole" basis of his knowledge because he knows the information "based on . . . public statements, from Meta." Schnell Vol. 2 Dep. at 303:21-24, 308:11; *see also id.* at 308:17-21 (explaining information about the Meta's "fr cookie" is available publicly because "[y]ou can search on the web for FR cookie, and you'll see that it's a marketing cookie. . . . [I]n my experience, you won't find any other cookies that are third-party cookies that are marketing cookies at Meta."); *id.* at 307:10-308:12 ("I'm not saying it's the sole source of that information"). Indeed, Meta's publicly available "Cookies Policy" confirms Mr. Schnell's testimony. As late as September 12, 2023, that policy stated that "the 'fr' cookie is used to deliver, measure and improve the relevancy of ads." *See* Ex. F (available at https://web.archive.org/web/20230912103449/https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3).[3]

This does not provide a basis for exclusion. Indeed, Plaintiffs neglect to mention that their own damages expert, Mr. Krause, engaged in the exact same conduct during his deposition, which would warrant exclusion of his entire report if Plaintiffs' position in this motion is correct:

> **A:** I'm not comfortable sharing that level of information.

[3] Even if the Court were to find the single sentence contained in Mr. Schnell's reports that references the "fr" cookie is based on confidential information (it is not), striking the entire report based on one sentence would not be the appropriate remedy. *See Matthew Enter. v. Chrysler Group LLC*, 2016 WL 4272417 (N.D. Cal. Aug. 15, 2016) (analyzing Rule 702 admissibility opinion by opinion).

> **PLAINTIFFS' COUNSEL:** Again, I believe this is protected by confidentiality in the case, by a confidentiality order in the case.
>
> **A:** That is -- that is specific data provided by the parties in that case. Just like I wouldn't provide it from this case, I would not provide that.
>
> **Q:** And, Mr. Krause, is the basis for why you're refusing to provide that information because you believe it's covered by a Protective Order in that case?
>
> **A:** Yes, sir.
>
> **Q:** Fair enough.

Krause Dep. 287:12-288:1. During Mr. Krause's deposition, when he indicated the questions sought information subject to a protective order in a separate case, Capital One's counsel moved on to a different topic instead of pressuring the witness to violate a court order. *Id.* Plaintiffs' counsel took the opposite tactic. *See* Schnell Vol. 2 Dep. at 317:4-11 (asking witness "have you seen Meta productions in other cases" after discussing protective orders in cases involving Meta); *see also* Cal. Rules of Pro. Conduct Rule 3.4, 8.4 ("A lawyer shall not … disobey an obligation under the rules of a tribunal" or "induce another to" violate such an obligation).

Finally, there is no credible argument that Mr. Schnell failed "to disclose even the *general existence* of Schnell's confidential knowledge." Mot. at 7. His report identifies every case in which he has testified during his career, exceeding the requirements of Rule 26. Schnell Rep., App. B; *see also* Fed. R. Civ. P. 26(a)(2)(B)(v) (requiring disclosure of all "cases . . . during the previous 4 years, the witness testified as an expert at trial or by deposition"). Mr. Schnell even referenced that he was bound by protective orders during his first deposition, yet Plaintiffs did not seek access to the sealed information prior to his second deposition. Instead, they waited four months to request that the Court "require[]" Mr. Schnell to "sit for" a *third* "deposition and give testimony" about information "he has learned through prior litigation." Mot. at 15. Plaintiffs' untimely request—made after the parties have fully briefed class certification and a 12(b)(1) motion to dismiss Plaintiffs' claims—would upend the case schedule. Their Motion should be rejected on that basis alone. *See Arguedas v. Carson*, 2024 WL 253644, at *2 (S.D. Cal. Jan. 22, 2024) ("Discovery is now closed, and the time for wrangling over disclosure violations is long past."); *In re Sulfuric Acid Antitrust Litig.*, 230 F.R.D. 527, 532-33 (N.D. Ill. 2005) (denying

request—made two months after discovery closed—to reopen deposition, and observing that "[t]he rules do not allow for endless depositions, the modern form of trial by ordeal").

