Kathryn E. Cahoy (Bar No. 298777)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
(650) 632-4735
kcahoy@cov.com

Matthew Q. Verdin (Bar No. 306713)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-7065
mverdin@cov.com

*Attorneys for Defendant Capital One Financial Corporation*

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

GARY INGRAHAM, and DEIA WILLIAMS, individually, and on behalf of all others similarly situated,

Plaintiffs

v.

CAPITAL ONE FINANCIAL CORPORATION, d/b/a CAPITAL ONE, d/b/a CAPITAL ONE, NATIONAL ASSOCIATION, d/b/a CAPITAL ONE, N.A., d/b/a CAPITAL ONE SHOPPING,

Defendant.

Case No. 3:24-cv-05985-TLT

**CAPITAL ONE'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S EXPERT KINSHUK JERATH**

Judge: Hon. Trina L. Thompson
Hearing: April 21, 2026
Time: 2:00 p.m.
Ctrm: 9, 19th Floor

**PUBLIC REDACTED**

**TABLE OF CONTENTS**


INTRODUCTION ..... 1

BACKGROUND ..... 2

A. Professor Jerath's Qualifications. ..... 2

B. Plaintiffs' Expert Reports and Professor Jerath's Response. ..... 2

1. Dr. Egelman and Mr. Krause Assume the Technologies Do Not Benefit Consumers, and Professor Jerath Explains Why This Assumption Is Wrong. ..... 3

2. Dr. Egelman and Mr. Krause Criticize the Technologies, and Professor Jerath Provides Industry Context. ..... 3

3. Dr. Egelman Claims Technologies Can Identify Users, and Professor Jerath Explains Why They Do Not. ..... 4

C. Professor Jerath's Deposition. ..... 5

D. Plaintiffs Seek to Exclude Professor Jerath's Opinions. ..... 5

PROCEDURAL STANDARD ..... 6

ARGUMENT ..... 6

I. Professor Jerath's Opinions About How Consumers Benefit From Capital One's Practices Are Relevant. ..... 6

II. Professor Jerath's Opinions About How Capital One's Practices Are Consistent with Industry Practice Are Relevant. ..... 9

III. Professor Jerath's Opinions About Pseudonymous Data Are Relevant and Reliable. ..... 11

CONCLUSION ..... 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. DJ Supply Inc. v. Am. Pro Int'l Corp.*,
2013 WL 12123986 (C.D. Cal. Feb. 22, 2013)....7

*Brown v. Google, LLC*,
685 F. Supp. 3d 909 (N.D. Cal. 2023)....12

*Brown v. Google, LLC*,
2022 WL 17961497 (N.D. Cal. Dec. 12, 2022)....8, 11

*Cahen v. Toyota Motor Corp.*,
717 F. App'x 720 (9th Cir. 2017)....12

*Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*,
2021 WL 5407316 (N.D. Cal. Nov. 18, 2021)....9

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011)....6

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025)....6

*Fair Fight Action, Inc. v. Raffenspenger*,
2020 WL 13561757 (N.D. Ga. Nov. 16, 2020)....13, 14

*Galinis v. Bayer Corp.*,
2019 WL 2716480 (N.D. Cal. June 28, 2019)....6

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022)....10, 11

*Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*,
340 F. Supp. 3d 934 (N.D. Cal. 2018)....11

*Hunter v. Ohio Indem. Co.*,
2008 WL 728893 (N.D. Cal. Mar. 17, 2008)....9

*Kudos Inc. v. Kudoboard LLC*,
2021 WL 5415258 (N.D. Cal. Nov. 20, 2021)....11

*Messick v. Novartis Pharms. Corp.*,
747 F.3d 1193 (9th Cir. 2014)....6

*Mikulsky v. Noom, Inc.*,
2024 WL 251171 (S.D. Cal. Jan. 22, 2024)....12

*Miller v. Travel Guard Grp., Inc.*,
2023 WL 7106479 (N.D. Cal. Sept. 15, 2023) ....................7, 8

*Peterson v. Cellco P'ship*,
164 Cal. App. 4th 1583 (2008) ....................7

*In re Piasecki*,
745 F.2d 1468 (Fed. Cir. 1984) ....................14

*POM Wonderful LLC v. Coca Cola Company*,
2016 WL 5929259 (C.D. Cal. Feb. 24, 2016) ....................13

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) ....................10, 12

*Rothe Dev., Inc. v. Dep't. of Def.*,
107 F. Supp. 3d 183 (D.D.C. 2015) ....................14

*Russell v. Walmart, Inc.*,
680 F. Supp. 3d 1130 (N.D. Cal. 2023) ....................7

*Sec. & Exch. Comm'n v. Panuwat*,
2024 WL 1012916 (N.D. Cal. Mar. 8, 2024) ....................11

*Space Data Corp. v. Alphabet Inc.*,
2019 WL 2603285 (N.D. Cal. June 25, 2019) ....................9