**C. Plaintiffs Misrepresent Mr. Schnell's Opinion on Hashing.**

Plaintiffs' assertion that Mr. Schnell should be excluded because his opinions on hashing are "[u]nsupported" is baseless. Mot. at 8. The argument ignores Mr. Schnell's actual opinion on hashing—that Dr. Egelman's speculation that hashed values enabled Meta to re-identify putative class members is not supported by any evidence—and instead cobbles together miscellaneous sentences from the report to argue his "understanding of hashing is superficial." *Id.* None of this is a basis to exclude Mr. Schnell.

Mr. Schnell's primary opinion on hashing specifically rebuts Dr. Egelman's opinions that [redacted]. Schnell Rep. ¶ 148; *see also* Egelman Rep. ¶¶ 193-95. Mr. Schnell criticizes Dr. Egelman because he "does not state or provide any evidence" that [redacted] Schnell Rep. ¶ 148. He also explains [redacted] *Id.* Indeed, Dr. Egelman's reliance on speculation instead of evidence is an issue throughout his report, *infra* at 16–17, and Plaintiffs have no response to these criticisms.[4]

Plaintiffs miss the point when they assert that Dr. Egelman was able to use records from data breaches to un-hash some (but not all) of the hashed emails in the record in this case. Mot. at 8; Egelman Rep. ¶¶ 86; 194. As Mr. Schnell explains, [redacted]. *See* Schnell Rep. ¶ 148.

Because Plaintiffs cannot challenge Mr. Schnell's key hashing opinion, they baselessly nitpick other statements sprinkled throughout his report. Plaintiffs imply the FTC advises against hashing, but the FTC has advised no such thing. Instead, in a blog post on the agency's website it simply advises against holding out hashed data as anonymous if it is not (a point not contested in Mr. Schnell's report).

[4] This opinion from Dr. Egelman is irrelevant to Plaintiffs' claims. None of the Plaintiffs' [redacted] prior to the filing of the Complaint, and server-to-server technology is outside the scope of the case. *See* Morawetz Decl., ECF No. 215-38, figs. 2, 3; Report and Recommendation on Mot. for Sanctions, ECF No. 213, at 1–2 ("[F]rom the inception, Plaintiffs' case . . . did not include server-to-server transmission.").

Mot. at 9 & n.2. They erroneously accuse Mr. Schnell of inventing a new security standard, when he was simply acknowledging that one of the ways that SHA-256 provides security is that the data "could not easily be used for identity theft," a concern for any company with extensive data. *Id.* at 8 (quoting Schnell Rep. ¶ 59). And they quibble with his reliance on a NIST article to support that "SHA-256 hashing is considered an industry standard method to protect DII," but do not actually challenge his statement. *Id.* at 8–9.

Plaintiffs cannot ignore Mr. Schnell's key hashing opinion, but try to exclude him based on other references to hashing in his report. Even if their criticisms had merit (and they do not), they go to the weight of Mr. Schnell's opinions, not admissibility, and do not support his exclusion. *See SEC v. Retail Pro, Inc.*, 2011 WL 589828, at *5 (S.D. Cal. Feb. 10, 2011) ("To the extent Plaintiff challenges the correctness or one-sided nature of the underlying facts (and the evidence supporting them), Plaintiff's recourse is not exclusion of the testimony, but, rather, refutation of it by cross-examination and by the testimony of [his] own expert witnesses." (quotation omitted)).

### D. Plaintiffs' Criticism that Mr. Schnell Analyzed DII Based on Record Evidence—Not Dr. Egelman's Speculation—Is Meritless.