*Stewart v. Quest Diagnostics Clinical Lab'ys, Inc.*,
2022 WL 5236821 (S.D. Cal. Oct. 5, 2022) ....................6

*United States v. Chang*,
207 F.3d 1169 (9th Cir. 2000) ....................13

*United States v. Ray*,
583 F. Supp. 3d 518 (S.D.N.Y. 2022) ....................14

*United States ex rel. Palmer Constr., Inc. v. Cal. State Elec., Inc.*,
940 F.2d 1260 (9th Cir. 1991) ....................8

*Valenzuela v. Super Bright LEDs Inc.*,
2023 WL 8424472 (C.D. Cal. Nov. 27, 2023) ....................10

*In re Vioxx Class Cases*,
180 Cal. App. 4th 116 (2009) ....................7, 8

**Statutes**

Cal Civ. Code § 1798.140 ....................10

Cal. Civ. Code § 1798.81.5 ....................13

Cal. Civ. Code § 1798.150 ........................................................................ 13

**Other Authorities**

Federal Rule of Evidence 702 ........................................................................ 6, 14

## INTRODUCTION

Plaintiffs' motion rests on the flawed premise that the testimony of Capital One's expert, Professor Kinshuk Jerath, is irrelevant and must be excluded to the extent he does not opine on the legal question of consent. That is not the law, as an expert need not opine on every issue in the case, and it is not the case Plaintiffs themselves have litigated. Even if Plaintiffs could prove a lack of consent—and they cannot, either as to themselves or on a classwide basis—they and every other putative class member still must prove they have Article III standing to sue, which Professor Jerath's testimony directly addresses. He also responds to flawed assumptions in Plaintiffs' damages analysis and other issues Plaintiffs have directly put at issue in the case, including as to elements of Plaintiffs' claims.

Plaintiffs' own class certification motion emphasizes some of these additional issues. Plaintiffs contend that Capital One's information-sharing practices breach industry-wide standards for purposes of their negligence claim, ECF No. 187-1 at 16-17, and provide "no valuable benefit" to consumers for purposes of their damages theories, *id.* at 3. Their experts echo those contentions: Plaintiffs' technical expert claims that the purpose of information-sharing technologies is to [redacted], ECF No. 187-15 ("Egelman Rep.") ¶¶ 64, 115-117, 207, while their damages expert assumes that consumers obtain no benefit if Capital One shares their information with third parties, ECF No. 215-6 ("Krause Tr.") 171:24-172:19.

Professor Jerath—a highly respected Columbia Business School marketing professor with a deep background in digital marketing practices—explains why Plaintiffs and their experts are wrong. Plaintiffs' attempt to exclude Professor Jerath lacks merit. Plaintiffs do not dispute that Professor Jerath is qualified to offer the opinions he actually offers in this case. Instead, they argue that his opinions are irrelevant because he does not address consent and therefore are a bad fit for this case. Those arguments fail because Professor Jerath directly responds to the issues and theories Plaintiffs themselves have placed in dispute. Plaintiffs contend that consumers receive no benefit from Capital One's challenged practices—both on the merits of their claims and as to their damages theories—and Professor Jerath's explanation of how consumers benefit directly addresses that contention. Plaintiffs' claims likewise demand an inquiry into the purposes for which information is shared, and Professor Jerath explains the purposes of the technologies and how Capital One's practices are consistent with widespread industry practices, which is

directly relevant to the service provider exceptions under the CCPA and CIPA, as well as to Plaintiffs' negligence claim. Plaintiffs also suggest that third parties can identify users from the information transmitted, and Professor Jerath explains how the technologies can function without identifying particular individuals.

By addressing issues and theories Plaintiffs have placed in dispute, Professor Jerath's opinions are relevant to this case and helpful to a factfinder, and there is no basis to exclude them.

## BACKGROUND

### A. Professor Jerath's Qualifications.

Professor Jerath is a well-respected, tenured marketing professor at Columbia Business School. ECF 249-02 ("Jerath Rep.") ¶ 1. He teaches classes that focus on "online advertising," including "social media marketing," "customer data analytics, targeting, privacy, and business models enabled by advertising," "customer analytics," and "marketing strategy." *Id.* ¶ 2. As his report explains, Professor Jerath's research is primarily in the fields of "digital advertising, customer management, and retailing," and he has "published extensively on these topics." *Id.* ¶ 3.

In addition to his academic work, Professor Jerath has "consulted for and advised multiple Fortune 500 companies" on "digital marketing issues," and he "serve[s] as an advisor to a number of startups in the digital marketing and analytics space." *Id.* ¶ 5. He also has testified as an expert in cases "involving consumer privacy issues in the context of digital marketing." *Id.*

### B. Plaintiffs' Expert Reports and Professor Jerath's Response.

Plaintiffs face many obstacles in this case. They asked this Court to certify sweeping classes that lump together different information, shared at different times, from differently situated consumers, via different technologies, for different purposes. *See* ECF 187-1 at 1. That means Plaintiffs must not only prove injury to prevail on the merits of their individual claims and to establish Article III standing, but they also must show that these issues can be resolved through common proof to be able to represent a class.