Dr. Egelman opines throughout his report that "third parties received personally-identifiable information"—which he describes as "direct identifiers" or "indirect identifiers"—"about the activities of Capital One's website visitors." *E.g.*, Egelman Rep. ¶¶ 8, 160, 173. One of Mr. Schnell's assignments was to evaluate Dr. Egelman's opinions concerning what "direct identifiers" and "indirect identifiers" may be transmitted to third parties when a consumer submits an application on the Capital One website. Schnell Rep. ¶¶ 9, 12. His report refers to these two terms collectively as "DII." *Id.* ¶ 9. Plaintiffs assert Mr. Schnell's rebuttal opinion should be excluded because his analysis did not credit Dr. Egelman's unsupported speculation that third parties *might* have other data that converts transmitted data into "indirect identifiers." But speculation is not a basis for an expert's opinion, and Plaintiffs' argument should be rejected.

Plaintiffs do not challenge Mr. Schnell's opinions concerning "direct identifiers," *see* Mot. at 11 n.4, but they argue his opinions about whether certain data transmitted to third parties are "indirect identifiers" are "unsound." *Id.* at 12. Their expert Dr. Egelman defined "indirect identifier" as "data [that]

is 'linked' or 'linkable' to other data that identifies someone[,] or when multiple data points are used in conjunction to identify someone." Egelman Rep. ¶ 37. Dr. Egelman's report does not list which of the data at issue in this case is an "indirect identifier." Instead, it lumps "indirect" and "direct" identifiers together as "personally-identifiable information," which he broadly states is sent to third parties. *Id.* ¶¶ 161, 165, 172, 176, 184, 197. This appears to be based on his speculation that third parties have certain *other data*, and for that reason, even though the data Capital One separately transmits cannot be used on its own to identify a particular user, it is still somehow personally identifiable. *Id.* ¶ 37 (explaining a "device identifier" is an "indirect identifier" where "databases exist that link that identifier to the individual"). But this analysis is not sound. Not only does Dr. Egelman rely on speculation instead of record evidence, but he fails to even identify what specific data third parties supposedly have that transforms transmitted data into an "indirect identifier."

In his rebuttal report, Mr. Schnell adopts Dr. Egelman's definition of "indirect identifier" and analyzes whether the record supports that any "indirect identifier" was transmitted to third parties. Schnell Rep. Table 1. But unlike Dr. Egelman, Mr. Schnell limits his analysis to actual evidence. He applies Dr. Egelman's "indirect identifier" by evaluating whether there was evidence that that transmissions to third parties contained data that "in conjunction with" each other could "identify a particular user." *See* Schnell Rep. ¶ 9, Table 1; Schnell Supp. Rep. ¶ 3. He also opines that although [redacted]. Schnell Rep. ¶ 9, Table 1. This analysis was not an "arbitrary modification" to Dr. Egelman's definition, Mot. at 12, but instead the application of the definition to actual evidence, as required by Rule 702. *See Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019) (An expert's opinion "must rest on 'facts or data in the case that the expert has been made aware of or personally observed,' not merely assumptions and speculation." (quoting Fed. R. Evid. 703)).

Indeed, Plaintiffs' challenge reveals the fatal flaw in Dr. Egelman's own report: his opinions are based not on evidence, but on his own speculation about what other data third parties *may* have, and what third parties *may* do with that data. Mr. Schnell's unwillingness to credit Dr. Egelman's speculation in his own analysis is not a basis to exclude him under Rule 702.

**E. Plaintiffs' Attempt to Re-Litigate Their Sanctions Motion Should Be Rejected.**

Plaintiffs argue that Mr. Schnell's opinion that Google and Skai could not infer "behavioral or commercial signals" from obfuscated data elements, Schnell Vol. 2 Dep. 262:19-22, should be excluded because that opinion was based on "untimely" and "[i]ncomplete" productions by Capital One, Mot. at 13-14. This argument is baseless for at least two reasons.