In an effort to meet these challenges, Plaintiffs offered the opinions of a technical expert, Dr. Serge Egelman, and a damages expert, Eric Krause. In his rebuttal report, Professor Jerath explained why Dr.

Egelman's and Mr. Krause's reports depend on incorrect conclusions and assumptions regarding the purposes of the at-issue website technologies and the benefits they provide to consumers.

**1. Dr. Egelman and Mr. Krause Assume the Technologies Do Not Benefit Consumers, and Professor Jerath Explains Why This Assumption Is Wrong.**

In assessing the potential harm to putative class members from the challenged technologies and otherwise offering opinions on the at-issue technologies, Plaintiffs' experts rely on a shared assumption that the technologies provide no benefit to consumers. Plaintiffs' damages expert, Mr. Krause, admitted that he did not "attempt to determine" whether consumers received any benefits and simply "assume[d] there are no[ne]." Krause Tr. 171:24-172:19. Plaintiffs' technical expert, Dr Egelman, narrowly characterized the at-issue technologies as a way for companies to "observ[e] how users interact with [a] service in order to maximize its profitability," and states that the technologies allow companies to "manipulat[e] users into spending more time using a Service." Egelman Rep. ¶ 12.

Professor Jerath's rebuttal report corrects Plaintiffs' experts' flawed portrayal of these technologies and their purpose, which would be critical context for the jury. He explains that these assumptions and conclusions "overlook[] the range of benefits that the [at-issue] technologies provide." Jerath Rep. ¶ 18. As Professor Jerath explains, the technologies "provide multiple benefits and serve multiple functions" for the millions of companies that use them. *Id.* ¶ 25. For example, businesses use web analytics tools "to better understand user journeys and identify areas where website design can be improved." *Id.* ¶ 33. Additionally, these "website tools" allow "companies [to] benefit from more efficient advertising spending." *Id.* ¶ 29. As a result, Professor Jerath explains that consumers can benefit from "improved user experience through more relevant, less repetitive, and fewer ads, and more access to free products and services." *Id.* ¶ 18; *see also id.* ¶¶ 28-29, 32-38 (expounding on benefits to consumers and explaining that "Dr. Egelman does not consider the effects of limiting these services and the resulting trade-off in the quality and number of free-to-use tools").

**2. Dr. Egelman and Mr. Krause Criticize the Technologies, and Professor Jerath Provides Industry Context.**

Plaintiffs' experts also criticize the at-issue technologies as inherently privacy-invasive. For example, Dr. Egelman claims that the purpose of the at-issue technologies is to [redacted]. Egelman Rep. ¶ 64, 115-117, 207. Meanwhile, Mr. Krause

assumes that "the primary function of tracking pixels" is "to collect and transmit personally identifying information about user behaviors and interactions with websites." ECF No. 187-53 ("Krause Rep.") ¶ 13.

Here again, Professor Jerath responds by explaining why Plaintiffs' experts are wrong. In his report, Professor Jerath "compared Capital One's use of these technologies to digital marketing practices in three areas: Capital One's choice to use the at-issue tools, Capital One's business purposes for using these tools, and Capital One's sharing of [redacted] through these tools." Jerath Rep. ¶ 20. "[B]ased on [his] experience, research, and expertise," Professor Jerath concluded that "Capital One's approach is consistent with digital marketing practices" in all "three areas." *Id.*

Professor Jerath also explains that Capital One is not alone. Plaintiffs challenge Capital One's use of (among other technologies) the Meta Pixel, Meta Conversions API, and Google Analytics. But Professor Jerath explains that "over 30 million live websites have used Google Analytics," and "over 5.6 million and 4.6 million live websites have used Meta Pixel and Meta Conversions API, respectively," including other "financial services firms." *Id.* ¶ 48. In addition, Professor Jerath explains that Capital One uses the technologies for purposes consistent with digital marketing practices of other firms. *Id.* ¶ 49. For example: "Capital One uses Adobe Analytics"—another technology challenged by Plaintiffs—[redacted] *Id.* ¶ 49. In a case that centers on Plaintiffs' allegations about marketing tools and receiving unwanted ads, ECF No. 1 ¶ 237, Professor Jerath's testimony clarifying that certain tools are used for analytics and not advertising is critical.

### 3. Dr. Egelman Claims Technologies Can Identify Users, and Professor Jerath Explains Why They Do Not.

Dr. Egelman further opines that the information transmitted through the at-issue website technologies has "little practical privacy protection," and "[could] be used to distinguish or trace an individual's identity." Egelman Rep. ¶¶ 36, 64, 88, 160. He further asserts that the at-issue website technologies [redacted] *Id.* ¶ 207.