*First*, it is a transparent and improper attempt to re-litigate Plaintiffs' motion for sanctions, which Magistrate Judge Kim recently recommended that this Court deny. *See* ECF 213. As Judge Kim explained, Capital One's discovery conduct was proper: "Capital One's refusal to update its responses to written discovery to include documents and information about server-to-server technology was … justifiable" because, "from the inception, Plaintiffs' case was limited to the transmission of data directly from its website to third parties and did not include server-to-server transmission." *Id.* at 1-2, 11. The proper method for Plaintiffs to challenge Judge Kim's decision is to object to the Report and Recommendation, which Plaintiffs have done, ECF 226. But a motion to exclude Capital One's expert is no place to re-litigate Plaintiffs' complaints about fact discovery, which closed nearly five months ago. *See Inventio AG v. Thyssenkrupp Elevator Corp.*, 2014 WL 554853, at *3 (D. Del. Feb. 6, 2014) (denying motion to exclude expert's opinions based on alleged untimely productions because "[a] Daubert Motion is not the proper vehicle to raise a possible discovery violation"); *Correct Transmission, LLC v. Nokia of Am. Corp.*, 2024 WL 1327906, at *3 (E.D. Tex. Mar. 26, 2024) ("Daubert is not the appropriate vehicle for addressing discovery disputes."); *cf. Reynolds and Reynolds Co. v. Alternative Source Inc*, 2014 WL 12558119, at *2 n.4 (C.D. Cal. Apr. 16, 2014) ("An opposition to a motion for summary judgment is not the time to litigate discovery disputes.").

*Second*, Mr. Schnell's opinions about what Google and Skai can read or infer from server-to-server transmissions are consistent with Plaintiffs' own characterizations of the record, and those of their expert Dr. Egelman. Dr. Egelman confirmed at his deposition that he was not aware of any evidence that data dictionaries were shared with Google or Skai—dictionaries that he needed to decipher the data fields he analyzed. *See* Egelman Dep. 243:17-20; 271:23-272:2, 274:9-13, 279:19-20. Plaintiffs' discovery conduct and their representations to the Court further confirm that no such evidence exists: in connection with their non-party subpoena to Google, Plaintiffs attempted to obtain information about asserted "server-

to-server" transfers from Capital One to Google relating to Plaintiffs, but Google provided no such information, and Plaintiffs never filed their threatened motion to compel. *See* ECF 199-9, at 2-5 (exchange between Plaintiffs' counsel and Google's counsel). And at the hearing on Plaintiffs' motion for discovery sanctions, Plaintiffs' counsel acknowledged to Magistrate Judge Kim that Google did not provide Plaintiffs with any information about server-to-server transmissions. *See* ECF 212, 2/23/26 Hearing Tr., at 19:1-8. Accordingly, Plaintiffs' own characterizations of the evidentiary record support Mr. Schnell's opinion that neither Google nor Skai could infer behavioral or commercial signals from obfuscated data elements.[5]

Unable to cast doubt on Mr. Schnell's opinion, Plaintiffs shift gears to complaining that they could not "ask questions" about alleged server-to-server transmissions. Mot. at 14. But that is not true: Plaintiffs' counsel *did* ask questions to Ms. Ager—at least three dozen of them[6]—about Capital One's use of server-to-server technologies, including about the data dictionaries for Google and Skai, Ager 12/10/25 Dep. 28:2, 67:5, 81:4 (introducing dictionaries as exhibits). Plaintiffs were free to ask Ms. Ager whether these dictionaries were provided to Google and Skai such that they could decode the data fields at issue, but Plaintiffs asked no such question, likely because they understood (correctly) that the answer would be no. Just as they did in their sanctions motion, Plaintiffs make "sweeping generalizations about Capital One's [discovery] obligations," gesture at broad discovery failures but fail to establish any in particular, and ultimately ask the Court to "make arguments for moving parties and puzzle through dozens of exhibits to do so." ECF 213, at 9–10. At bottom, Plaintiffs failed to generate any evidence undermining Mr. Schnell's opinion about what Google and Skai can infer from server-to-server transmissions that are not at issue in this case. Plaintiffs' attempt to blame Capital One for their failure to develop a more favorable evidentiary record is meritless, and Plaintiffs offer no persuasive basis to exclude Mr. Schnell's opinion.