Professor Jerath's rebuttal report explains that "the theoretical ability, if any, of these companies to identify individual humans among the class members, is distinct from whether such identification has actually occurred." Jerath Rep. ¶ 41. Drawing on his industry experience and expertise, Professor Jerath explains that "the at-issue website technologies use pseudonymous identifiers and machine identities, and they can perform without identifying individual humans." *Id.* ¶ 40. In response to Dr. Egelman's "specul[ation] that the data provided to the at-issue website technologies could be used to uncover human identities" through reverse engineering, Professor Jerath discusses "methods to pseudonymize the data collected while still achieving" intended marketing and analytics goals. *Id.* ¶¶ 41-42. Professor Jerath concludes that "Dr. Egelman fails to demonstrate that Meta, Google, and Adobe engage in practices that would allow them to determine the personal identities of individual users." *Id.* ¶ 46.

**C. Professor Jerath's Deposition.**

At Professor Jerath's deposition, Plaintiffs' counsel focused in large part on questioning Professor Jerath about opinions that he was *not* offering as to the legal question of consent. Professor Jerath consistently confirmed that "consent is outside the scope of [his] report," ECF No. 249-03 ("Jerath Tr.") 31:10-12; *see also, e.g.*, *id.* 32:13-15, and emphasized what is the scope of his report: rebutting certain aspects of Dr. Egelman's and Mr. Krause's opinions, *id.* 38:18-39:20.

**D. Plaintiffs Seek to Exclude Professor Jerath's Opinions.**

Plaintiffs have moved to exclude all of Capital One's experts, including Professor Jerath. Plaintiffs challenge on narrow grounds Professor Jerath's opinions (1) explaining the purposes and benefits of the at-issue technologies and (2) explaining how Capital One's use of the at-issue technologies is consistent with practices in digital marketing. Mot. at 7-8. They do not argue that Professor Jerath is not qualified to offer these opinions, nor do they dispute that these opinions are reliable. Instead, Plaintiffs argue that Professor Jerath's opinions should be excluded solely because they do not "fit" the case because Professor Jerath does not offer an opinion on the legal issue of consent. Mot. at 6-7.

Plaintiffs also challenge Professor Jerath's opinion observing that the at-issue website technologies use pseudonymous identifiers. As to this opinion, Plaintiffs again claim that Professor Jerath's opinion on this topic does not "fit" the case, and they further assert that Professor Jerath is "not qualified to opine on that highly technical matter." Mot. at 9.

## PROCEDURAL STANDARD

"The Ninth Circuit has held that expert testimony offered at the class certification stage must meet the standards of relevance and reliability." *Stewart v. Quest Diagnostics Clinical Lab'ys, Inc.*, 2022 WL 5236821, at *5 (S.D. Cal. Oct. 5, 2022) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)). Federal Rule of Evidence 702 requires that expert testimony satisfy four elements:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of expert testimony—here, Capital One—bears the burden establishing admissibility by a preponderance of the evidence. *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025).

## ARGUMENT

Plaintiffs seek to exclude Professor Jerath on the ground that his opinions "do not fit the[ir] theory of the case." Mot. at 6. The "fit" inquiry bears on "Rule 702's 'helpfulness' standard," and this "condition goes primarily to relevance." *Galinis v. Bayer Corp.*, 2019 WL 2716480, at *5 (N.D. Cal. June 28, 2019). The "relevancy bar is low," and "demand[s] only that the evidence logically advances a material aspect of the proposing party's case." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196-97 (9th Cir. 2014). Here, Professor Jerath's opinions are relevant, reliable, and helpful to the fact finder, and this Court should not exclude them.

### I. Professor Jerath's Opinions About How Consumers Benefit From Capital One's Practices Are Relevant.

Plaintiffs seek to exclude Professor Jerath's opinions rebutting Dr. Egelman and Mr. Krause's characterization of the "benefits and purposes" of the at-issue technologies. Mot. at 3. Their arguments that these opinions do not "fit" this case lack merit.

In seeking to exclude Professor Jerath's opinions, Plaintiffs wrongly assert that "no claim… involves any consideration of a purported benefit incurred to Plaintiffs." Mot. at 7. That is false. Plaintiffs' unjust enrichment claim requires consideration of the benefits Plaintiffs received. *Am. DJ Supply Inc. v. Am. Pro Int'l Corp.*, 2013 WL 12123986, at *3 (C.D. Cal. Feb. 22, 2013) (no unjust enrichment where plaintiffs "received the benefit of the alleged bargain"); *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008) (same); *see also In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 131, 135–36 & n.20 (2009) (explaining that damages evidence would need to consider "the actual value" individuals received for unjust enrichment claim). It also requires Plaintiffs to "show that a defendant received and *unjustly* retained a benefit at the plaintiff's expense" as a result of the challenged conduct. *Russell v. Walmart, Inc.*, 680 F. Supp. 3d 1130, 1133 (N.D. Cal. 2023) (emphasis added). They also advance a restitution theory, and "the appropriate measure of restitution" accounts for the "value [plaintiffs obtained] from the products or services at issue." *Miller v. Travel Guard Grp., Inc.*, 2023 WL 7106479, at *17 (N.D. Cal. Sept. 15, 2023) (Thompson, J.).