[5] Plaintiffs fault Mr. Schnell for not providing an "admissible basis for his statement that no data dictionaries were provided," Mot. at 13, but Plaintiffs' demand for proof of a *lack of evidence* is unreasonable: the basis for Mr. Schnell's opinion is that he reviewed the factual record and (like Dr. Egelman) found no evidence that data dictionaries were provided to Google or Skai. *See* Schnell Rep. ¶ 76 (describing materials reviewed).

[6] *See* Ager 12/10/25 Dep. 9–16, 19, 21–23, 36–38, 40–42, 56, 72–73, 91–92, 109, 116–19, 124, 131–36.

### F. Plaintiffs Cannot Exclude Mr. Schnell Based on His (Correct) Criticism That Dr. Egelman Ignored His Own Testing.

Finally, Plaintiffs criticize Mr. Schnell for highlighting that Dr. Egelman cherry-picked deposition testimony about what data may be transmitted rather than his own testing in claiming that Capital One shared four specific data fields with Meta. Mot. at 14; *see* Schnell Rep. at 42-43. Notably, Plaintiffs' criticism applies to only four of fifty-five data elements that Mr. Schnell analyzed in refuting Dr. Egelman's analysis. *See id.* at 36–43.

Plaintiffs' criticism also lacks merit. Considering that Dr. Egelman performed testing on Capital One's website that was specifically designed to determine what user information Capital One shared with third parties (including Meta), Egelman Rep. ¶¶ 145-54, it is entirely appropriate for Mr. Schnell to emphasize that Dr. Egelman relied only on deposition testimony (and not his own testing) in concluding that certain data fields were shared with Meta. If Dr. Egelman's testing *had* found that the data fields at issue were transmitted to third parties, his report surely would have said so. Highlighting that Dr. Egelman's opinion was undermined by his own testing is thus a proper rebuttal opinion. In any event, Plaintiffs' criticism is not about the relevance or reliability of Mr. Schnell's opinions. Rather, it is about the persuasiveness of Mr. Schnell's critique of the Egelman Report. This critique goes to weight, not admissibility, as "persuasiveness is, in general, a matter for the jury." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016).

Plaintiffs inexplicably cite *Oracle America, Inc. v. Hewlett Packard Enter.* (Mot. at 14), but that case undermines their argument. The *Oracle America* court *admitted* testimony from Mr. Schnell that—like his criticism of the Egelman Report here—"identif[ied] an alleged flaw in the [opposing expert's] report." 2018 WL 6511146, at *6 (N.D. Cal. Dec. 11, 2018) (admitting Mr. Schnell's opinion that certain "distinctions in the policies and practices as between Sun and Oracle are not addressed at all in [the opposing expert's] report"). *Oracle America* thus confirms that it is entirely appropriate for Mr. Schnell to criticize Dr. Egelman's report by highlighting the evidence it lacks.

## CONCLUSION

The Court should deny Plaintiffs' motion to strike or limit Mr. Schnell's testimony.

Dated: April 6, 2026

By: /s/ Kathryn E. Cahoy
Kathryn E. Cahoy (Bar No. 298777)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
(650) 632-4735
kcahoy@cov.com
Matthew Q. Verdin (Bar No. 306713)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-7065
mverdin@cov.com

Andrew Soukup *(pro hac vice)*
Nicholas Evoy *(pro hac vice)*
Marianne Spencer *(pro hac vice)*
Jeffrey Huberman *(pro hac vice)*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
asoukup@cov.com
nevoy@cov.com
mspencer@cov.com
jhuberman@cov.com

*Attorneys for Defendant Capital One Financial Corporation*