In either case, if putative class members benefit from Capital One's information sharing practices, that benefit must be accounted for to determine whether Capital One's retention of any benefit it received is unjust or whether Plaintiffs are entitled to restitution. Professor Jerath directly addresses these points. *See* Jerath Tr. 79:3-12 (discussing differing views among consumers as to the value of data sharing and explaining, for example, that one consumer "might think [there] is a great benefit [that] comes at a low privacy cost" and may be "happy to share [their] data," while others may take a different view).

Plaintiffs themselves have put the relevant benefits of Capital One's practices at issue. They argued in their class certification motion that the consumers "receive[] no valuable benefit" in exchange for sharing their data. ECF No. 187-1 at 3. And their Complaint asserts that "Defendant's disclosure of Plaintiffs' and Class Members' Personal and Financial Information provides no benefit to Customers[.]" ECF No. 1 ¶ 276. Plaintiffs' damages expert Mr. Krause further has assumed that consumers do not benefit from the challenged conduct. Krause Tr. 171:24-172:19.

Professor Jerath directly responds to these contentions and would help the factfinder understand why they are wrong. Professor Jerath identifies at least three ways consumers may "benefit" from the at-issue technologies in the form of "an improved user experience with the website design and interface;

fewer, more relevant, and less repetitive ads; and more access to free products and services." Jerath Rep. ¶ 29. Plaintiff Ingraham's experience is consistent with Professor Jerath's opinion: Mr. Ingraham admits that he clicks on advertisements from Capital One because he "like[s]" the company and is interested in seeing the "newest and greatest" credit cards they are offering. ECF No. 215-5 ("Ingraham Tr.") 168:18-169:11, 184:3-21.

In the face of Professor Jerath's opinions, Plaintiffs cannot establish—on a classwide basis or otherwise—that Capital One's at-issue technologies "have no value for consumers," and thus lack common proof of a critical element underlying their damages theories. *Miller*, 2023 WL 7106479, at *17 (rejecting restitution damages model that "fails to measure the value of Defendants' [] services"); *see also In re Vioxx Class Cases*, 180 Cal. App. 4th at 135-36 & n.20 (explaining that "a proper measure of restitution" considers "the actual value of what the plaintiff received").

Plaintiffs cite no authority supporting their position that the benefit received by class members is irrelevant to this case. Instead, they purport to quote a Ninth Circuit decision for the confusing proposition that unjust enrichment considers the "benefit conferred upon the party minus the damages to the party." Mot. at 7. That quotation appears nowhere in the cited decision, which in any event involved contract claims Plaintiffs do not assert here.[1] *See United States ex rel. Palmer Constr., Inc. v. Cal. State Elec., Inc.*, 940 F.2d 1260, 1262 (9th Cir. 1991). Plaintiffs' reliance on *Brown v. Google, LLC* as to damages calculations (Mot. at 8) directly refutes their contention as well: the restitution model in that case expressly considered the value received by plaintiffs in the form of the "$3 rate" that "Google actually pays Screenwise participants for agreeing to allow Google to collect their browsing data." 2022 WL 17961497, at *5 (N.D. Cal. Dec. 12, 2022).

Plaintiffs next attempt to recast consideration of the benefit of the at-issue technologies as an "affirmative defense" (Mot. at 8), but they ignore that Capital One is rebutting Plaintiffs' own contention—advanced through their expert—that the at-issue technologies have no value for consumers. Plaintiffs do not explain how an insurance case addressing set-offs has any application to their data-

[1] This is not the only time Plaintiffs made this mistake in connection with motions scheduled to be heard on April 21. *See* ECF No. 240 at 2.

transmission claims—because they do not. *Hunter v. Ohio Indem. Co.*, 2008 WL 728893, at *6 (N.D. Cal. Mar. 17, 2008) (describing "set-offs" in insurance case as "an affirmative defense"). This is not a case where Capital One is seeking a set-off based on amounts Plaintiffs owe Capital One: Plaintiffs themselves placed the benefits received by putative class members at issue in this case, both by arguing that consumers did not benefit from Capital One's practices and by advancing claims and seeking to argue damages analyses that require the factfinder to account for benefits received by those putative class members. *See supra* at 1.

Nor is it true, as Plaintiffs suggest, that Professor Jerath's opinions about the benefits consumers receive from Capital One's practices are "irrelevant" if Plaintiffs "didn't" "consent[] to the transmissions at issue." Mot. at 7. On the contrary, if the Court finds that each Plaintiff consented to the at-issue data practices, the case is over. But if a particular Plaintiff or absent class member proves lack of consent, it is still relevant whether and to what extent Plaintiffs benefit from Capital One's purported data sharing, which Professor Jerath has offered opinions about. And Plaintiffs do not dispute that Professor Jerath's opinions on these points directly respond to Dr. Egelman's and Mr. Kraus's opinions, which "overlook[]" the "range of benefits" the at-issue technologies provide "to consumers who visit the websites that use them." Jerath Rep. ¶ 28; *see* Egelman Rep. ¶¶ 12-13; Krause Tr. 171:24-172:19. "[C]hallenging the assumptions of an expert witness' report is a permissible topic of rebuttal testimony." *Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*, 2021 WL 5407316, at *2-3 (N.D. Cal. Nov. 18, 2021) (allowing rebuttal expert to "critique the assumptions" underlying damages' experts opinions); *Space Data Corp. v. Alphabet Inc.*, 2019 WL 2603285, at *4 (N.D. Cal. June 25, 2019) (similar).

## II. Professor Jerath's Opinions About How Capital One's Practices Are Consistent with Industry Practice Are Relevant.

Plaintiffs also seek to exclude Professor Jerath's opinions rebutting Dr. Egelman and Mr. Krause's critique of Capital One's use of the at-issue technologies as inherently privacy-invasive technologies. Plaintiffs do not challenge Professor Jerath's qualifications to opine on this issue. Although Plaintiffs say "it is not clear what part of Dr. Egelman's report they even respond to" (Mot. at 8 n.2), the plain text of Professor Jerath's opinions resolves their confusion. *See* Jerath Rep. ¶ 49 & n.137-38, ¶ 50 (specifying contentions in Dr. Egelman's and Mr. Krause's reports that Professor Jerath's opinions respond to).

Plaintiffs do not directly challenge the relevance of Professor Jerath's opinions that the at-issue technologies may be used "for various business purposes," including "[a]nalytics," "[m]arketing analytics," and "[w]eb analytics." *Id.* ¶ 24. That omission matters. The Article III inquiry must consider *why* a third party received information, as courts repeatedly have held that "data collection and disclosure to third parties that is 'routine commercial behavior' is not a 'highly offensive' intrusion of privacy." *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1090 (N.D. Cal. 2022); *see Popa v. Microsoft Corp.*, 153 F.4th 784, 786 (9th Cir. 2025) (no standing for data transmissions that are not "highly offensive"). The purpose for sharing data matters on the merits as well, because CIPA and the CCPA do not prohibit the sharing of information when the third party uses the data solely in its capacity as a "service provider" to Capital One, such as Adobe Analytics' [redacted] Jerath Rep. ¶ 49. *Valenzuela v. Super Bright LEDs Inc.*, 2023 WL 8424472, at *5 (C.D. Cal. Nov. 27, 2023) (CIPA Section 631); *see* Cal Civ. Code §§ 1798.140(ai)(2); 1798.140 (ag)(1) (CCPA). Because Professor Jerath's unchallenged opinions establish that these purposes vary by technology, Plaintiffs necessarily lack common proof required to show Article III standing and liability on the merits, let alone proof sufficient to establish their individual claims. *See* ECF No. 220 at 17-18.

Professor Jerath bolsters these opinions by demonstrating how Capital One's "use of the technologies is consistent with digital marketing practices" across millions of websites, including within the banking industry. Jerath Rep. ¶¶ 47-48 ("over 30 million live websites have used Google Analytics"); *id.* ("over 5.6 million and 4.6 million live websites have used Meta Pixel and Meta Conversions API, respectively"); *id.* ("other financial services firms . . . use these tools for their websites"). These opinions are directly relevant to Plaintiffs' negligence claim, which is premised on the alleged breach of "industry standards." ECF No. 1 ¶¶ 202, 216. By situating the technologies within this broader digital marketing industry, Professor Jerath directly rebuts the premise shared by both Plaintiffs' experts that the technologies' purpose is unusually privacy-invasive. Egelman Rep. ¶¶ 64, 115-117, 207 (claiming the technologies' purpose is to [redacted]); Krause Rep. ¶ 13 (claiming that "the primary function of tracking pixels" is to "collect and transmit personally identifying information about user behaviors and interactions with websites"). At a minimum, Professor

Jerath's opinions "provide important context" about the use of the at-issue technologies to "defuse the impact of" Dr. Egelman's and Mr. Krause's flawed premises. *Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*, 340 F. Supp. 3d 934, 996 (N.D. Cal. 2018) (allowing expert rebuttal opinion for this reason); *Sec. & Exch. Comm'n v. Panuwat*, 2024 WL 1012916, at *7 (N.D. Cal. Mar. 8, 2024) (similar).

Given the opinions offered by Plaintiffs' experts, there should be little dispute that Professor Jerath's opinions about the ubiquitous and routine use of the at-issue technologies "fits" this case. "[R]outine commercial behavior" is "not a 'highly offensive' intrusion of privacy," *Hammerling*, 615 F. Supp. 3d at 1090, as required for Article III standing (*supra* at 10). Professor Jerath reviewed "Capital One's choice to use the at-issue tools, Capital One's business purpose for using these tools, and Capital One's sharing of [redacted] through these tools," and concluded "Capital One to be consistent with digital marketing practices in these three areas." Jerath Rep. ¶ 47; Jerath Tr. 32: 7-12 (testifying that Capital One's use of the data is "industry standard"). Those opinions bear directly on the standing inquiry and the merits of Plaintiffs' claims. They also make irrelevant Plaintiffs' complaint that Professor Jerath "did not do any analysis of [other] companies' disclosures," which goes to the distinct issue of "consent." Mot. at 8. In any event, courts routinely permit experts to "situate [another expert's] opinion in a broader context," *Kudos Inc. v. Kudoboard LLC*, 2021 WL 5415258, at *13 (N.D. Cal. Nov. 20, 2021), including to "provide background and context" in data transmission cases like Professor Jerath does here. *Brown,* 2022 WL 17961497, at *10 (allowing expert to provide a "general overview of data privacy in the context of internet usage," including background on "data collection" on the internet).

## III. Professor Jerath's Opinions About Pseudonymous Data Are Relevant and Reliable.

Finally, Plaintiffs seek to exclude Professor Jerath's opinions rebutting Dr. Egelman's conclusion that Meta, Google, and Adobe use the at-issue technologies to trace individual identities. Plaintiffs argue that this opinion does not "fit" this case and that Professor Jerath is "not qualified to opine on that highly technical matter" (Mot. at 9), but neither contention has merit.

In an effort to argue that Professor Jerath's opinions do not "fit" this case, Plaintiffs cast aside the central premise of their claims—namely, their contention that the challenged transmissions involve "personally identifiable" data. ECF No. 1 ¶ 1 (alleging that is why they "bring this [putative] class action"); ECF No. 187-1 at 1 (seeking to certify classes of individuals who had "personally identifiable

information collected or transmitted"). They now contend that "it does not matter whether the transmitted data was anonymized." Mot. at 9 n.3. Plaintiffs' position is irreconcilable with both their own theory and Ninth Circuit authority, which requires Plaintiffs and putative class members to show that the transmitted data is "individually identifiable" in order to establish an Article III injury. *Cahen v. Toyota Motor Corp.*, 717 F. App'x 720, 724 (9th Cir. 2017). If identifiability "did not matter," Plaintiffs necessarily cannot establish Article III standing, because "[t]he disclosure of non-individually identifiable data is insufficient to give rise to an injury-in-fact to support Article III standing." *Mikulsky v. Noom, Inc.*, 2024 WL 251171, at *4 (S.D. Cal. Jan. 22, 2024) (collecting cases).

Plaintiffs argue that Professor Jerath's opinions on this issue are irrelevant, when their own expert repeatedly speculates that the at-issue technologies "can be used to distinguish or trace an individual's identity." Egelman Rep. ¶ 36; *see also id.* ¶ 207. To be clear, Professor Jerath does not purport to opine on whether third parties could theoretically use a data transmission or "hashed data" to "to identify an individual"—indeed, Plaintiffs have offered no evidence that any third party *actually* does so, which makes Plaintiffs' accusation that he is "not qualified" to make this observation beside the point. Mot. at 9.

Instead, "[b]ased on [his] industry experience and expertise," Professor Jerath simply responds to Dr. Egelman by pointing out that "the at-issue website technologies are commonly used to perform website analytics and facilitate digital marketing, which can be and typically are performed using pseudonymous identifiers and machine identities, without the need to identify individual humans." Jerath Rep. ¶ 19. Although Plaintiffs dismiss this distinction as "a distinction without difference" (Mot. at 10), Ninth Circuit law makes clear that it is critical: Article III standing cannot rest on "potential harms that *might* be associated with [website] technology." *Popa*, 153 F.4th at 791 n.5. Plaintiffs' reliance on *Brown v. Google LLC*, does not change this. 685 F. Supp. 3d 909, 925 (N.D. Cal. 2023) (explaining that "the standing analysis is contextual" and plaintiffs had standing where Google allegedly stored incognito and regular browsing logs jointly). Professor Jerath's opinions therefore foreclose Plaintiffs' ability to offer common proof that Meta, Google, Adobe, or any other third party actually uses the at-issue technologies to identify individuals, a showing required to establish Article III standing on a classwide basis. *See* ECF No. 220-1 at 16.

The distinction is also critical because whether the data was anonymized matters on the merits and as to Plaintiffs' damages theories. For example, as to Plaintiffs' CCPA claim, if qualifying "personal information" was subject to an "unauthorized . . . disclosure" but it was redacted or encrypted, there is no violation. Cal. Civ. Code §§ 1798.150(a)(1), 1798.81.5(d)(1)(A). And if "information necessary to identify them" has not been transmitted to a third party, Mr. Krause concedes that he has not calculated damages for those individuals. Krause Tr. 137:23-138:3; *see also id.* 140:18-21 ("If there was information shared that didn't allow for identification in your hypothetical, I don't know what the value of that would be. I have not studied that.").

Plaintiffs' attack on Professor Jerath's qualifications fare no better. Professor Jerath draws on his extensive familiarity with these technologies to opine that the at-issue technologies can and do serve their intended functions by using pseudonymous data and without identifying specific individuals. He does not need technical expertise to address how these technologies operate at a high level, especially when he is drawing on his digital marketing and direct experience with these technologies to do so. Jerath Rep. ¶¶ 2, 5 (Professor Jerath's academic expertise and courses focus on "online advertising" at the "tactical and strategic levels," and include "customer data analytics, targeting, privacy," and Professor Jerath "serve[s] as an advisor to a number of startups in the digital marketing and analytics space.").

Plaintiffs cite no caselaw or authority suggesting that someone with Professor Jerath's digital marketing experience cannot opine on such issues. Plaintiffs instead rely on wholly inapposite cases concerning experts who were clearly testifying outside their area of expertise. This case is not like *United States v. Chang*, 207 F.3d 1169, 1173 (9th Cir. 2000), where a professor in clinical marketing was not qualified to opine on whether a certificate was counterfeit because he had zero "experience determining whether a particular security is counterfeit, the fact at issue in this case," or like *POM Wonderful LLC v. Coca Cola Company*, 2016 WL 5929259, at *8 (C.D. Cal. Feb. 24, 2016), where a pharmacologist who admittedly had no "expertise in damages or any related field" was not qualified to opine on what plaintiffs' damages expert "should or should not have taken into consideration" in his damages analysis. The decision in *Fair Fight Action, Inc. v. Raffenspenger*, 2020 WL 13561757 (N.D. Ga. Nov. 16, 2020) is also of no help to Plaintiffs because that case addressed a "political commentator" seeking to opine on voter wait times, even though he had never "analy[zed] polling place operations," never "authored or generated

hypotheses for any academic research," never "authored a peer-reviewed study or article," and had no experience whatsoever with subject matter of the expert he was meant to rebut. *Id.* at *3, 7-8.[2] Rather, this is a situation where an eminently qualified expert with extensive experience and expertise as to the digital marketing technologies at issue in the case described how those technologies operate.

Plaintiffs' contentions that "[redacted]" (Mot. at 10) does not contradict Professor Jerath's conclusions. Professor Jerath does not conclude that Meta can never "successfully identify individuals." Mot. at 10 (citing Jerath Rep. ¶ 41 (no such conclusion)). Rather, he explains that "ad targeting and analytics can rely on user profiles (e.g., demographics, interests) created from pseudonymous data, rather than specific human identities." Jerath Rep. ¶ 43. [redacted], only confirms that Professor Jerath is correct that the practices at issue here do not always allow third parties to identify an individual based on anonymized identifiers—and did not here as to all putative class members. *See* ECF No. 220-1 at 8. Indeed, Capital One's ability to [redacted] with internal Capital One data repositories that are not available to third parties—including Adobe—is also consistent with Professor Jerath's opinion. *See* ECF No. 220-1 at 16. Finally, Plaintiffs' citation to *In re Piasecki*, 745 F.2d 1468, 1472 (Fed. Cir. 1984) (Mot. at 11), is entirely inapposite, as it is not a Rule 702 case and clearly discusses the meaning of rebuttal evidence under patent law, not as to expert witnesses.

**CONCLUSION**

This Court should deny Plaintiffs' motion.

---

[2] Plaintiffs' additional authority provides no support for their argument that Professor Jerath is unqualified. *See United States v. Ray*, 583 F. Supp. 3d 518, 544 (S.D.N.Y. 2022) (prohibiting therapist with expertise in "psychotic disorders" and no "background or experience in victimization, coercive control, or interpersonal violence" from testifying as to "coercive control"); *Rothe Dev., Inc. v. Dep't. of Def.*, 107 F. Supp. 3d 183, 194, 202-03 (D.D.C. 2015) (rebuttal expert who was electrical engineer by training and with no experience in "*any* statistical or econometric methodology" not qualified to rebut expert testimony that used econometric modeling to demonstrate that "socially disadvantaged and minority-owned small businesses are significantly less likely, statistically, to win government contracts" (emphasis added)).

Dated: April 6, 2026

By: /s/ Kathryn E. Cahoy

Kathryn E. Cahoy (Bar No. 298777)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
(650) 632-4735
kcahoy@cov.com

Andrew Soukup (*pro hac vice*)
Nicholas Evoy (*pro hac vice*)
Marianne Spencer (*pro hac vice*)
Jeffrey Huberman (*pro hac vice*)
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-5066
asoukup@cov.com
nevoy@cov.com
mspencer@cov.com
jhuberman@cov.com

Matthew Q. Verdin (Bar No. 306713)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-7065
mverdin@cov.com

*Attorneys for Defendant Capital One Financial Corporation*